Vickie SINGER, Individually, and Heidi Singer, Suzanne Singer, Timothy Singer, Charlotte Singer, Joseph Singer, Benjamin Singer, and Israel Singer, by and through their natural mother and next friend, Vickie Singer; Vickie Singer as personal representative of the Estate of John Singer, Deceased, and on behalf of the heirs of John Singer, Deceased, Vickie Singer, Heidi Singer, Suzanne Singer, Timothy Singer, Charlotte Singer, Joseph Singer, Benjamin Singer, and Israel Singer, Plaintiff,

v.

Robert WADMAN, individually and as Director of the Division of Narcotics and Liquor Law Enforcement, South Summit School District, Summit County, Utah, Val D. Edrington, Individually and as Superintendent of the South Summit School District, Utah, Scott M. Matheson, Individually and as the Governor of the State of Utah, Ron Robinson, Individually and as Sheriff of Summit County, Utah, Larry Lunnen, Individually and as Commissioner of Public Safety for the State of Utah, Robert Adkins, Individually and as Summit County Attorney, Summit County, Utah, Terry Christiansen, Individually and as Deputy Summit County Attorney, Summit County, Utah, Larry Henley, Individually and as Deputy Sheriff of Summit County, Utah, Floyd Farley, Individually and as Sargeant of the Utah State Highway Patrol, Robert A. Bates, Individually and as Deputy Sheriff of Summit County, Summit County, Utah, Grant Larson, Individually and as Assistant Director of the Division of Narcotics and Liquor Law Enforcement, State of Utah, Lewis Jolly, Individually and as an officer of the Division of Narcotics and Liquor Law Enforcement, State of Utah, Tom Carlson, Individually and as an officer of the Division of Narcotics and Liquor Law Enforcement, State of Utah, David Fullmer, Individually and as an officer of the Division of Narcotics and Liquor Law Enforcement, State of Utah, Ron Gunderson, Individually and as an officer of the Division of Narcotics and Liquor Law Enforcement, State of Utah, Joe Scouten, Individually and as an officer of the Division of Narcotics and Liquor Law Enforcement, State of Utah, Robert Hayward, Individually and as an officer of Utah State Highway Patrol, and Bill Riggs, Individually and as an officer of the Division of Narcotics and Liquor Law Enforcement, State of Utah, Defendants.

Vickie SINGER, individually, and Heidi Singer Swapp, Suzanne Singer Bates, Timothy Singer, Charlotte Singer, Joseph Singer, and Israel Singer by and through their natural mother and next friend, Vickie Singer, Vickie Singer, as personal representative of the Estate of John Singer, deceased, Vickie Singer, Heidi Singer Swapp, Suzanne Singer Bates, Timothy Singer, Charlotte Singer, Joseph Singer, Benjamin Singer and Israel Singer, Plaintiffs,

v.

Walter D. TALBOT, individually and as State Superintendent of Public Instruction of the State of Utah, Defendant.

Civ. Nos. C-80-0212, C-82-0037W.

United States District Court,
D. Utah, C.D.

Sept. 3, 1982.

Kathryn Collard, Salt Lake City, Utah, G.L. Spence, Robert P. Schuster, Jackson, Wyo., for plaintiffs.

Joseph P. McCarthy, Robert R. Wallace, Asst. Attys. Gen., David W. Slagle, Alan L. Larson, Salt Lake City, Utah, for defendants Robert Wadman, Bill Riggs, Larry Lunnen and Robert J. Reid.

Don J. Hanson, A. Alma Nelson, Salt Lake City, Utah, Walter R. Ellett, Murray, Utah, for defendants South Summit School Dist. and Val D. Edrington.

Joseph P. McCarthy, Robert R. Wallace, Asst. Attys. Gen., Salt Lake City, Utah, for defendants Scott M. Matheson, Robert B. Hansen and J. Wallace Graham, M.D.

P. Keith Nelson, Gary B. Ferguson, Glenn C. Hanni, Robert A. Burton, W. Eugene Hansen, Ralph L. Dewsnup, Salt Lake City, Utah, for defendant Ron Robinson.

P. Keith Nelson, Gary B. Ferguson, Glenn C. Hanni, Robert A. Burton, Salt Lake City, Utah, for defendants Robert Adkins and Terry Christiansen.

P. Keith Nelson, Gary B. Ferguson, Salt Lake City, Utah, for defendant Guarantee Ins. Co.

David W. Slagle, Allan L. Larson, Salt Lake City, Utah, for defendant Compass Ins. Co.

Tim Dalton Dunn, Salt Lake City, Utah, for defendants Farley, Larson, Jolley, Carlson, Fullmer, Gunderson, Scouten and Hayward.

Stewart M. Hanson, Jr., J. Michael Hansen, Salt Lake City, Utah, for defendants Robert A. Bates and Larry Henley.

David L. Wilkinson, Utah State Atty. Gen., John S. McAllister, Asst. Atty. Gen., Salt Lake City, Utah, for defendant Walter D. Talbot.

## MEMORANDUM DECISION AND ORDER

WINDER, District Judge.

This is an action under 42 U.S.C. § 1983 and the common law for damages arising from the death of John Singer, who was shot and killed by law enforcement officers attempting to arrest him. Pending before the court are some twenty-odd motions, including summary judgment motions covering all defendants. The motions have been exhaustively briefed by the parties through approximately 1,000 pages of memoranda. In addition, the court is aided in deciding these motions by thousands of pages of deposition testimony and nearly two full days of oral argument. In all, 72 persons have been deposed by the parties. After careful analysis of all of the foregoing, the court issues this memorandum decision and order.

## I. BACKGROUND FACTS

While the court has some misgivings about attempting to abbreviate the myriad calamitous facts giving rise to this action to something less than a Tolstoyan epic, such an exercise is necessary to put the resolution of these motions in proper perspective. John Singer and his wife lived with their seven children on a two and one-half acre parcel of land near the small farm community of Marion, Summit County, Utah. The most important thing in the family's life was their belief in and their reliance on God. The family followed the will of God, as set out in scripture and determined by revelation and answers to prayers, in all their actions. The Singers all affiliated with the Church of Jesus Christ of Latter-day Saints (the Mormon Church), the predominant church in their community until May 31, 1972, when John and Vickie were excommunicated by that organization. Their beliefs and actions were nevertheless governed by the Mormon scripture, including the Holy Bible, the Book of Mormon, the Doctrine and Covenants, and the Pearl of Great Price. They further placed great emphasis on the Mormon belief in personal revelation direct from God and prayed for and received guidance in all substantial undertakings. The Singer family's reliance on God was so complete that for a period of years they would not utilize medical or dental aids but relied solely on the healing power of God, despite various afflictions.

The saga begins on March 29, 1973, when Vickie and John Singer withdrew their children from the South Summit Ele-

mentary School at Kamas, Utah, objecting to the public school's teachings and the environment to which their children were being exposed. The children were in some respects teased and made fun of. The Singers viewed the school environment as permitting of and containing behavior to which they were opposed: vulgarity, sex, and drug use. The Singers objected to the long hours and wasted time involved in standard classroom education. Additionally, they could not accept some of the teachings of secularistic education.

The Singers contemplated removing their children from school for some time and prayed concerning the matter. The incident that triggered the March 29 withdrawal was a reader containing the pictures of George Washington and Martin Luther King "side by side as equals and great men." Vickie Singer Journal at 240. John Singer viewed King as a traitor to the country and didn't believe textbooks should promote integration and mixture of races. Vickie Singer Deposition at 169–170.

Soon after the Singers removed their children from school, they were visited by defendant Edrington, the Superintendent of South Summit School District, and Mr. Boyd Lake, the Pupil Personnel Director. After an additional meeting with the Singers and the School Board, Edrington apparently wrote a letter to State School Superintendent Walter D. Talbot posing questions to Talbot concerning the state law on home education. Dr. Talbot responded in a letter dated May 9, 1973, in which he gave Edrington a general interpretation of the State Compulsory Attendance Law:

3. What special qualifications, if any, must the parent have to meet the requirements of the law in teaching the children at home?

No special qualifications are made for the parent who teaches at home. The law does require persons who teach in the public schools to be properly certified, but no such requirement is imposed upon parents who teach at home. However, the board of education should be satisfied that such instruction meets a minimum quality.

4. What monitoring requirements relative to the instruction will be expected of the local school district?

. . . . .

The local board of education must satisfy itself that the evidence of the existence for non-attendance is sufficient [sic] in accordance with the above criteria. If reason exists, the board may issue a certificate of exemption; if not the board must report the parents to the juvenile court and the officers of the court must proceed to investigate and take appropriate action. The parent who willfully fails to comply with the compulsory attendance law is guilty of a misdemeanor.

Deposition of Walter D. Talbot at Exhibit 12. Under the direction of the School Board, Edrington wrote a letter to the Singers dated May 25, 1973, notifying them, in accordance with Talbot's instructions, that they might teach their children at home "if they are taught in the branches prescribed by law for the same length of time as children are required by law to be taught in the district schools." *Id. See* Vickie Singer Deposition at Exhibit 3.

Edrington's letter to the Singers stated that if the local Board were satisfied that the latter requirement was being met, it would "issue a certificate of exemption; if not, the Board must report the parents to the Juvenile Court." The letter further conditioned the grant of a certificate on periodic evaluation of the program by the Superintendent and the Pupil Personnel Director. By letter dated June 16, 1973, John Singer responded and notified Edrington and the Board of his position:

My God has let me know by his scriptures & by his Holy Spirit that I am not required according to his Laws, to bow under laws which trample upon my liberties of exercising rights & privileges, in which liberties my God has made me a free man. Also, knowing that my God is more powerful than you & your illegal laws & that only slaves will bow under

those conditions; therefore, all I can say is go to Hell you & your kind for such unrighteous demands.

*Id.* at Exhibit 5.

Dr. Talbot wrote an additional letter to Edrington on July 11, 1973, in which he described a discussion he had with the Attorney General's office concerning the possibility of filing an action against the "parents who held their children out of school last spring." Talbot Deposition at Exhibit 13. Dr. Talbot stated that the opinion of the Attorney General's office was that at that time nothing was actionable because the children were not presently out of a school being operated to which they should attend, and that if the parents refuse to send their children to school when it opened in the fall, action should be then taken.

Dr. Talbot further wrote to Mr. Edrington on October 4, 1973, apparently in response to a call from Edrington. *Id.* at Exhibit 14. Talbot's October 4 letter states that after consultation with the Attorney General's office, he was "in accord that action should be initiated by your board of education in accordance with the law." The letter goes on to describe the applicable provisions of the Utah Compulsory Attendance Law and states: "The District would not be discharging its responsibility if it did not do as the law requires and report this matter formally to the juvenile court in your area."

On October 18, 1973, the case was referred to the District Juvenile Court for Summit County and a complaint issued against the Singers for neglecting their three oldest children by withdrawing them from school and for failing to comply with the Utah Compulsory Attendance Law, Utah Code Ann. §§ 53–24–1 & –3 (1981). The Singers were served with a summons to appear in the juvenile court on December 10, 1973, but neither appeared. On December 11, Leon Wilde, from the Summit County sheriff's department went to the Singer home with a warrant for John's arrest. Vickie Singer Deposition at 196; Vickie Singer Journal at 245–46. John told Sheriff Wilde that he would not go in with

him. The sheriff told John that if he didn't go in with him that "the judge would probably send about ten guys after him and break the door down to get him." Vickie Singer Journal at 245–46. John responded: "'If that's the case then there will be bloodshed.'" *Id.*

On January 10, 1974, John Singer was arrested outside a home in Kamas where he was making a television repair call. Vickie Singer Deposition at 199; Sheriff Ron Robinson Deposition at 7–8. John spent a night in jail and was released the next day on his own recognizance. The juvenile court judge at that time, Judge Hermansen, appointed an attorney to represent the Singers, and on the advice of that attorney, the Singers prepared an outline of subjects that they were going to teach their children at home. The Singers' attorney delivered to Mr. Edrington a copy of the Singers' outline for educating their children at home, and on February 14, 1974, the South Summit School District Board of Education received a request from the Singers' attorney that the Singers be excused from sending their children to public school. Affidavit of Val D. Edrington at 3–4. By letter dated March 22, 1974, the local Board notified the Singers that their request for a certificate of exemption from the Compulsory Attendance Laws would be granted if an understanding could be reached in certain specified areas. Vickie Singer Deposition at Exhibit 7. The juvenile court action was continued from time to time and eventually dismissed without further developments. *See* Deposition of Judge L. Kent Bachman, Exhibit 2, at 61.

One of the areas of concern to the Board of Education was that they be permitted to monitor and test the Singer children. *See* Affidavit of Val D. Edrington at 4; Vickie Singer Deposition at 208–09. Accordingly, the Singers allowed their children to be given the California Achievement Test and the Short Form Test of Academic Aptitude by Tony Powell, the school psychologist, in 1975. These tests were the same as those given to all the children in the South Sum-

mit School District during the 1975 school year. Tony Powell Deposition at 164–65. These tests are designed for use in evaluating how a school grade has affected a large group of children and not necessarily for making educational decisions about individuals. James Carroll Deposition at 36.

The test results were analyzed by Val Edrington and Tony Powell on September 18, 1975. The Singer children's scores were found to be lower than the group average of the children who would have been in the equivalent grade in public schools as the child tested. Whatever the validity and applicability of the tests given the Singer children, which are of course disputed by plaintiffs' experts, the only decision made at that time that was based on these tests was to monitor and test the children for an additional school year. Plaintiffs' expert apparently does not dispute the state's right to test and monitor children taught at home. *See id.* at 11.

The Singers, however, refused to allow their children to be tested during the 1975–1976 school year. Vickie Singer recorded in her journal a telephone conversation with Tony Powell on April 1, 1976, where he requested that he be allowed to test the children. Vickie Singer Depositon at 212–14 (quoting Journal at 303–304). Mrs. Singer denied the request, citing both indications from the Lord and the Singers' personal responsibility for educating their children.

Following the refusal to permit testing, on May 13, 1976, the South Summit School District Board decided to contact Superintendent Talbot for further legal advice. *See* Deposition of Val D. Edrington at Exhibit 6d. On June 15, 1976, Edrington met with Dr. Talbot in Talbot's office where

Talbot advised Edrington to "[t]urn the complaint over to the county attorney and let him handle it." *See* Deposition of Walter D. Talbot at 73 & Exhibit 2.[1] The school board then met, on July 15, 1976, and resolved by motion to accept Superintendent Talbot's recommendation and turn the Singer matter over to the courts. *See* Deposition of Val D. Edrington at Exhibit 4 (Board meeting minutes for July 15, 1976).

At the August Board meeting, the Board decided to petition the court to appoint a public defender so that a meeting could be held with John Singer and his legal counsel to discuss whether to continue the exemption. *See id.* (minutes for August 12, 1976). Robert W. Adkins, the Summit County Attorney, filed a motion to appoint substitute counsel on August 31, 1976.[2] *See* Deposition of Judge L. Kent Bachman at Exhibit 2, p. 60. The motion was heard before Judge Bradford of the juvenile court on September 30, 1976. Judge Bradford, on hearing the motion, determined that there was no action pending before the court and that he therefore had no jurisdiction to take any action in the case. *See* Deposition of Charles E. Bradford at 70–71; Deposition of Robert Adkins at 135.

During the hearing on the motion, defendant Adkins explained to Judge Bradford the background concerning the Singer-School Board situation. The judge's response was to the effect that "each parent should have substantial latitude in the education of his child." Deposition of Robert Adkins at 137. Adkins took the judge's statement to mean that he was adverse to taking any action regarding the matter. *Id.* at 137–38.

---

**1.** Apparently Edrington and Talbot did not share the same view of their individual responsibilities. Edrington felt as the district superintendent that when Talbot, as State Superintendent, instructed him to turn the matter over to the county attorney he had no choice in the matter from that point on. *See* Deposition of Val D. Edrington, vol. 1 at 15. Talbot on the other hand viewed the local superintendent's role as answering to the local board of education. He did not consider it within his jurisdiction to direct local superintendents in carrying

out their functions. Deposition of Walter D. Talbot at 127–29.

**2.** Defendant Adkins learned that Mr. Singer had had an attorney appointed for him several years earlier, and in the meantime Summit County had hired a public defender. Therefore the motion to substitute counsel was to permit Mr. Singer's defense by the county public defender. *See* Deposition of Robert Adkins at 134.

Judge Bradford recalled that after the hearing, as he, his clerk, the court bailiff, and a probation officer, who he thinks was Theldon Myrup, were walking out of the building, he "made an offhand comment" that he "had some questions about the effect of the compulsory attendance statute." Deposition of Charles E. Bradford at 110–11. He commented that he thought that "if parents were capable of teaching their children in the home, that the law ought to be such as to allow for that." *Id.* at 111. He further recalls that he intended the remark as referring more to "what the law is and what [he] thought it ought to be," and didn't intend it to be construed as a comment that he wouldn't enforce the law if it was other than he preferred. *Id.* The court can find no evidence in the record that these comments were ever communicated to the school board or Edrington.

On October 4, 1976, Adkins wrote a letter to Edrington in which he described the hearing before Judge Bradford, concluding as follows:

> I don't believe that we would receive too much help out of the juvenile court, if another crmminal [sic] action were filed against the Singers. Judge Bradford apparently takes the position that a parent should have substantial discretion in the type of education, or lack of it, which his child receives. Accordingly, I think it would be very difficult to bring any pressure to bear upon the Singers from the juvenile court for failure to enroll their children in a public school or the failure to educate those children at home.

Deposition of Robert Adkins at Exhibit 6. After receiving the letter, Edrington reviewed with the school board the Singer situation, and that body resolved to reapprise Superintendent Talbot. A short time later Edrington met Talbot at a luncheon of the school superintendents of the state.

As Edrington recalls the occasion, they "were sitting around with other superintendents eating lunch and he asked me something to the effect of, 'Where are you on the Singer case?' Or 'How are you coming on the Singer case?'" Deposition of Val D. Edrington, vol. 1 at 85.[3] Edrington, in response to Talbot's question, informed him that the county attorney had indicated that Judge Bradford would be hesitant in pursuing a complaint if it was filed. Talbot responded that that didn't seem to be appropriate action on the part of the judge. *Id.* Edrington also recalls Talbot as indicating to him that if he would write Talbot a letter he would appreciate that and be interested in that communication. *Id.*

On November 29, 1976, Edrington wrote a letter to Dr. Talbot to bring him "up to date with the latest chapter in the intriguing saga of South Summit School District and Mr. and Mrs. John Singer who refuse to send their children to the district schools." *See* Deposition of Walter D. Talbot at Exhibit 4. In this letter Edrington reviewed briefly the Singer situation and described Judge Bradford's actions as he saw them. Edrington stated that the school board was putting pressure on him "to see where it will finally come to rest." In seeking Talbot's "formal, legal interpretation and direction" in solving the matter, Edrington stated in the letter: "I certainly don't want to put you in the position of taking on the juvenile court system in their failures to enforce the state statutes. Therefore, I guess the end result could be that the juvenile court is failing to act."[4] *Id.* Along with this November 29, letter, Edrington enclosed the October 4 letter which he received from Adkins.

Talbot responded to Edrington's letter on December 22, 1976, as follows:

> This will acknowledge your November 29 letter concerning the "latest chapter in

**3.** Dr. Talbot in his deposition could not specifically recall a discussion at a superintendents' luncheon as described by Mr. Edrington. *See* Deposition of Walter D. Talbot at 26–28.

**4.** On seeing this language for the first time on January 21, 1982, Judge Bradford stated in his deposition that he thought it was a "gross misperception" of his attitude towards the matter. Deposition of Charles E. Bradford at 92.

the intriguing saga" of John Singer. I will follow up on this matter but keep it low key.[5] When I have something I believe to be important or helpful, I'll get back to you.

Deposition of Walter D. Talbot at Exhibit 4.

Towards the end of 1976 and early in 1977, several other incidents occurred on which plaintiffs rely heavily. A summary account of these events is found in a sheet from the agenda to the Summit County School Board meeting of February 1977.[6] Deposition of Val D. Edrington, vol. 2 at Exhibit 6c. As background to a proposed discussion of the Singer situation, the February agenda states:

Early this fall we received indication [sic] that the Juvenile Court Judge for our school district would not look favorable [sic] on a complaint compelling parents in our school district to send their children to school. The Board directed the superintendent to take the case to Superintendent Talbot. Until recently no action was forth coming [sic]. However, since the last Board meeting Superintendent Talbot has directed me to go ahead with the complaint. He has the assurance of Judge Bradford that he will carry out the compulsory attendance law even though it is contrary to his personal beliefs. It seems that Superintendent Talbot contacted the Attorney General's office about "What do we have to do to get Juvenile Court judges to carry out the law?" The Attorney General's office apparently called in Judge Bradford and put the pressure on him. He then called Superintendent Talbot and informed him of his intent to carry out the law.

The events which Edrington described in the agenda began apparently on December 6, 1976, when Mr. Theldon Myrup, a probation officer[7] with the juvenile court, dropped in to see Edrington. They discussed the background of the Singer situation and Myrup indicated he was going to discuss it with Judge Bradford and "get back" to Edrington. *Id.*, vol. 2 at 129–31. Edrington, however, does not remember Myrup ever "getting back" to him. *Id.* at 132.

Judge Bradford recalls speaking with Theldon Myrup during this same time period. Judge Bradford described a telephone conversation as follows:

Mr. Myrup just simply called and said, "I heard on the grapevine that Mr. Talbot has written a letter to the governor complaining that you will not hear cases relating to the compulsory attendance statute, and I thought you ought to know about that."

And that was the sum and substance of that conversation.... And I don't know that there was even the name of a case mentioned.

Deposition of Charles E. Bradford at 98.

Judge Bradford recalled in his deposition that following this discussion he placed a telephone call to Dr. Talbot, in which he stated: " '[I]ts been reported to me that you wrote a letter to the governor stating that I would not hear cases relating to the compulsory attendance statute.' " *Id.* at 99. He recalled that Talbot responded: " 'No, I haven't written a letter to the governor, but I have received a letter from the school district concerning this matter.' " Judge

---

**5.** While the reference to keeping the matter low key is somewhat ambiguous, it is in response to Edrington's request in the November 29 letter that Talbot keep the matter low key. Neither Edrington nor Talbot construed the language as a request from Talbot that Edrington keep the matter low key when giving their depositions. *See* Deposition of Val D. Edrington, vol. 1 at 97–98; Deposition of Walter D. Talbot at 78.

**6.** While the document has a handwritten date of February 11, 1977, that date is probably wrong and probably should be February 10. *See* Deposition of Val D. Edrington, vol. 2 at 92–93. The agenda was prepared by Edrington sometime during the week preceding that meeting.

**7.** Myrup's functions for a time as a probationary officer were both as to supervision, and casework or intake. Deposition of Charles E. Bradford at 95. In Judge Bradford's view, it was "quite customary for intake officers to meet with the various social agencies that from time to time made referrals to the court." *Id.* at 95–96.

Bradford then stated to Dr. Talbot some of his concerns about the compulsory attendance statute and some of the reasons why he thought there might be merit in amending the statutes to obviate some of the problems he had observed in the courts resulting from people "being forced to go to school when they didn't want to be in school." *Id.* at 99–100. He recalled Dr. Talbot expressing some degree of agreement with the view that there might be some merit in looking into amendments to the statutes relating to secondary schools.

Dr. Talbot recalled having a telephone conversation with Judge Bradford but was unsure as to the exact time of the conversation. He recalled that Judge Bradford called him prior to the time that Bradford would be up for reappointment as a juvenile judge. *See* Deposition of Walter D. Talbot at 30–31. He remembered the nature of the conversation to be the compulsory attendance laws, not as they applied to the Singers specifically, but just in general. *Id.* at 31. Talbot recalled in his deposition that the judge at one time had said that he did not believe in the compulsory attendance law, but that in their conversation he stated that "even though that it [sic] may be against his own philosophy, that as a judge he was willing to enforce the law as he knew it." *Id.* at 32. Talbot's own position had been all along that the compulsory education law should be enforced. *Id.* at 35.

As background to this communication between Talbot and Bradford, it must be pointed out that Dr. Talbot, as the State School Superintendent, sat on a panel during this time period which screened and recommended candidates for appointment to the juvenile court bench. This committee would recommend three applicants to the governor who then would make the appointment from one of those three persons. Judge Bradford testified in his deposition that he knew Talbot was a member of the committee and that he realized that his appointment as a judge was to be reviewed in the summer of 1977. Dr. Talbot stated that in screening applicants for juvenile court judge appointments, the committee would interview the applicants and question them as to their philosophy relating to enforcement of the school laws, including the compulsory attendance law. Dr. Talbot felt that the compulsory attendance law was a serious matter and that his opinion on the committee could be influenced by whether or not judges intended to enforce it. *Id.* at 47.

Some time later, in the summer of 1977, Judge Bradford went through that committee's screening process. Bradford later received a telephone call from then Utah Attorney General Robert B. Hansen in July of 1977 in which Hansen alerted him to the fact that his name was not one of the three recommended to the governor by the Juvenile Court Commission. *See* Deposition of Charles E. Bradford at 33. When Bradford heard this, he contacted some people and learned that Clyde Patterson, then President of the Utah State Bar and a member of the Juvenile Court Commission, had not abstained from voting on the applicants despite the fact that his law partner was one of the applicants for the position. *Id.* at 49.

When making these contacts, Bradford went to see Dr. Talbot and told him that it was his understanding that his name had not been recommended. Talbot responded that that was correct and commented that "some of the others had indicated that they didn't want [Bradford] on the list, so he thought since they had more to do with [Bradford] than he did, that he should go along with them and vote in that regard." [8] *Id.* at 49–50. Bradford told Talbot that he felt that Mr. Patterson had a conflict of interest, since his partner was an applicant, and that he should have abstained from voting. Judge Bradford recalled in his deposition that Dr. Talbot responded: " 'I'm sorry that it went the way it did.... I will

---

**8.** Dr. Talbot does not presently recall voting against Judge Bradford. Deposition of Walter D. Talbot at 46–47.

personally request that the commission reconvene, and that we further consider this matter.'" *Id.* at 50. The Commission did reconvene and Judge Bradford's name was added to the list that was submitted to the governor; however, Governor Matheson decided to appoint someone else. *Id.* With this backdrop, the communication between Talbot and Bradford perhaps takes on a different significance.

In addition to referring to Judge Bradford's "assurance" to Dr. Talbot that he would carry out the compulsory attendance law, Edrington's agenda for the February school board meeting made reference to a contact between Talbot and the Attorney General's office. Dr. Talbot, at the time of his deposition, assumed that he met with someone from the Attorney General's office because of the reference that Edrington made in the agenda. He did not, however, have any specific recollection of such a meeting. *See* Deposition of Walter D. Talbot at 50–51, 146. Talbot noted that as State School Superintendent his contacts with the Attorney General's office were frequent. *Id.* at 54. While Dr. Talbot had no specific recollection of the meeting, he could not categorically deny that he requested a member of the Attorney General's office to contact Judge Bradford. *Id.* at 56–57. Talbot also stated in his deposition, however, in referring to enforcement matters: "I don't believe that my style of working with the Attorney General's office would have me ask the attorney general to contact anybody. I think that that would be his business. I would simply initiate the discussion and ask if anything could be done." *Id.* at 123.

An additional incident referred to in Edrington's agenda, was that the attorney general's office "apparently called in Judge Bradford and put the pressure on him." Judge Bradford, in his deposition, could not recall being contacted by anyone from the attorney general's office. He stated:

... I have no recollection whatever of being contacted by anybody from the Utah Attorney General's Office concerning this matter to discuss the case or to put pressure on me to hear it or to rule on it in any certain way or anything else. I do not have at this time any recollection. I think that I would have recalled that had it happened.

Deposition of Charles E. Bradford at 112.

From the school board's February agenda it would appear that all these incidents occurred before some type of contact between Edrington and Talbot in January of 1977. Both Edrington and Talbot are unclear as to a meeting between them at that time. Talbot does not recall meeting with Edrington in January of 1977. *See* Deposition of Walter D. Talbot at 49. Edrington in his deposition, was not sure when this meeting was or when he talked to Superintendent Talbot about these events. *See* Deposition of Val D. Edrington, vol. 2 at 83. From the statement in the agenda, Edrington assumed that he talked to Talbot between the January 1977 board meeting and the February board meeting. *Id.* at 90, 98. Edrington's impression at the time of his deposition was that the information contained in the agenda was received by him from Dr. Talbot, *id.* at 98, 109, & 119–21, although he did not specifically recall the conversation with Dr. Talbot in which the information in the February agenda was received.

At any rate, Edrington submitted this information to the local school board in their February 10, 1977 meeting, and the school board determined to invite the Singers to their March board meeting to give reasons why their exemption from the mandatory attendance laws should not be withdrawn. John Singer attended the school board meeting on March 9, 1977, without his spouse. In response to questions from the school board, Singer stated that his family was holding school 180 days a year, for the same amount of time as required in the public schools, and in the same subjects as the public schools. *See* Deposition of Val D. Edrington, vol. 2 at Exhibit 4 (board meeting minutes for March 9, 1977). John told the school board, however, that he would not allow the district to monitor his children's school work or to test the chil-

dren. He also stated that he would not keep an attendance record. *Id. See also* Deposition of Vickie Singer at 216–17.

Following the school board's discussion with John Singer, the board voted to refer the situation to the juvenile court. Accordingly, on March 11, 1977, the school board notified the Singers by letter that they were withdrawing the certificate of exemption allowing them to teach their children at home. *See* Deposition of Val D. Edrington, vol. 2 at Exhibit 8. The reasons stated in the letter for the board's decision were the Singers' refusal to allow monitoring and testing by district personnel and their refusal to maintain an attendance roll. The letter further notified the Singers that unless they reinstated their children into the district school by March 18, 1977, their case would be reported to the juvenile court.

The Singers having taken no action, complaints were filed on May 3, 1977, charging John and Vickie Singer with the crimes of contributing to the delinquency and neglect of Heidi Singer, Suzanne Singer, Charlotte Singer, Joseph Singer, and Timothy Singer, by failing to send those children to school and failing to comply with the requirements of Utah Code Ann. §§ 53–24–1 & –3. *See* Deposition of Judge L. Kent Bachman, Exhibit 2 at 1–4 & 28. The complaints and a summons for the Singers to appear in court on June 7, 1977, were served on the Singers on May 5th.

At the June 7 preliminary hearing, the Singers were given the option of pleading guilty, pleading innocent or remaining silent in response to the charges of the complaint. The Singers chose to remain silent. They were also given the option of hiring their own lawyer, having a state- appointed lawyer, or waiving the right to a lawyer; they chose the latter. *See* Vickie Singer Deposition at 227–28. Vickie Singer also remembers talking to a "personal manner" with Judge Bradford and discussing the Singers' belief that "these things are unconstitutional." *Id.* at 228. Vickie recalled at her deposition: "He actually agreed with us, actually told us he had tried prior to this trouble to somehow fight against this.

I'm putting this in my own words as I remember, and that he believed that we were standing on our constitutional rights." *Id.* At that time John Singer also requested that the members of the school board and Superintendent Edrington be subpoenaed for the trial. *Id.* at 228.

On August 3, 1977, Judge Bradford appointed Robert Orton as guardian ad litem of the Singer children. *See* Deposition of L. Kent Bachman at Exhibit 2, p. 6. Judge Bradford noted that he appointed attorney Orton as guardian ad litem rather than as attorney for the children "because the quirk in the law made it so that if I appointed him as guardian ad litem he could be paid, and if I appointed him as attorney there might be a question as to whether he could be compensated for his services." *See* Deposition of Charles E. Bradford at 62.

John Singer responded to the order appointing a guardian ad litem for his children by letter to Judge Bradford, dated August 7, 1977, as follows:

Dear Mr. Bradford!

I have received your orders by which you appointed Robert F. Orton as guardian of my children.

My reply!

1. You, Mr. Bradford, by making a court order of this nature are, according to the laws of the land, a lawbreaker & to pursue this matter further against me & my family makes you also the lawbreaker in the eyes of Allmighty [sic] God. I have lost all confidence in you as an officer of Justice & as a man of God. God's remedy of restoring confidence, is, that the transgressor repents.

2. I have never yet turned a person away from my home, if they acted halfway decent. This will apply to Mr. Orton also. But if he comes here as the guardian of my children I, personally, will throw him out.

3. Concerning the explanatory note in your correspondence, specifically Chapter two is nothing but a smoke screen to hide the true issues which, if exposed to

fresher air, will disburse this smoke screen to the four winds.

Conclusion:

You, Mr. Bradford, have placed me in a very peculiar situation, namely, either to transgress the laws of my God & obey men's corrupt laws, or obey my God's laws & defy men's corrupt laws. I, fearing God more than men, have chosen the latter. Now, in order to be justified before my Maker because of pending troubles, I now lift the *first* standard of peace [9] unto you people according to the laws of God, (D & C 98:32–38) hoping you can see my side & we can come to an agreement in truth & righteousness, which is my desire, greatly.

May I expect a reply to this letter not later than Aug. 22, 1977.

Sincerely,

John Singer

Ps.: [sic] Since you will be out of this office you hold by Jan. 1978, why all this?

Deposition of Vickie Singer at Exhibit 11.

On August 10, 1977, additional petitions were filed by the school district, charging that the Singer children were neglected and habitually truant from school under the

provisions of Utah Code Ann. § 55–10–1 *et seq. See* Deposition of L. Kent Bachman, Exhibit 2 at 10–13. The matter was set for hearing on August 23, 1977, before Judge Bachman, who had replaced Judge Bradford on August 15.

The Singers appeared at the August 23 hearing in their own behalf, Robert Orton represented the children, and defendant Terry Christiansen represented the State. Testimony was offered regarding the number of hours the Singer children were being taught in their home, the textbooks which were being used, the school and teaching facilities that existed, and the subjects taught by the parents to the children. Vickie Singer Journal, vol. 2 at 435. John Singer was permitted to produce and examine witnesses, and he made the following opening statement:

This issue here is a religious issue and only a religious issue. I am going to stay on that and I believe one thing that this people that I live amongst, by those individuals I have been harassed through the years and I can give proof to these statements because we have kept an active journal of these things and every action that we have taken in behalf of

---

**9.** The reference to standards of peace is explained by Vickie Singer in her deposition. According to the Singers' beliefs, Section 98 of the Doctrine & Covenants establishes a procedure by which a person can offer their opponents or enemies a standard of peace, thereby letting them know that they are suing for their liberties and rights and asking that they be granted. *See* Deposition of Vickie Singer at 231–32. The Singers viewed this letter as the first standard of peace offered to the court. The significance of the standards of peace is described in Section 98 of the Mormon scripture. As quoted by Vickie Singer:

Behold this is the law I gave unto my servant Nephi and thy fathers, Joseph, and Jacob, and Isaac, and Abraham and all mine ancient prophets and apostles.

And again, this is the law that I gave unto mine ancients that they should not go out unto battle against any nation, kindred, tongue, or people, save I, the Lord, commanded them.

And if any nation, tongue, or people should proclaim war against them, they should first lift a standard of peace unto that people, nation, or tongue;

And if that people did not accept the offering of peace, neither the second nor the third time, they should bring these testimonies before the Lord;

Then I, the Lord, would give unto them a commandment, and justify them in going out to battle against that nation, tongue, or people.

And I, the Lord, would give unto them a commandment, and justify them in going out to battle against that nation, tongue, or people.

And I, the Lord, would fight their battles and their children's battles, and their children's children's, until they had avenged themselves on all their enemies to the third and fourth generation.

Behold this is an example unto all people, saith the Lord, your God, for justification before me.

*Id.* at 233–34. By raising the first standard of peace the Singers intended to let the courts know that they could not "bow under" and allow their "God given liberties" to be infringed. *Id.* at 235.

our children was because of our religious beliefs. It is for that reason that we have made these decisions and our religious beliefs are that we live amongst a people that are "losers" or as the Lord puts it *"they're going to be destroyed one day."* I believe that is not in the too far future and this is my religious belief and we could go into detail on this if you would prefer it. But this is just my opening statement.

Transcript of Hearings (August 23, 1977) at 4.[10] *See also* Vickie Singer Journal at 432–38.

The prosecutor provided testimony from Rex Walker, who was the principal of the elementary school, Val Edrington, and Tony Powell, all of whom were cross-examined by John Singer. For his defense, John Singer placed his brother, Harald, on the stand briefly and testified himself. John testified that God had given him the responsibility to rear his children and that he had the right to do so according to his beliefs. *See* Transcript of Hearings (August 23, 1977) at 54. He testified that he was a responsible parent and that he was not "negligent" of the things for which he was charged. *Id.* at 56. He stated that "as far as my children go, ... I don't have to send them to school because this is my religious belief as far as God and me is concerned." *Id.* at 57. John further testified that teaching the children for five and one-half hours a day was an impossibility and that the two and one-half hours a day that the Singers were teaching their children was equivalent to the education in school, due to the "goof off" period of time in between lessons in the public schools. *Id.* at 60.

The prosecutor interposed several objections to John Singer's testimony as being argument rather than testimony. At one point in response to an argument John stated: "Its none of your business if my kids

learn!" *Id.* at 61; Vickie Singer Journal at 435–36. Under cross-examination, John stated: "So let's get down to the basics, have you got even the right to force my children under any form of education. This is the thing." Transcript of Hearings (August 23, 1977) at 62. John further stated that he believed it to be very important that his children learn to read, write, learn mathematics, and know about science and social studies. He stated that he had taught all of these subjects in the home, "more or less." *Id.* at 65. He stated that he did not want to regiment his children in education because of the experiences that he personally had gone through in the Hitler Youth. *Id. See also* Vickie Singer Journal at 436–37.

At the conclusion of the testimony, Mr. Orton stated that he thought there were "some real conflicts which have got to be resolved" and that he didn't think he was prepared to make any recommendations to the court. Transcript of Hearings (August 23, 1977) at 68. Orton did recommend that the court order the children to be examined by Dr. Victor Cline, a psychologist at the University of Utah. *Id.* at 70. Legal arguments were also made regarding the Singers' claim that because of his religious beliefs he did not have to subject himself or his children to the laws of the State of Utah. Lengthy references were made to the cases of *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), *In re State v. Black*, 3 Utah 2d 315, 283 P.2d 887 (1955), and *In re McMillan*, 30 N.C. App. 235, 226 S.E.2d 693 (1976). *See* Transcript of Hearings (August 23, 1977) at 73–77.

Following these arguments, and in response to a request from the court to state his views on whether an evaluation from Dr. Cline should be made, John Singer stated: "I think I have a simpler solution to the whole thing. Couldn't Your Honor just

**10.** This transcript was apparently prepared by defense counsel from tapes of the hearing. The clerk of the Juvenile Court then proofread the transcript while listening to the tape and certified that the transcript, with such changes as made by the clerk, was accurate according to the content of the tape. The clerk did not certify that the tape was an accurate recording of the hearing, but plaintiffs have made no objection on this ground and have in fact cited the transcripts in memoranda to the court.

rule this law unconstitutional which creates this compulsory action?" *Id.* at 80. John referred the court to a statement in the *Yoder* case by Chief Justice Burger that that case involved the fundamental interests of parents as contrasted with that of the state. Singer stated that all he asked was that he be allowed the primary role in the upbringing of his children.

Judge Bachman, in making his decision, stated that he viewed the court's responsibility with a great deal of concern, but that he did not regard the decision as difficult to make in light of the technical aspects of the law regarding compulsory attendance. He found that there had been a "neglectful situation"—not in terms of raising the children to believe in God or in terms of feeding, clothing, nurturing, or teaching the children the basics of existence, but in failing to abide by the commitment made to the school board to teach the children the basics of education. *Id.* at 82. The court ordered that the children be evaluated, that the Singers cooperate with the evaluations, and that the Singers themselves submit to an examination by Dr. Cline. He further ordered that the Singers be committed to the county jail for a period of sixty days and pay a fine of $299.00, the same to be suspended upon compliance with the court's orders. *Id.* at 85. The court reserved the right to amend its order as it received new information concerning the evaluation by Dr. Cline.

On August 29, 1977, the Singers filed a notice of appeal from the August 23 judgment, but the appeal was dismissed for lack of prosecution by the Utah Supreme Court on December 7, 1977. Deposition of Judge L. Kent Bachman, Exhibit 2 at 39 & 48; Vickie Singer Journal at 440. The day after the Singers filed their appeal, Dr. Victor Cline called the Singers to make an appointment to meet with them. *Id.* The Singers explained their feelings to him and

apparently declined to allow him to meet with them.

On September 6, the Singers went to the Coalville Courthouse and allowed Mr. Orton to interview them and their children. They reiterated to Orton their views and beliefs, and notified him that they would not allow Dr. Cline to evaluate them. *Id.* at 438, 443. The Singers appeared at a hearing before Judge Bachman on September 13, which had been set up because they had failed to comply with the court order. *See* Deposition of L. Kent Bachman at 8. While at the courthouse, the Singers were introduced to an attorney who offered to defend them if necessary, but the Singers declined. Vickie Singer Journal at 444. After discussing the situation with Judge Bachman in his chambers, the Singers consented to permit Dr. Cline to evaluate them and their children. *See id.* at 445–46. Accordingly, Dr. Cline met with and evaluated the children on September 15, 1977, at the University of Utah, and on September 27, at the Singer home in Marion. *See* Deposition of Victor B. Cline at 56. Following the evaluation of the children, John and Vickie Singer were to be evaluated within the next couple of weeks, but they decided not to "follow through with this." *See* Vickie Singer Journal at 447.

At about this time, the Singers began looking into the possibility of incorporating a private school, which they hoped would remove them from the jurisdiction of the school board and free them from the court troubles. *Id.* at 447–48. The Singers had been in touch with Tom and Mary Bergman of Porterville, Utah, who taught their children at home apparently without governmental interference because they had incorporated a private school. The Bergmans apparently gave the Singers a copy of a letter they received from Dr. Talbot in which Talbot stated that private schools are not subject to regulation by the state. *See id.* at 472.[11] John's brother, Harald,

---

11. Dr. Talbot corresponded with and met with the Bergmans in 1974 after he received a newspaper account that their fifteen-year-old daughter had been accepted by the University of Utah and Westminster College on the basis of her

performance on the ACT test. *See* Deposition of Walter D. Talbot at Exhibit 6. Dr. Talbot wrote the Bergmans to congratulate them on their daughter's achievement and noted his interest in a statement in the newspaper article that their

assisted them in preparing the papers, and in October, of 1977, the Singers filed articles of incorporation for a private school called "High Uintahs Academy, Inc." *See id.* at 448, 472. *See also* Deposition of Vickie Singer at 407–11 & Exhibit 18.

The Singers next met with the court on November 1, 1977, where they again waived their right to counsel, and Orton represented the children. *See* Deposition of L. Kent Bachman, Exhibit 2 at 18–19. The Singers notified the court that they had incorporated a private school. *See* Vickie Singer Deposition at 473; Deposition of L. Kent Bachman at 55. Finding that the Singers had failed to submit to testing and evaluation by Dr. Cline, the court again ordered the Singers to pay fines of $299.00 and sentenced each to sixty days in the Summit County jail. *Id.* The court stayed the imposition of sentence for thirty days to give the Singers time to appeal from the order.

Mr. and Mrs. Singer, after praying about the matter, decided to allow Dr. Cline to test them. *See* Vickie Singer Journal at 477–78. Accordingly, the Singers were tested by Dr. Cline at the University of Utah on November 3, 1977, and Dr. Cline submitted a report filed in the juvenile court, on November 8. Dr. Cline's five-page report to the court sets out background information, his evaluation strategy, the key issues investigated, and a summary and recommendation. His conclusions and recommendations are set out in the margin.[12]

The next court appearance was on November 15, which was scheduled to be the trial on the neglect petition. As the Singers had complied with the court's testing order, it was felt that, with Dr. Cline's report, the case could be settled rather than tried on the neglect charges. The November 15 hearing was therefore treated as a pretrial conference. *See* Deposition of Terry Christiansen at 22; Vickie Singer Journal at 478. The Singers met in chambers with Judge Bachman, defendant Christiansen, and Mr. Orton, where Dr. Cline's

private school, from which she apparently graduated, was "fully accredited and registered with the State Board of Education." The Bergmans responded by letter stating to Dr. Talbot that "[t]he Pioneer Trails Academy meets all requirements that the state and county have for private schools." *See id.* at Exhibit 7. Talbot responded in an additional letter to the Bergmans, stating: "Your statement in your letter that the Pioneer Trails Academy meets all requirements that the state and county have for private schools is undoubtedly true, because insofar as I know there are no legal requirements in this state on meeting educational standards in private schools." Id. at Exhibit 5.

12. "While Mr. & Mrs. John Singer are mentally sound, above average parents who have put together a remarkable family with a high degree of love, loyalty, and great qualities of character and resourcefulness they have, probably unwittingly, in their concern to protect their children from unsavory experiences and influences denied them important types of intellectual growth stimuli by taking them out of school four years ago. This has profoundly interferred [sic] with the children's mental growth in the area of academic type of subject matter. Also as their children move into adolescence and adult life there is no way they can overprotect them from every adverse experience. It might be wiser to teach the children how to cope with these while they grow up rather than let them experience only a protected unreal life at present.

"The evidence clearly indicates that the psychological and intellectual isolation which the parents have provided for their children is having a profoundly negative effect on their intellectual growth. There are already some test signs suggesting interference with their social growth and understanding of how to handle diverse social situations with people outside of their immediate family.

"I would suggest that the parents be appraised [sic] of these facts and be given a brief period of time to recommend a program whereby their concerns for their children's moral and character growth might be taken into account, but that also the children be given appropriate remedial educational experiences, and that the concerns of the school board and state statutes be taken into account. I would feel that to take the children away from their parents would have devestating [sic] psychological and emotional consequences for the children. Peaceful negotiations with the parents toward the end of getting these children back into some kind of high quality educational experience would be seen as most important. Despite the mother's valiant attempt to educate her children that does not seem to me to be a workable viable solution." Deposition of L. Kent Bachman, Exhibit 2 at 43–44.

report was reviewed and various solutions to the problem were discussed for approximately two and one-half hours. The judge told the Singers that if they wouldn't "bend" and if he upheld their right to continue to teach their children, that he would run the risk of losing his job. *See* Vickie Singer Journal at 480. Mr. Singer told the court that he had given up his job repairing televisions to teach full time in the private school and told the court that if that "doesn't mean anything to you, then you'll have to make your orders against me, because I won't make any committments [sic] because I've made these things a matter of prayer." *Id.* at 481.

On the record in open court, the judge, on motion by County Attorney Christiansen, vacated the jail sentences and fines previously imposed on the Singers. *See* Transcript of Hearings (November 15, 1977) at 122. Judge Bachman continued the matter until December 16 so that he might consider the information contained in Dr. Cline's report. Judge Bachman also ordered the Singers to exhaust all of their abilities with regard to making a recommendation to the court concerning the education of their children. *Id.* He finally admonished the Singers to obtain legal counsel for any future hearings. *Id.* at 124.

Between the November 15 and December 16 hearings, several other events transpired. By this time, the Singer situation was receiving extensive media exposure. At the South Summit School District Board of Education meeting of November 17, 1977, the Board watched a local television station's news report of the Singers' education problems. *See* Deposition of Val D. Edrington, at Exhibit 4 (Minutes for November 17, 1977). The Board directed Superintendent Edrington, along with the district's attorney, to "handle the John Singer case in regards to the news media." *Id.*

On December 4, 1977, John Singer wrote a letter to Judge Bachman, defendant Christiansen and Robert Orton,[13] on stationery of the High Uintah Academy, Inc. *See* Deposition of L. Kent Bachman at Exhibit 1. In his letter, which he considered to be his second "standard of peace" to the court, Mr. Singer reviewed the events that had occurred to that date and cited to three judicial decisions. Following a discussion of religious bases for his position, Singer concluded: "Reviewing again the actions taken against me and the alternatives or compromises given to me, I know I will not make any committments [sic] to this court, nor any other peoples; as pertaining to my children, they are enrolled in my private school and so it will stand." *Id.,* Exhibit 1 at 9. John further stated in his letter that he would deal with "you people" according to the laws of God and quoted several paragraphs from Section 98 of the Doctrine & Covenants.[14] John concluded his letter as follows:

**13.** The December 4 letter was sent to many other people, including Edrington, all members of the school board, Sheriff Ron Robinson, Dr. Talbot, Dr. Cline, members of the press, and family friends. *See* Vickie Singer Journal at 710–11. Both this letter and the "first standard of peace", see footnote 9, *supra,* were actually authored by John's brother Harald. *See* Deposition of Harald Singer at 162.

**14.** In addition to the paragraphs quoted in footnote 9, *supra,* John in his December 4 letter quoted also the Doctrine & Covenants, section 98, verses 23–28, as follows:

23. Now, I speak unto you concerning your families—if men will smite you, or your families, once, and ye bear it patiently and revile not against them, neither seek revenge, ye shall be rewarded;

24. But if ye bear it not patiently, it shall be accounted unto you as being meted out as a just measure unto you.
25. And again, if your enemies shall smite you the second time, and you revile not against your enemy, and bear it patiently, your reward shall be an hundred-fold.
26. And again, if he shall smite you the third time, and ye bear it patiently, your reward shall be doubled unto you four-fold;
27. And these three testimonies shall stand against your enemy if he repent not, and shall not be blotted out.
28. And now, verily I say unto you, if that enemy shall escape my vengence, that he be not brought into judgment before me, then ye shall see to it that ye warn him in my name, that he come no more upon you, neither upon your family, even your children's children unto the third and fourth generation.

I will lay full claim to these promises since my family and myself have been smitten more than three times since these troubles have begun; and we have not reviled against you people, nor did we seek revenge, but we were always in hopes that you people's hearts would be softened and show fairness to our beliefs and freedoms. But now, since this has not been the case, and the threat that my children would be taken out of our homes still exists, *I now warn you in the name of Jesus Christ, my Lord, to cease your mischief against my family and myself.* This letter is also my *second* Standard of Peace that I raise to this court, and all others . concerned. Hoping you people will repent, Is my deepest desire.

*Id.,* Exhibit 1 at 10.

On December 9, 1977, Superintendent Talbot sent a memorandum to all school district superintendents concerning an opinion prepared by the Attorney General's office on November 23, 1977. *See* Deposition of Walter D. Talbot at Exhibit 1. The five-page opinion addressed the question of "what is a regularly established private school ... for purposes of the compulsory attendance requirements." The opinion stated: "Since the legislature has not deemed it necessary to find precisely what a regularly established private school is, the local boards of education, under the general control and supervision of the State Board (Utah Code Ann. § 53–2–12) have the responsibility of determining whether or not any school is a 'regularly established private school.'" The opinion defined a private school as "a school operated by private interests as a substitute for, and giving the equivalent of, instruction required in public schools." It noted that Utah law specifically allows for home instruction and "therefore distinguishes home instruction from private school instruction." The opinion further advised that while "*public* school teachers must be certified by the state, ... no such requirement appears to be imposed on private school teachers." The school board could,

Deposition of L. Kent Bachman, Exhibit 1 at 9.

the opinion decided, "require the private school to demonstrate that its teachers are capable of educating their students on a qualitative par with the public schools."

On December 11, 1977, the Singers washed their feet to be clean of the "court business," Vickie Singer Journal at 719, and on December 15, the Singers sent another letter to the court in which they respectfully declined to appear at the trial scheduled for the next day. *See* Deposition of L. Kent Bachman, Exhibit 2 at 38. The Singers stated in the letter that they felt their constitutional rights were being "trampled upon." The letter stated: "According to the Supreme Law of the Land and of God, the jurisdiction over my children is strictly vouched safe in my hands. Also, we are incorporated legally, by the State of Utah, as a private home school." *Id.*

John and Vickie Singer then failed to appear for the December 16 hearing, a bench warrant for John's arrest issued, and the trial was continued until January 3, 1978. *See* Deposition of L. Kent Bachman at 9, Exhibit 2 at 27. The following day, John Singer sent an additional letter to Judge Bachman. *See id.* Exhibit 2 at 37. The letter stated, in part:

I have tried to raise the standard of peace twice before. Your decision to have me arrested is an indication that you have ignored my attempts to live at peace in this community. Therefore, in accordance with the law of God (D & C 98:20ff) I am raising the third standard of peace and implore you in the name of the living God, the God of Abraham, of Isaac and of Jacob to dismiss all charges against me and my family.

On December 22, Superintendent Edrington, responding to the school board's directive of November 17, issued a press release "[b]ecause of the publicity surrounding the case ... and because some of the publicity [was] based on false assumptions and some important facts [were] not being presented." *See* Plaintiffs' Memo-

randum in Opposition to Motions for Summary Judgment of defendants South Summit School District and Edrington, at Exhibit G. The press release discussed the school district's position in relation to the Singers' withdrawing their children from school, set out a history of the situation, described the status of the juvenile court case at that time, described the school district's interest in the case, set out the legal duties of the school board, and described the school board's present position relating to the education of the Singer children.

At about this same time, towards the end of December, Sheriff Ron Robinson called and talked to John Singer. He asked John what his position was and whether he would consent to be arrested, to which John responded "no". *See* Vickie Singer Journal at 720–21. John told the Sheriff that he couldn't consent to arrest and that he would "have to resist arrest" should it be attempted. *Id.* Sheriff Robinson said that he did not want to trespass on the Singer property against their wishes, and John responded that he could "barricade" the farm and attempt to arrest him that way rather than attempting a forced arrest on the Singer property. *Id.* at 721–22.

Also prior to the January 3 hearing, John's brother, Harald, wrote a letter to Judge Bachman in his brother's behalf. *See id.* at 757. Harald Singer stated in the letter that the issue between his brother and the Summit County School Board was a "religious" issue and that the private school established by the Singers was a religious school. Accordingly, Harald stated, it was not subject to state supervision or control under the Utah Constitution, Art. X, § 2. Harald quoted the establishment clause of the First Amendment, and the provisions of Article VI of the Constitution, and stated: "If then, the state through its judicial system is trying to enforce such an illegal law, the charges against the officers of this judicial system

would be one of harrassment and that of denial of one's constitutional rights...." He also quoted 18 U.S.C. §§ 241 & 242, which are the criminal civil rights provisions, and stated that "all parties to this travesty of justice have subjected themselves to [this] punishment." Harald implored Judge Bachman to dismiss the case against John at the hearing to be held on January 3rd. He concluded by requesting that Judge Bachman make the January 3 decision a matter of fasting and prayer and promised that the Lord would give him a proper answer.

The Singers did not appear for the January 3, 1978, trial despite pleas from friends and offers of free legal representation. *See id.* at 722. The trial revolved around the petitions alleging neglect of the Singer children, and prosecuting Attorney Terry Christiansen called Rex Walker, Val Edrington, Tony Powell, and Dr. Cline as witnesses. *See* Transcript of Hearings (January 3, 1978). The testimony of Walker, Edrington, and Powell was basically the same as that which they gave at the trial of August 23, 1977. Dr. Cline testified that he had seen the Singers on four occasions.[15] He further testified that the children had been deprived in the sense of intellectual stimulation and training, and that the test differentials between the parents and the children were "shocking."[16] *Id.* at 166. He further testified that even though Vickie Singer was a "marvelous mother and woman as far as the emotional life of the children" was concerned, she was "in no way competent or prepared, really, to teach these children." *Id.* at 167. He testified that the Singer children tested in the bottom eight percent of their peers while the Singer parents tested in the top twenty percent as compared to their peers. *Id.* at 168.

Dr. Cline recommended in his testimony to the court that the Singers and the school district "negotiate" to accommodate the

**15.** In addition to the three times that Dr. Cline tested the family, he met with Mr. Singer in early November to discuss the test results with him. *See id.* at 162.

**16.** Of course, plaintiffs' education and testing experts dispute vehemently the testing methods employed by Dr. Cline and the results which he achieved.

personal and private values of the family, while affording the children a "remedial educational experience." *Id.* at 169. He stated that this could be accomplished by having properly trained remedial teachers come into the home or by permitting the children to attend a public or private school. *Id.* at 169–70. Dr. Cline further testified that he recommended very strongly to John Singer that if this were not to occur, his children would suffer some "very negative, very very major adjustment problems, both vocationally as well as socially, in their later adolescent and adult lives." *Id.* at 170. At the same time, Dr. Cline felt that the interests of the children would not be served by "yanking" them away from their parents and putting them in another environment. *Id.* at 171.

In a legal argument to the court at the hearing, defendant Christiansen cited the applicable Utah statutes to the court and the *McMillan, Yoder,* and *Black* cases which he had previously cited at the trial on August 23, 1977. Mr. Orton, representing the children, outlined to the court the alternative remedies that the court could apply after making a finding of neglect. He stated that he felt some of the remedies were overly harsh. *See id.* at 191. Mr. Orton recommended that the school district present a program for the education of the children in the home by February 1, 1978, and that the court, or someone at the court's direction present that program directly to the Singers. *Id.* at 193. Mr. Christiansen concurred in Mr. Orton's recommendations. *Id.* at 195.

Judge Bachman's written order was signed on January 18, 1978. *See* Deposition of L. Kent Bachman, Exhibit 2 at 24–26. The court ordered the Singer children to submit to daily tutoring under the direction of the South Summit School District. The school district was ordered to provide the daily tutoring, at its own expense, subject to several requirements set out in the court order: "That the teaching be in subjects widely taught in the schools of Utah;" that the "interests, feelings, and beliefs of John and Vickie Singer … be taken into consideration in the type of materials used so that they are not personally offensive;" that the tutoring be performed "pursuant to an educational plan to be proposed by the South Summit School District on or before February 1, 1978;" that the plan allow the parents to assist in "the explanation of the subjects taught;" that the plan be presented to the Singers and they be given five days to respond; that if difficulty arises at the time the plan is presented to the Singers that the matter be brought "forthwith before this court;" that the tutoring of the Singer children be monitored through testing by Dr. Cline and Mr. Powell every two months; that Dr. Cline and Mr. Powell work with the parents and children "to bring the children to a level where they will not fall within the status of being intellectually deprived;" that the tutoring continue until August 1, 1978, "at which time a hearing shall be held to examine the progress of the children and determine whether the children are prepared to return to private or public school."

The court also ordered John and Vickie Singer to "permit and allow Dr. Victor Cline, Tony Powell, and school personnel into their home to teach and test their children and to cooperate fully with said persons." If the Singers were to refuse to comply with the court's order, they were to be cited and held in contempt of court pursuant to Utah Code Ann. § 78–3a–52. The court also continued its previous order that the Singer children be in the custody of the State Division of Family Services, with the children being allowed to remain in their parents' home until further order of the court.

On February 2, 1978, the school district submitted a "Daily Home Tutoring Educational Plan" to the juvenile court. The board had apparently met with school district personnel to discuss the formulation of the plan on January 23, 1978, and mailed a registered letter to the Singers on that date requesting their help. *See* Vickie Singer Journal at 684. On the 24th, a meeting was held involving school principals, Superintendent Edrington, a school counselor, and the school psychologist, who

each submitted their recommendations for the tutoring plan. The following day, the plan was submitted to district personnel and state education specialists for their recommendations and approval. On January 30, 1978, the final approved plans were mailed to the Singers by registered mail.

On February 7, 1978, defendant Terry Christiansen, the prosecutor in the Singer case, wrote a letter to the editor of the Park Record newspaper regarding the Singer matter. *See* Plaintiffs' Responsive Memorandum to Motion for Summary Judgment of Defendant Terry Christiansen at Exhibit B. Christiansen's letter reviewed the history of the Singer-school board dispute and responded to a previous letter to the editor criticizing the " 'unjust intrusion of "big brother" into [the Singers'] commendable family affairs.' "

During this same period of time, defendant Edrington made public comments which created some controversy. As described by Nadalee Noble in an affidavit, Edrington met on February 21, 1978, with the Citizen's Group, a group formed to provide community input to the school district. *See* Plaintiffs' Response to Motion for Summary Judgment of Defendants Edrington and School District at Exhibit B (Affidavit of Nadalee Noble). Most of the February 21 meeting was spent discussing the Singer case with Mr. Edrington. Nadalee Noble in her affidavit reported part of the discussion as follows:

A member of the group stated to Mr. Edrington that he felt the Singer issue should not be pursued or pushed. Mr. Edrington stated that he intended to press the matter to the very ultimate. People at the meeting expressed their belief that the issue should not be pushed or pressed to the point that John Singer would be killed. Mr. Edrington responded that he intended to press the issue,

and if that meant that John Singer was shot, then that's the way it would be. . . . People at the meeting argued with Mr. Edrington's position and told him that it should not be pushed that far. Mr. Edrington continued to maintain his position concerning the death of John Singer, stating that Singer had broken the law and if pushing it meant that John Singer would be killed then that's the way it would be.

The minutes of the South Summit School District Board of Education for March 1, 1978, reflect a meeting of some board members with Judge John Farr Larson, the new judge [17] assigned to the Singer case, on February 23. *See* Deposition of Val D. Edrington, vol. 2 at Exhibit 4. The minutes state:

Mr. Van Van Tassell reported on the meeting with Judge Larsen [sic] Juvenile Court, on February 23, 1978. Judge Larsen [sic] stated that he would take action on the Singer case. He said that the case is in the hands of the court, and that he would take action on it and not allow the court to be backed into a corner by what has taken placed in the past.

The meeting, held in Judge Larson's chambers in Salt Lake City, involved Superintendent Edrington, Mr. Van Tassell, the president of the local school board, and possibly legal counsel for the school district, the county attorney, and Mr. Orton. *See id.* at 135, 141. Other than the minutes of the school board meeting, there is apparently no evidence in the record as to what occurred at this meeting other than the deposition testimony of Mr. Edrington, who could not recall specifically what occurred. *See id.*, vol. 2, at 140–42.

Whatever occurred at this February 23 meeting, Judge Larson issued an order on that date for the Singers and their children to appear in court on March 14, 1978, to

---

17. The Summit County Juvenile Court was transferred from the First District to the Second District pursuant to a general order issued by the Juvenile Court Board of Judges effective January 18, 1978. *See* Deposition of Judge L. Kent Bachman, Exhibit 2 at 36. According to Judge Bachman, the transfer was made due to the closer proximity of the Salt Lake County Detention Center and because of the added convenience to the Division of Family Services. *See id.* at 10–11. Plaintiffs do not argue that this transfer was in any way the result of a conspiracy by or the individual actions of the defendants.

show cause why they should not be held in contempt and why the children should not be placed in custody for failure to comply with the prior court orders. *See* Deposition of Judge John Farr Larson at 215 & Exhibit 1 at 4; Vickie Singer Journal at 679–82 (copy of two motions and orders). On February 28, 1978, Sheriff Robinson served the orders on the Singers at their farm. *See* Vickie Singer Journal at 702; Transcript of Hearings (March 14, 1978) at 88.

Neither the Singers nor their children appeared for the hearing on March 14, although several of their friends were present. Prosecutor Christiansen called Sheriff Robinson, who testified briefly about the service of the orders on the Singers. *See* Transcript of March 14, 1978, hearing at 89–90. Sheriff Robinson testified that when he served the orders on the Singers at their home, John indicated that "he would no way come in on the order and … he wouldn't let any tutor come into his home that the schedule they set up was too rigorous more so than in the public schools [sic]." *Id.* at 89. Robinson further testified that John said he'd "never allow anyone to come on the property to enforce that, [and] that he'd rather fight than give into these orders that were against his religion." *Id.*

The court found John and Vickie Singer in contempt for failing to comply with the January 18 court order. The court imposed a thirty-day jail sentence and a $200.00 fine, but stayed the fine and sentence for seven days to allow the Singers an opportunity to appeal or obtain an additional stay. *Id.* at 98–99. In making the order, Judge Larson stated: "I would say this, believing that my words may be carried to Mr. and Mrs. Singer, the olive branch is still out. This court cannot tolerate just a complete ignorance of the system." *Id.* at 98. *See also* Vickie Singer Journal at 672.

Vickie Singer recorded in her journal her and her husband's views concerning court proceedings:

> The next day (15th) after analyzing our situation & praying things came clear again. John experienced a marvelous feeling & everything was made plain. It came to him that if we would appeal this case to the Supreme Court that it would make *null & void all* that we'd done in the way of setting God's laws in motion, by sending the three Standards of Peace & having Performed [sic] the ordinance of the washing of our feet, etc. This knowledge came to me also at about the same time (it was inspiration). We both saw the clearness of the way—that we should *not* appeal the case, & *of course* we would make *no* compromises nor talk with the new Judge for it became plain that the "olive branch" that the Judge said was still out towards us, was another subtleness of Satan ….

Vickie Singer Journal at 671–72.

On March 20, one day before the stay of sentence was to expire, an unsigned notice of appeal was filed with the court. *See id.* at 674; Deposition of Judge John Farr Larson, Exhibit 1 at 5. The Singers heard of the appeal through phone calls from various news reporters. *See* Vickie Singer Journal at 674–75. Vickie recorded their reaction to the appeal as follows: "We really wondered what was going on and felt that perhaps Satan was trying to pull trickery to 'thwart' the purposes of the Lord, which an appeal would do." *Id.* at 675.

On March 21, Sheriff Robinson went to the Singers' residence and showed them the notice of appeal. *See id.* at 676. Vickie Singer recorded the conversation with the sheriff as follows:

> The sheriff really tried to get us to "Appeal," we told him that for very important reasons that we could not—It was impossible to explain those reasons to him, of course. He said that when news of the appeal first came to the courthouse last Monday, that Terry Christiansen (our prosecuting attorney) yelled from the basement, "I've got good news—The Singers have appealed to the Supreme Court!"

*Id.* at 676–77.

Also on March 21, Judge Larson ordered that a hearing be set up for April 6, to "determine whether, in fact, said notice of

Appeal was filed by the said John and Vickie Singer, to determine if a transcript of record should be provided and counsel appointed to represent the said John and Vickie Singer, both without cost to them." *Id.* at 634. The court also ordered that the March 14 sentences and fines be stayed until the 6th of April.

Between the time of the filing of the appeal and the April 6 hearing, many people talked with the Singers in an attempt to persuade them to sign that appeal. *See id.* at 639–55. Several of the Singers' friends and relatives either called or visited them, and on April 3, one of the Summit County Commissioners called to persuade John. Despite these attempts, the Singers neither appealed nor appeared at the hearing on April 6. At the hearing, Sheriff Robinson testified that the Singers had denied having filed the appeal, and the court found that the appeal was invalid. *See* Deposition of Judge John Farr Larson, Exhibit 1 at 5. The court dissolved the stays and placed the children in the temporary custody and guardianship of the Division of Family Services. The court also directed Sheriff Robinson to take John and Vickie Singer into custody under the thirty-day jail sentence. The court continued the matter to July 7, 1978, for review. *Id.*

Vickie Singer recorded in her journal an interview with a television news reporter on April 6, following the court hearing:

> The same questions were asked, "Will you resist arrest?" John answered, "Yes, I would have to—I will not let them scatter my family." Then they ask [sic] how he will resist and it always boils down to the fact that weapons will be used if they come upon us to arrest us or attempt to remove our children from our home.
>
> John explained to them our stand & reiterated on the promises of God in the scriptures pertaining to the stand we have taken.

Vickie Singer Journal at 618–19.

Shortly after this hearing, Samauel D. Taylor, a member of the Utah House of Representatives, approached Utah Attorney General Robert B. Hansen to see if Hansen could "give ... any help in connection with the Singer case." Deposition of Robert B. Hansen at 7. Representative Taylor expressed concern that there would be bloodshed if the sheriff attempted to carry out the orders to arrest Singer at that time· and requested that Hansen call the sheriff and get him to "hold off." Hansen told Taylor that he didn't have any jurisdiction over the county sheriff, but that he would be happy to call him as a concerned citizen and express Representative Taylor's concerns. *Id.* at 7. Representative Taylor further expressed his concerns in a letter to Mr. Hansen dated April 8, 1978, copies of which were sent to Governor Matheson,[18] Dr. Talbot, Judge Larson, Sheriff Robinson, and the press. *See id.* at Exhibit 1. In the letter, he requested Mr. Hansen to "[p]lease call off the gun-toting sheriffs."

Hansen telephoned Sheriff Robinson and informed him that he was calling at the request of a state legislator and that even though he had no jurisdiction over the Singer case, he would appreciate Sheriff Robinson's cooperation in not attempting to arrest John Singer until he could contact Judge Larson. *See id.* at 16–19. From the telephone conversation, Mr. Hansen received the impression that the judge was not expecting the arrest warrants to be executed immediately and that Sheriff Robinson was given discretion to serve them at a time and in a manner least likely to cause any physical resistance. *Id.* at 18. Mr. Hansen was also under the impression that Sheriff Robinson would be willing to "hold off" on trying to serve the warrant until Hansen could talk with the judge. *Id.* at 23.

Two or three days later, Hansen called Judge Larson and again expressed the concerns of Representative Taylor. Hansen made it clear to the court that he was not

---

18. At the time of his deposition, Governor Matheson could not recall having ever seen Representative Taylor's letter. *See* Deposition of Governor Scott Matheson at 169–70.

attempting to inject himself into the case, but was merely calling as a concerned citizen. Judge Larson expressed appreciation for Hansen's concern and "kind of politely but firmly gave [Hansen] the impression that he felt perfectly adequate to handle [the] situation." *Id.* at 19. In light of the conversation with Judge Larson, Hansen thought it would be inappropriate for him to take any further action and left a message with Sheriff Robinson's office to that effect. *Id.* at 19, 23.

On April 13, 1978, Governor Matheson sent out a response to a letter from a citizen who expressed concern regarding the Singer family. *See* Deposition of Governor Scott Matheson at Exhibit 6.[19] The letter stated:

> I understand the Attorney General has intervened in this matter and is reviewing the possible alternative solutions to the problem, which seems to have been met with some controversy by the public and Utah legislators.
>
> . . . . .
>
> Although Utah law prohibits the Governor from intervening in court matters, I am sure that the Attorney General will do everything within the power of his office to see that the matter is settled fairly and equitably, with both the parents' rights and the well-being of the children of the Singer family in mind.

*Id.*

On April 19, 1978, Vickie Singer recorded in her journal a visit from Sheriff Robinson:

> Sheriff, Ronald Robinson, called John and asked if he could come up here to talk to us. John said "yes." He came & said that Judge John Farr Larson had sent him here to try and get us to appeal our case to the Utah Supreme Court—we again very patiently told the Sheriff the reasons that we couldn't reasons being—

(because we'd made it a matter of prayer and found out we weren't supposed to, etc.).

Vickie Singer Journal at 588. Vickie also notes in her journal that she felt that Sheriff Robinson had dealt honorably with her family, and she hoped that they would not have a confrontation with him because of their respect for him. *Id.* at 588, 589.

During this period of time, the Singer matter continued to receive extensive media exposure. In early May, Dr. Cline was interviewed by a Salt Lake City television station and stated that the Singer children were "in a sense, abused, because they are deprived academically and socially." *Id.* at 575. The following evening, interviews with both Dr. Cline and Mr. Singer were carried on local news broadcasts. In his interview, Dr. Cline stated that the Singer children were "brain damaged" because of their isolation on the Singer farm. *Id.* at 578.

On May 19, 1978, Mr. Orton, acting as guardian ad litem and counsel for the Singer children, moved the juvenile court for an order staying for a period of sixty days the orders entered on March 14 and April 6, under which the children were placed in the custody of the Division of Family Services and the Sheriff of Summit County was ordered to take the Singer parents and children into custody. *See* Vickie Singer Journal at 534. Mr. Orton based the motion on the following grounds: School was about to recess for the summer months; he had been unable to communicate with the children and their parents since the orders were entered and issued; there had been threats of violence since the orders were entered having, a "devastating affect upon the physical, mental and emotional well being" of the children; and the sixty-day stay would give Mr. Orton and others an opportunity to communicate with the children and parents during a time when a threat of

---

**19.** Several letters similar to the letter of April 13, 1978, were sent out from the Governor's office in response to letters from concerned citizens. *See* Deposition of Governor Scott Matheson at 124 & 127. The letters were apparently prepared by a member of Governor Matheson's staff, but were signed by Governor Matheson. *Id.* at 128. The Governor testified that while he reads all letters before signing them, he signs an average of 200 to 300 each day. *Id.* at 129.

incarceration was not imminent. The motion was set for hearing on June 13, 1978. On June 9, while the motion was pending, Sheriff Robinson again visited the Singers unarmed and asked John to submit peaceably to arrest. *See id.* at 560. John again refused to go with the sheriff and stated that he would use force to resist arrest. *Id. See also* Deposition of Judge John Farr Larson, Exhibit 1 at 6; Transcript of Hearings (June 13, 1978).

The day before the June 13 hearing, Mr. Orton called the Singers to try to get a commitment from them with regard to the school situation. *See* Vickie Singer Journal at 562; Deposition of Judge John Farr Larson, Exhibit 1 at 6. John told him that there was nothing further to be said about the matter and that he would not compromise his liberties. Vickie Singer Journal at 563. At the June 13 hearing, Sheriff Robinson testified regarding his visit to the Singer farm and stated that he did not feel it would be possible for him to execute the orders of the court without being armed. *See* Transcript of Hearings (June 13, 1978) at 206. Mr. Orton apprised the court of the reasons for his motion and requested that the court grant him the opportunity of attempting to work something out with the Singers so that the "ends of justice could be met." *Id.* at 207. Defendant Christiansen, representing the state, opposed the motion because, in his view, every attempt had been made to resolve the situation short of actual commitment. *Id.* at 208. Christiansen stated that it would be a dangerous precedent to excuse a person from complying with a court order because of a threat of violence. *Id.* at 208–09.

The court granted a stay for a period of one week, with the understanding that if Mr. Orton felt his efforts during that time were fruitful, the court might further consider the matter. *See id.* at 211. Judge Larson then made the following statement from the bench:

> It should be kept in mind, however, the [sic] action today is not intended to excuse the Singers from complying with the law. Compulsory attendance law is the law of this state. The court has no power to excuse the fines, as a matter of fact the court has taken an oath that this law and other laws will be enforced. It probably would be timely to review our compulsory attendance law. This is a legislative matter not a judicial matter. All children under the law are afforded a minimum amount of education. It's not the court's desire to remove these children from their home unless they are denied the required minimal educational opportunities, Which [sic] I believe can be afforded them without interfering with the parent's [sic] teaching their moral & religious matters.... I would hope that the parents will take this opportunity now to seek an appropriate solution to this important matter.

*Id.* at 211.

That same day, Mr. Orton sent a letter to the Singers in which he urged them to meet with him before June 20, 1978, for the purpose of discussing the best interests of the Singer children. *See* Vickie Singer Journal at 532–33. He requested specifically that the Singers meet him on the 15th to resolve the pending disputes. Vickie recorded her reaction to Mr. Orton's letter in her journal:

> They *must* think we're stupid—to trust such a trick—we know that we would be arrested right on the spot! We wouldn't trust them at all in such a situation, besides, we have literally washed our feet of them and we have nothing more to say to them. As far as we're concerned, that court doesn't exist.

*Id.* at 599. John Singer called Mr. Orton's office and told his secretary that the Singers would not be at the June 15 appointment. He also told her not to make any other appointments for them. *Id.* at 599 & 612. Mr. Orton responded by letter dated June 16 in which he again pleaded with the Singers to reconsider and meet with him prior to June 20.

On June 17, 1978, Representative Taylor and two other legislators visited the Singers at their farm in an attempt to achieve some solution to the problem. *See id.* at

516–17. Perhaps in response to this approach, *see id.* at 517, the court on June 20, pursuant to a stipulation by Mr. Orton and Mr. Christiansen, further stayed the orders until July 3, 1978. *See id.* at 530; Deposition of Judge John Farr Larson, Exhibit 1 at 7. On June 22, 1978, the legislators returned to the Singer farm with the directors of a private school in Salt Lake City. *See* Vickie Singer Journal at 517. At this meeting, the private school officials offered to assist the Singers in any way which would "appease the Courts." *Id.* at 518. A few days later, the Singers received a phone call from a friend who also offered to "oversee" the teaching of the children as a way of solving the court problems. *Id.* at 522–23. Vickie told her friend that she "could not consent to even this" and that they could not compromise or make commitments of any kind. *Id.* at 523. On June 27, the private school directors wrote a letter to Judge Larson in which they reported their interview with the Singers and recommended that the charges against them be dismissed. *See id.* at 765.

On July 3, 1978, the court held a hearing on the motion of Mr. Orton which sought to vacate the orders placing the children in the custody of the Division of Family Services and to grant probation to John and Vickie Singer. Anna Lou Jeffs testified that she had visited the Singers, examined the Singer school facilities, and discussed with the Singers their school program. *See* Deposition of Judge John Farr Larson, Exhibit 1 at 7. She also testified to her willingness to attempt the development of a home school program for the Singer children. *Id.* Mr. Christiansen, representing the state, agreed generally with the proposal of a home educational program in which the Jeffs or someone else qualified could assist the Singers. *See* Transcript of Hearings (July 3, 1978) at 260–61.

At the conclusion of testimony and argument, the court pointed out that it had a duty to sustain the compulsory attendance law unless it was declared unconstitutional and that the constitutional question had not been raised in the case. *See* Deposition of

Judge John Farr Larson, Exhibit 1 at 7; Transcript of Hearings (July 3, 1978) at 263–64. The judge noted that if the Singers or their children wished to raise the question of constitutionality, the court would cooperate and give them the opportunity even though the time for appeal had expired. Absent the appeal, the court stated that it must insist on compliance with the law. *See id.* at 264. The court then vacated the previous order placing the children in the custody and guardianship of the Division of Family Services and stayed the judgment and order of commitment against Vickie Singer. *Id.* at 266. The order to place John Singer in custody was maintained in effect, containing the following language: "The sheriff shall, in his sole discretion, employ such means and take such time as are reasonably calculated to avoid the infliction of bodily harm on any person." Deposition of Judge John Farr Larson, Exhibit 1 at 7; Vickie Singer Journal at 782–84 (copy of order).

Following the hearing, Representative Taylor and the directors of the Salt Lake City private school again visited the Singers at their farm. These people spent considerable time on July 3 and 4 in attempting to convince the Singers to "bend" the little bit required to satisfy the court. *See* Vickie Singer Journal at 769–74. Representative Taylor sent the Singers a letter dated July 4, congratulating them on the "victory" they received in court the previous day. *See id.* at 775. Representative Taylor's letter stated in part:

As we stated to you last night, "The court handed you a 98% ruling in your and your family's favor." What will *you* do about the other 2%? So little is asked of you when we humbly beseech you to voluntarily visit Judge Larson in his *private* chambers. Judge Larson is "willing" to visit you. But, shouldn't you demonstrate to him, to the Court, to the thousands of real friends you all have made that you wish VOLUNTARILY AND WITHOUT COERCION FROM THE COURT personally to furnish to him a general outline of your and Vick-

ie's plan for home training? Vickie can be present. The Jeffs are so willing to act in an advisory capacity. There is nothing forced; nothing dictated. There is only wholesome dedication from them to both of you and to the children.

*Id.*

After talking with the Singers on July 4, the private school directors apparently decided that further action on their part would be futile. They called Judge Larson at home and told him that it would not be possible to work out a school program for the Singer children "because of Mr. Singer's unwillingness." Deposition of Judge John Farr Larson, Exhibit 1 at 7. Representative Taylor, on the other hand, persisted in his effort regarding the Singer. He sent a letter to Judge Larson on July 6, 1978, in which he suggested that Judge Larson visit the Singers at their farm. *See* Vickie Singer Journal at 776 (copy of Representative Taylor's letter). Representative Taylor hoped that a visit by the judge to the Singers would lead to a solution to the problem. Judge Larson responded by letter dated July 13, in which he cited the statutes governing the case, including the mandatory attendance law and the statutes governing jurisdiction of the juvenile courts and neglect of children. *See* Vickie Singer Journal at 777–81. After reviewing the history of the Singer court proceedings, Judge Larson stated:

> ... I have never met Mr. and Mrs. Singer. Though they have been served with summons and given notice of all proceedings, they have elected not to attend the court hearings and each time through the media have expressed hostility towards the Court. Every conceivable attempt has been made to assure these children an education compatible with their parents' beliefs, including the aforementioned school program at home.

All attempts to meet the requirements of the law have been consistently refused by the parents. This Court has stayed the Orders a total of six times to give the Singers an opportunity to pursue their rights in this and/or the Supreme Court. The Court has offered to appoint counsel. Each of these steps have been met with further defiance.

. . . . .

In the first paragraph you expressed the hope this matter could be dismissed. This is not possible at this stage of the proceedings. We have children duly adjudicated as neglected and their parents duly convicted of a criminal offense. In addition to this they are in contempt of court. The only way this can be resolved is through compliance with the law or by appeal....

. . . . .

Your efforts to resolve this matter are commendable. A dispute such as this ought to be resolved within the law in accordance with procedures established by law. Mr. and Mrs. Singer would do well to appeal my decisions to a higher court. Although the time for appeal has expired and my Orders are therefore final I believe an appeal could still be had. If this were done my actions could be ratified or rejected and the constitutionality of the compulsory attendance law could thus be determined.

*Id.*

On July 12, 1978, Judge Larson wrote Governor Matheson a three page letter to "inform and update" him on the Singer matter. *See* Deposition of Governor Scott Matheson at Exhibit 4.[20] The first eight paragraphs of Judge Larson's letter to Governor Matheson are identical to the historical overview contained in Judge Larson's July 13 letter to Representative Tay-

---

**20.** The record is unclear as to what precipitated this letter. Judge Larson testified in his deposition that "[o]n one occasion I wrote him a letter because I heard he was getting a lot of inquiries." Deposition of Judge John Farr Larson at 181. Governor Matheson testified in his deposition that he had talked with Judge Larson concerning the Singer matter and that he may have requested that Judge Larson give him a report on the case. *See* Deposition of Governor Scott Matheson at 111. Governor Matheson further stated that he might have requested information because of public inquiry concerning the case. *Id.* at 111–112.

lor. Judge Larson concluded the letter to Governor Matheson as follows:

In the final analysis we have in this case a finding of neglect of the children and a conviction of the parents of a criminal charge. Their response has been defiance and extreme hostility towards the Courts and other established authority and have repeatedly stated, through the media, that they are above the laws of this State because they are receiving direction from God. They have threatened to use violence if necessary to protect their position. My instructions to Sheriff Robinson, Summit County, have been to avoid violence. The use of violence has never been threatened by the State but has constantly been threatened by Mr. Singer. . . .

The Court has been extremely patient with this man. He has serious personal problems and has had trouble with the law several times during his adult life. He is extremely paranoid, distrusting almost everyone. While I have a good deal of sympathy for his desire at self determination I cannot in good conscience excuse him from complying with the law of this State because of his threats of violence nor his claimed communications from God. He has attracted to him a number of vocal individuals who believe he should be excused from the law for these same reasons.

On July 17, 1978, John Singer, without a marriage license, secretly married himself to a second wife, Shirley Black. *See* Deposition of Shirley Black at 53–56; Vickie Singer Journal at 798. At the time John performed this marriage, Shirley Black was legally married to Dean Black. *See* Deposition of Vickie Singer at 128. Shirley told her children on the 17th of the marriage, but did not tell her husband until some time later. *See* Deposition of Shirley Black at 56–57; Deposition of Vickie Singer at 134. At that time, Shirley continued to live at her home in Kamas, Utah. *See* Deposition of Vickie Singer at 133.

On August 25, 1978, defendant Christiansen appeared before the juvenile court and moved that the court's order dated July 13, be amended to omit the following language: "... Provided, that in carrying out this order said sheriff shall, in his sole discretion, employ such means and take such time as are reasonably calculated to avoid the infliction of bodily harm on any person." Deposition of Judge John Farr Larson, Exhibit 1 at 8. The motion was made at the request of Sheriff Robinson, who was present at the hearing along with Floyd Bradshaw, a probation officer of the juvenile court. *See* Deposition of Terry Christiansen at 104 & 107. Before the hearing in court, Robinson, Christiansen and Bradshaw met with Judge Larson in his chambers, where Christiansen indicated to the court that the sheriff had "some grave reservations about effectuating [the] arrest with the language that was there, that he could not guarantee what John Singer would do, and therefore he [Sheriff Robinson] felt he could not serve the orders." *Id.* at 178. Judge Larson apparently told Christiansen to make a motion in open court and he would make a decision. *Id.* Judge Larson summarized the hearing as follows:

In support of the motion Mr. Christiansen stated that John Singer had been making many threats that he would resist by using a gun or other means and that as long as that wording was in the order there was no way possible for the Sheriff to carry out the order since he could not foresee what might happen. The Court was assured that every precaution would be taken to avoid any violence.

Motion was granted. The Court again stated that it was his desire to avoid violence and that the Sheriff was to take whatever time he needed to effect the arrest.

Deposition of Judge John Farr Larson, Exhibit 1 at 8. *See also* Deposition of Terry L. Christiansen at 110–25.

On October 4, 1978, Shirley Black and her youngest children moved onto the Singer farm. *See* Vickie Singer Journal at 826. John had spent several weeks previous to

this time fixing up a small house behind the Singer home in which the Blacks could live. *Id.* at 825–26. When Shirley's legal husband, Dean, returned home from the midwest [21] a couple of days later, and found his family gone, he "went into a rage" and contacted a lawyer. *Id.* at 827. Dean did not know at that time that Shirley had married John, but thought merely that she was living on the Singer farm. *Id.* at 828. At about this time, Shirley Black secured the representation of County Attorney Adkins who filed divorce papers in her behalf. *See* Deposition of Shirley Black at 79 & 168. On about October 10, the news of John's second marriage became public information. *See* Vickie Singer Journal at 830; Deposition of Judge John Farr Larson, Exhibit 1 at 8.

Also early in October, 1978, Sheriff Robinson telephoned Mr. Larry Lunnen, the Utah State Commissioner of Public Safety.[22] Sheriff Robinson requested an appointment and went down to Mr. Lunnen's office, where he asked Mr. Lunnen if the Department of Public Safety could provide him with resources to assist him in effecting the arrest of John Singer. *See* Deposition of Larry Lunnen at 21–22; Deposition of Sheriff Ron Robinson at 58. As the conference progressed, Mr. Lunnen contacted Robert Wadman, the Director of the Narcotics and Liquor Law Enforcement Division, who joined them in the meeting. Deposition of Larry Lunnen at 22. Sheriff Robinson outlined to Lunnen and Wadman the fact that he had misdemeanor warrants to serve on Mr. Singer, that he had attempted to serve the warrants but had been unable to do so, and felt that he did not have sufficient resources to accomplish that. *Id.* at 22–23. Mr. Lunnen told Sheriff Robinson that he would provide assistance and directed Mr. Wadman to work with Sheriff Robinson. *See id.* at 23; Deposition of Sheriff Ron Robinson at 60.

A day or so after the meeting with Sheriff Robinson, Mr. Lunnen met with Governor Scott Matheson to inform him of Sheriff Robinson's request and let him know that the Department of Public Safety intended to assist Sheriff Robinson. Deposition of Larry Lunnen at 35. Lunnen recalls Governor Matheson as saying, "Okay." *Id.* at 36.[23]

On October 16, 1978, the juvenile court held a hearing on a motion to lift the stay on the order of arrest for Vickie Singer and the order placing the Singer children in the custody of the Division of Family Services. *See* Transcript of Hearings (October 16, 1978); Deposition of Judge John Farr Larson, Exhibit 1 at 8. Mr. Christiansen, the assistant county attorney, based the motions on two grounds. He first argued that the fact that John Singer was now living with another wife was "an extremely unhealthy situation for the children" to live in. Transcript of Hearings (October 16, 1978) at 269. Mr. Christiansen also stated that the sheriff had expressed grave concern about having to make separate arrest attempts. *See id.* at 269–70. Mr. Orton, representing the children, did not oppose the motion, but recommended "that caution

---

**21.** For several months previous to this time, Dean Black had been working in another state and would return home for a few days periodically.

**22.** As Commissioner of Public Safety, Mr. Lunnen administered the Utah Department of Public Safety, which includes all state-level law enforcement agencies such as the Utah Highway Patrol and the Narcotics and Liquor Law Enforcement Division. *See* Deposition of Larry Lunnen at 4–6.

**23.** The governor recalled the meeting with Mr. Lunnen as follows:

As best I recall, he said, "We have received a request from," I believe, "the sheriff of the county for assistance in helping him bring

about an arrest of Mr. Singer. We think that that's an appropriate and customary thing. Do you have any problems with that?" And I said, "No."

. . . . .

I did not have any legal evaluation, I did not have any written report, I had an oral presentation from Commissioner Lunnen about the existence of the Court Orders which required the arrest. He asked for permission to participate in it. I said, "I think that's fine." That was the information I had.
Deposition of Governor Scott Matheson at 33 & 60.

and discretion be used." *Id.* at 270. The court granted the motion, and Sheriff Robinson was directed to arrest Vickie Singer and take the children into custody and deliver them to the Salt Lake County Detention Center. *Id.* at 270–71.

At about this same time, Sheriff Robinson and the State Law Enforcement officers began planning an arrest attempt on Mr. Singer. There were probably three planning meetings, the major one of which involved Mr. Lunnen, Mr. Wadman, Sheriff Robinson, and Highway Patrol Superintendent Reid. *See* Deposition of Robert Wadman, vol. 1 at 90; Deposition of Larry Lunnen at 64. Superintendent Reid was brought into the matter at the request of Mr. Lunnen, because he felt there might need to be assistance from the highway patrol. Deposition of Larry Lunnen at 64 & 71. At these meetings, the law enforcement people discussed possible alternatives for assisting Sheriff Robinson. *Id.* at 71–72. One plan which was considered was for law enforcement officers to masquerade as hunters in the area. *See* Deposition of Robert Wadman, vol. 1 at 243. This plan was rejected because the fact that the hunters would be conspicuously armed meant that Mr. Singer would likewise be "more proned to be armed." *Id.* Another approach considered involved posing as religious people sympathetic to polygamy movements, but this plan was also rejected because it was felt that the law enforcement officers would not be sufficiently knowledgeable regarding religion. *Id.* at 243–44. Plans involving law enforcement officers posing as attorneys were also considered and rejected, and a plan involving an approach by the sheriff and other officers to merely catch Mr. Singer offguard was also rejected. *Id.* at 244.

The arrest plan which was finally developed involved posing as news reporters. Pursuant to the arrest plan, Mr. Wadman called John Singer on the telephone and identified himself as a freelance writer. *See* Deposition of Robert Wadman at 200–01. Wadman told Mr. Singer that he would like to meet with him "regarding his problems" and that he would be in town at a

later date. *Id.* at 201. John responded that he would be gald to talk with him. *Id.* Mr. Wadman told Mr. Singer that he wanted to meet with him away from his home because he had to ask him some personal questions that he couldn't comfortably discuss in front of Mr. Singer's family, and Mr. Singer said that was all right. *Id.*

On October 19, Mr. Wadman again called Mr. Singer, told him that he was in Heber City, and asked for directions to the Singer farm. Mr. Wadman and two agents from the State Narcotics and Liquor Law Enforcement Division, Grant Larsen and William Riggs, then drove to the Singer farm in a vehicle provided by the sheriff's office and a state narcotics and liquor law enforcement van. *Id.* at 202. The three officers parked inside the gate to the Singer farm, and Mr. Wadman talked with Mr. Singer briefly in front of the Singer home. Wadman talked with Mr. Singer about the press and told him as a freelance writer he would pay him for his story. *Id.* at 202–203.

The plan from that point was that if Mr. Wadman did not observe a weapon on Mr. Singer, he would introduce Mr. Singer to the other two officers who were posing as his camera crew. *Id.* at 203–04. As Mr. Singer shook hands with William Riggs, the officers planned to advise him that they were officers and place him under arrest with Mr. Riggs holding onto Mr. Singer's right hand. *Id.* at 205.

The officers' strategy was carried out as planned to that point. The various accounts of what subsequently occurred vary to some extent. Mr. Wadman recollected at the time of his deposition the events as follows:

"At that time Bill grabbed ahold of his hand, said, 'We are police officers, you are under arrest for the warrants', etc., etc. At that time a scuffle ensued. Mr. Singer did not submit to the arrest.

A scuffle ensued at which time with his free hand, his free left hand, he pulled a .380 automatic from his waist band. As he got free—with the weapon—all four of

us with Mr. Singer were together and he had the gun pointed at Mr. Larsen at which time he said, 'If you let go of me I won't shoot you,' which that was to be the best decision. We let go of Mr. Singer. He pointed the gun at Grant Larsen and at Bill Riggs and then alternately at me in the process of things.

Well, I'm the making the story too short. We got up into the van. It was quite a wrestling match, then back out onto the road and back into the van. The whole time he was yelling for another gentleman that was in the house. I can't think of his name right off the top of my head but that man and members of his family then came out and jumped on the backs of the agents that were there, myself and the rest of them. With the gun pointed at the other agents and the kids and family out there in the middle of it, the judgment that I utilized at that time was that without hurting someone, we'd better cool it, just back off. In the course of that situation, he pointed the gun alternatively, as I mentioned, back and forth and we backed out of the thing.

Q. What did he say to you?

A. Things that he was going to kill us, get out of there or he was going to kill me."

*Id.* at 205–06.

Grant Larsen recalled the arrest attempt as follows:

"A. In the confrontation he started hollering for someone.

Q. What did he say?

A. It stands out in my mind he was hollering Al or Alan or something to that effect and within 30 seconds to a minute an adult male showed up as well as Mrs. Singer as well as a couple of kids.

Q. What was going on when this was happening?

A. We were wrestling trying to put handcuffs on.

Q. What were you saying?

A. I wasn't saying anything.

Q. Anybody else say anything?

A. You are under arrest, don't resist.

. . . . .

Q. Then what happened as you were struggling?

A. As we were struggling, I was behind him trying to get his arms to put the handcuffs on him and at that point I don't know who it was started hammering or beating on the other two agents. I don't know. I was concerned with Mr. Singer.

Q. How do you know they were beating on the other two agents?

A. They were there, they were screaming.

. . . . .

Q. Did you see other people there?

A. Yes, sir.

Q. Other women?

A. Mrs. Singer was there.

Q. Anybody else?

A. A male.

Q. Anybody hit you?

A. No, sir.

Q. What prevented you from getting Mr. Singer subdued?

A. He was just too strong for me.

Q. There were two other men as well?

A. Okay, at the time that the other people were involved with the struggle, myself and Wadman—Riggs had let go and Mr. Singer's hand went down to what I felt was a gun and I was behind him and grabbed his hand and went on with his hand to where I felt a gun and at that point we rolled on into the side of the vehicle and come up again with me still behind Mr. Singer with my hand around him, both hands around him with one hand on the gun.

Q. Then what happened?

A. Alot of screaming, talking.

Q. What was said?

A. He was saying, 'I'm going to kill you, I'm going to kill you, you are not taking me.' That's what was said.

. . . . .

Q. You don't know whether he understood you to be police officers even if you told him, do you?

A. After he had gotten away he says, 'The police are here after me, the police have come to get me.'

Q. When was that—that's after?

A. After he got away.

Q. After he got away?

A. Yes, sir. He said it.

Q. Who did he say that to?

A. His family as well as to us. He was shouting. He was waving the gun around....

Q. Do you know of anybody who showed him a badge?

A. Bill Riggs did.

Q. How could he show him a badge when you were engaged in the struggle?

A. It was afterwards when he was waiving the gun around.

Q. Did anybody show him a badge before?

A. No, sir, not that I seen....

Q. As a matter of fact, as he was struggling with you it would have been as reasonable for him to believe that you were lying to him about being police officers as well as lying to him about being newspaper men, isn't that right?

A. I guess.

Q. Aren't you aware of the fact that the gun he pulled on you didn't have a bullet in the chamber?

A. No, sir, I'm not.

Q. You don't know that one way or another?

A. No, all I know is when he got the gun back he says 'I'll kill you, I'll blow your head off, I'll kill you.'

. . . . .

Q. So he said to you, in effect, if you leave me alone I won't shoot you, didn't you say that?

A. No, Bob Wadman said that.

Q. What did Bob Wadman say?

A. As far as I'm concerned Bob Wadman talked him out of killing me.

Q. What did he say?

A. He said, 'We will leave, Mr. Singer. If we let go, don't shoot. We will leave, don't shoot, Mr. Singer, and we will let go.' I was the only one that had ahold of him. I was behind him with my hands around him, with my hand on the gun. Until Bob Wadman started talking to him—I felt him relax when Bob started talking to him or I know that that gun would have went off."
Deposition of Grant Larson at 193–200.

Vickie Singer recorded the arrest attempt in her journal as follows:

"On Thurs. 19th 1978 (Oct.) we had a narrow escape ... Three men posing as reporters for the 'L.A. Times' came. They had called the day before to make an appointment to interview us.

All of the family but John were up in Shirley's house, watching us on the six o'clock news. Al Rider, who is living in grandma's house, was in Shirley's house too.

John had gone out to meet them and was shaking their hands, when they all started to grab him and started lifting him into their van. John started kicking and struggling, as the men held his hands behind his back.

In the meantime, Suzanne looked out of Shirley's window and saw that they were trying to take John. She yelled, 'they're trying to take Daddy!' The shock of those words took a couple of seconds to register in my mind, and then, in a flash, I was out the door and running towards the men. I grabbed the man who was on John's back and was ready to smash him hard in the face, when he pulled back with a startled, scared, look on his face, and said, 'No!

Don't!' I said, 'I'll knock your teeth out!' I didn't have to strike him because he let go.

By that time, or I should say just before that time, John had gotten his hands loose somehow·and was able to get his gun out of his pocket and while they had him bent over trying to shackle his legs, he pointed the gun on their legs and said, 'I'll shoot you if you don't let go!' —That's right when I came upon the man who was on John's back.

The rest of the family had followed me out the door of Shirley's house and came running, too. The kids started to pound on the guys, etc. Al came running and the two guys started climbing into the van.

24. Alvin Rider moved into John's mother's house on August 14 after being served with divorce papers by his wife. *See* Deposition of Alvin Lee Rider at 61. About two months later a Mr. Bob Reynolds and his wife Lueanne also moved onto the Singer farm. *Id.* at 65; Deposition of Lueann Parkinson at 40; Vickie Singer Journal at 840 & 42. Mr. Reynolds moved to the Singer farm "to support John in what he believed that he was doing, which was standing up for a religious principle which he believed was a correct thing to do, 'he' being Bob." Deposition of Lueann Parkinson at 13. Mr. Reynolds was apparently directed by God to go up to the Singer farm and to aid John Singer financially. *See* Deposition of Alvin Rider at 129–30. *Cf.* Deposition of Lueann Parkinson at 14. Mr. Reynolds and Mr. Rider were to assist John Singer in "the establishment of Zion." Mr. Rider described what this meant in his deposition as follows:

Q. ... How would you help in establishing Zion? What did he say?
A. Well, we believed that there were going to be mobs, people would come from the valley up there to try to kill us. There were many dreams that was being given to the various members of the family as well as Shirley Singer and even some of her kids.
Q. And Mr. Singer told you about this?
A. Well, yes, and some of the other Singer kids told about some of the dreams they had received as well as some of the kids in Shirley's family.
Q. Okay, so go ahead, tell us about what Mr. Singer said about the establishment of Zion.
A. He believed that the redemption of Zion had to come through the shedding of blood, because of a curse that was upon the land, and then we believed that we would be able to set up God's kingdom, that God would come and instruct us as to what to do.

Right away the men said, 'We'll leave!' They looked *really* scared. They were white and sickly looking. John was pointing his gun towards them and telling them to get off the property and 'never to show their ugly faces here again.' They left in a cloud of dust!

After the scuffle, one of the guys showed a police badge, but we didn't trust them and didn't know if they were really telling the truth. They did not identify themselves at the first as they said they did in the newspaper, etc."

Vickie Singer Journal at 834, 837–38. *See also* Deposition of Vickie Singer at 285–97.

Mr. Alvin Lee Rider, a friend of the Singers who lived on their farm from August to December, 1978,[24] recalled the arrest attempt as follows:

Q. When you say, "God would come and instruct us," who were you referring to?
A. John, Bob and myself....
Q. Did Mr. Singer tell you what would have to occur before Zion would be established?
A. Well, that the shedding of blood would have to occur to take the curse off the land.
Q. What land are you talking about?
A. Around the Singer farm and probably the Weller farm, also.
Q. Did Mr. Singer believe that that is where Zion was going to be established?
A. I think that was the reason for the cleansing, of the shedding of the blood, yes.
Q. And did he tell you that Zion was going to be established in that particular locale?
A. I believe that that is a correct assumption.
Q. Is that what he told you?
A. Yes.
Q. Did he tell you whose blood would have to be shed prior to the establishment of Zion?
A. Well, we had talked about the mobs coming and it would have been their blood. I personally did not believe that I would be killed. I know that John believed that he would not be killed, and Bob believed that he wouldn't be killed. None of us believed that we were going to be killed.
Q. But you did believe some of the members of the mob would be killed?
A. Yes, but that they would have no power over us because we were keeping God's commandments.

Deposition of Alvin Lee Rider at 119–21. Mr. Rider and both Mr. Reynolds and his wife left the Singer farm on December 23, 1978, at the request of John Singer. Deposition of Alvin Lee Rider at 136; Deposition of Lueann Parkinson at 53.

"I first became aware of this attempt when most of the Singer family and I were sitting in Shirley [Black] Singer's home watching the news report, because John Singer had been interviewed, and we were going to see what he had to say. Approximately five minutes or so into the news report, Susie Singer stood up and looked out and said, 'It looks like somebody is trying to hurt dad,' and I jumped up and looked out and I ran out of the house and straight down to where they were trying to take a gun away from John Singer. There was a fairly new van that was parked right alongside of where they were struggling.... I saw these men and they were struggling with John, and I ran as hard as I could as soon as I knew what they were doing. I knew they were trying to get him into the van.... What I saw was John Singer standing with his feet spread apart with both of his hands down on his right ankle with a gun in his hand. Two of the men was on the right side trying to control that right hand. There was another man on the left side that was trying to do something down here in the lower part of his legs. I don't know what he was doing. I wasn't really that concerned. I knew that I had to stop it. I was running very fast and when I got within about 20 feet of the first man that was on the left side, I was going to use a karate kick and get rid of him quickly, but he just turned around and got inside the van and sat down on a stool.

Q. Inside the back of the van?

A. Inside of the van. Not in the back but right straight in front of the door, the two doors that swing open to the side. I made a motion towards the second man. He was keeping an eye on me. I didn't know what I was going to do but I started after him and I never touched him and he ran around the other side of the van up by the windshield by the driver's door. The third man, he wanted to hang on until the last second, so to speak, and when I came around on the back side of him between the van and the back side of John, he finally let loose of his hand and he backed up with his hands up in the air. The next thing I know, Vickie had him by his necktie and I guess it come off in her hand.

Q. Did Mrs. Singer run down toward the scuffle with you?

A. Yes, she followed and so did all of the rest of the Singer family and Shirley's kids.

Q. Who was the first one to arrive at the scene of the scuffle?

A. I was....

Q. Now, when you first saw John Singer, did you see a gun in his hand?

A. Yes, I saw a gun in his hand.

Q. You didn't see Mr. Singer reach into his pocket and pull out a gun; it was already in his hand when you saw him?

A. Yes, it was already in his hand. The first thing that I said was, 'Who are you and why are you here.'

The man that was on the side of the van on the driver's side of the van, reached in his wallet, opened it up and showed a badge, and the man inside of the van did the same thing and showed his badge, and that's when they said that they were special police officers.

Q. Had anything been said before you made that statement?

A. No, sir, there was nothing said....

Q. Okay, what happened next after this?

A. All right. John had turned around and was facing the side of the van where the doors were opened and these three men and he had this gun in his hand and he was shaking considerably and I stood—

Q. Where was he pointing the gun?

A. Towards the inside of the van. Towards the guy that was in the middle....

Q. And then what happened?

A. I deliberately stepped between the gun and the man that was sitting on the stool and that's when I asked the question of 'Who are you and why are you here?'
. . .

Q. And then what happened next?

A. I didn't know exactly what was going to happen there. There was, you know, everybody was saying things but what I said was, I want to give you the exact words, I said, 'You men get out of here and don't ever come back.' Those are the exact words that I used. I didn't want any further problem with those men and that was the exact reason why I made the statement that I did.

And John said, 'Don't you ever show your ugly faces around here again or I will blow them off,' or something to that effect....

Q. And give us your best recollection of what Mr. Singer said to the police officers.

A. Those were the words that I remember him saying.

Q. And this is after you had stepped in between Mr. Singer and the officers?

A. This is after....

Q. And then tell us again what Mr. Singer said.

A. And he said, 'That's right.' He says, 'Don't you ever show your ugly faces around here again or I will blow them off.' And when they saw that they were free to go, the van backed down the road faster than I've ever seen anybody back in my life and the other man followed him in his new car and we never did see those men again."
Deposition of Alvin Lee Rider at 95–102.

Mr. Rider also stated at his deposition that as he and the Singers were walking back toward the Singer home, Mr. Singer told him "not to tell anybody, but he checked his gun and he found that it wasn't cocked." *Id.* at 104. Both Vickie Singer and Heidi Singer Swapp testified at their depositions that John told them after the arrest attempt that his gun was unloaded. *See* Deposition of Vickie Singer at 297; Deposition of Heidi Singer Swapp at 73.

A videotaped interview of John Singer, filmed apparently the day after the arrest

attempt, recorded his account of the events as follows:

"John Singer: 'They jumped me from the back and all three of them held me from the rear, twisted my arms out. I pulled out my pistol and I cocked it. I had both of my hands free for some reason or another, I still can't figure out how it happened, and so I cocked it and they were still on my back, that I was bent way down, and I told them if they wouldn't let go I would shoot them.'

Mr. Connaughton: 'What did they do then?'

John Singer: 'In the meantime, my whole family came out and heard this commotion here and before you know it, they were all over them guys, too.'

'The one guy says, "Hey, he has got a gun," and so then they lifted their hands up and says that I shouldn't shoot them. Vickie told one of the kids to get a rifle, too. And then they said, "No, no, we are going to leave. Don't."'"
Transcript of Channel 2 Newscast at 4–5.[25]

A short time after the arrest attempt, Governor Matheson was interviewed by various news reporters. One newspaper story quoted Governor Matheson as follows: "Governor Matheson said he would 'support the utilization' of state agents in serving the warrants, adding that 'I think they will notify me now of any plans they have regarding an arrest.'" Deposition of Governor Scott Matheson at Exhibit 1. Governor Matheson does not recall ever stating that he would approve all future arrest attempts. *See id.* at 85–92. On seeing this language at his deposition, Governor Matheson testified as follows:

I made a general statement to that effect, and let me explain what that is: I asked that I be kept advised of the process of what was happening with respect to the State's involvement and that I be

---

**25.** Most of the Singer children also testified in their depositions concerning the events of the October 19 arrest attempt. *See* Deposition of Timothy Singer at 24–31; Deposition of Charlotte Singer at 7–10; Deposition of Suzanne Singer Bates at 52–55, 117–122; Deposition of Heidi Singer Swapp at 67–73, 161–173, 230–232. The court will not attempt to summarize the testimony of the Singer children or Shirley Black concerning this arrest attempt.

advised about the plans that were made, and I was advised, but I was never advised about the nature of the plan.

. . . .

I don't recall that I ever said that I would approve the final plan in any case. I don't recall ever saying that to anybody.

*Id.* at 89 & 91.

A transcript of a videotaped interview with Governor Matheson, which occurred after the October 19 arrest attempt reads as follows:

"Mr. Greenlaw: 'Three state liquor agents had been used undercover as reporters. Governor Matheson said today he disapproved.'

'Do you agree with the use of State police agents posing as newsmen to effect an arrest warrant of Mr. Singer?'

Governor Matheson: 'I don't think that is a good practice, no.'

Mr. Greenlaw: 'Would you issue orders to not have this done in the future?'

Governor Matheson: 'Yes.'

Mr. Greenlaw: 'Did this happen with your approval?'

Governor Matheson: 'I knew it was going to happen but I didn't know the process.'

Mr. Greenlaw: 'You didn't know they were going to pose as Los Angeles news people?

Governor Matheson: 'No, I did not know that.'

Mr. Greenlaw: 'And you would disapprove in the future?'

Governor Matheson: 'That's what I said.'

Mr. Greenlaw: 'Thank you very much.' Transcript of Channel 2 Newscast at 11.

A couple of days after the statements to the press, the governor talked with Mr. Lunnen by telephone and told him "that he did not approve of that kind of masquerade by the officers." *See* Deposition of Larry Lunnen at 79. The governor also told Mr. Lunnen that he wanted him to keep him informed so that he could be sure that

officers were not utilized in that fashion again. *Id.*

On the same day as the arrest attempt at the Singer farm, a hearing was held before Judge Peter F. Leary of the Utah State District Court of Summit County in the divorce proceeding between Shirley and Dean Black. Mr. Black had made a motion for an order awarding him temporary custody of the minor children. Shirley Black was not present and was not represented by counsel at the hearing. The court ordered Shirley Black to "forthwith deliver said children to the Sheriff of Summit County, Utah," and ordered Sheriff Robinson to deliver the children to Mr. Black. *See* Deposition of Sheriff Ron Robinson, Exhibit 1 at 6–7.

On October 20, Summit County Attorney Robert Adkins prepared a criminal complaint against John Singer relating to the events that had occurred during the arrest attempt of the previous day. *See* Deposition of Robert Adkins at 94 & 116. The complaint, which charged Singer with three counts of aggravated assault, a third degree felony, was signed by Sheriff Robinson and subscribed and sworn to by him before Justice of the Peace Reed A. Warner. *See* Deposition of Sheriff Ron Robinson, Exhibit 1 at 4. Justice of the Peace Warner, on the basis of the complaint, issued a felony warrant for John Singer's arrest. *See id.*, Exhibit 1 at 5.

Towards the end of October, Sheriff Robinson, Mr. Wadman, Grant Larsen, and Deputy County Attorney Christiansen met with Judge Larson in his Salt Lake City office. The meeting was apparently held so that the law enforcement officers could explain to Judge Larson what had occurred during the October 19 arrest attempt and could discuss with him their concerns about arresting Mr. Singer without a violent confrontation. *See* Deposition of Terry L. Christiansen at 221; Deposition of Robert Wadman at 69. Mr. Wadman recalled in his deposition discussing with the judge that these were misdemeanor charges, that violence had been threatened, and that the law enforcement officers wanted to arrest

him without creating additional problems. Deposition of Robert Wadman at 69–70. Wadman also recalled the judge responding: "Not only do I want you to carry out those Orders, that [sic] we will find the Sheriff in contempt of Court if he does not carry out those Orders." *Id.* at 70.

Judge Larson, at his deposition, could not recall specifically what occurred at the meeting with Christiansen, Wadman, Grant Larsen, and Robinson, but he recalled generally meeting with Sheriff Robinson and Mr. Wadman in the latter part of October. *See* Deposition of Judge John Farr Larson at 103–106. The judge recalled that towards the end of October he "had been getting the feeling that the sheriff was maybe not going to carry out the arrest." *Id.* at 106. On October 30, 1978, Judge Larson submitted a new order in which he stated that because his previous arrest orders on both John and Vickie Singer had not been executed, the Sheriff of Summit County was ordered to arrest the Singers "upon penalty of contempt." Deposition of Sheriff Ron Robinson, Exhibit 1 at 2.

On November 6, 1978, Summit County Attorney Robert Adkins wrote a letter to the editor of the Salt Lake Tribune criticizing an editorial which appeared shortly after the October 19 arrest attempt. *See* Deposition of Robert Adkins at Exhibit 7. The letter challenged the editorial's statement that the law enforcement officers "ignored elementary police procedures" and charged that the newspaper had formulated the editorial "without being fully advised of all the facts." *Id.*

Following the October 19 arrest attempt, the state and Summit County law enforcement officials began devising a new plan for arresting John Singer. The planning was a combined effort of the law enforcement agencies involved, in which Mr. Wadman played a lead role, subject to the ultimate approval of Sheriff Robinson. *See* Deposition of Robert Wadman, vol. 1 at 133. Some time during the late fall of 1978, Mr. Wadman prepared a report enti-

tled "The Singer Investigation", which he submitted to Sheriff Robinson and Commissioner Lunnen. *See Id.* at 59 & Exhibit 3.[26] This initial Wadman report summarized the law enforcement procedures initiated up to November 15, 1978. The report noted that following the unsuccessful arrest attempt, the Singer situation was reviewed with several law enforcement agencies, including the F.B.I., the Los Angeles Police Department, the National Guard, the Salt Lake County Sheriff's Office and the police departments from Provo, Ogden, and Salt Lake City, Utah. The meetings with officials from Provo and Ogden, which were attended by Mr. Lunnen, Mr. Wadman, Sheriff Robinson, Superintendent Reid of the Highway Patrol, and a representative of the Attorney General's office, were essentially to discuss the availability of those cities' police department's SWAT teams. *See* Deposition of Larry Lunnen at 69; Deposition of Sheriff Ron Robinson at 65. Neither of those cities were willing to make their SWAT team available for use in an arrest plan. *See* Deposition of Robert Wadman, vol. 1 at 92.

This initial Wadman report also noted that members of the Utah Department of Public Safety, in cooperation with Sheriff Robinson, made numerous trips to Marion, Utah, to "review and evaluate the surroundings of the Singer complex." *See* Deposition of Robert Wadman, vol. 1 at Exhibit 3. The report also noted that neighbors of the Singers and news reporters were interviewed with regard to the Singer family. From these interviews, the planners learned details of the Singer farm and home, such as the fact that the windows of the Singer home were barricaded with wood and chicken wire. *See id.*, vol. 1 at 250. From these investigations, the Wadman report noted that several alternative plans were evaluated. The report stated that a plan to shut off power to the residence, or to shut off the water supply and attempt to limit food supplies, was considered and rejected because of concern

---

**26.** This same report was later updated with additional information as the law enforcement efforts progressed. *See* Deposition of Robert Wadman, vol. 1 at 59 & Exhibit 1.

for the Singer and Black children. The report also noted that the use of potential tranquilizing drugs was evaluated, but it was decided that such a plan also involved a high potential of risk to the Singer children.

Some time during this planning stage, a meeting was held between Mr. Lunnen, Superintendent Reid, Sheriff Robinson, Mr. Wadman, and a representative of the Attorney General's office. *See* Deposition of Robert Wadman, vol. 2 at 118 & Exhibit 33. In this meeting, several of the alternative plans mentioned in Wadman's initial report were discussed, and possible plans involving the use of tear gas and "rush" of the home with several squads of officers were also evaluated. The use of tear gas was rejected due to the problem of successfully placing it into the Singer home with the windows barricaded, the potential fire hazard involved, and the potential for harm to the children. *See* Deposition of Robert Wadman, vol. 1 at 254–55.

Mr. Wadman's initial report recommended a plan involving the use of an "armored personnel carrier." *See id.* at Exhibit 3. Wadman's report recommended first of all that warrants be obtained charging Alvin Rider and "any other individuals contributing to Mr. Singer's success in avoiding arrest" with obstructing justice. If these warrants could be issued with the approval of Summit County Attorney Adkins, the report recommended surveillance of the Singer farm so that these persons could be arrested. The report recommended close cooperation with the Summit County Attorney's office and Judge Larson so that the arrested individuals might be restricted by the court from returning to the Singer farm. The report recommended that, after these arrests were accomplished, negotiations be initiated with the Singers involving Vickie Singer's mother, Shirley Black's mother and father, a Mr. and Mrs. Doug Simpson, John Singer's mother, and a psychiatric team, all working with law enforcement negotiators. The re-

port contemplated negotiations extending over two or three days, with periodic evaluations to evaluate any concessions and to anticipate any future developments.

Wadman's initial report also recommended that manpower and equipment be in place near the Singer farm during the negotiation period. If the negotiations were to fail and it was determined that Mr. Singer would continue to resist arrest, an armored personnel carrier was to be moved into the Singer farm area containing personnel and equipment with radio communications back to a staging area. With the protection of the personnel carrier, additional negotiations were to be initiated apprising Mr. Singer of the situation through a public address system. If these negotiations failed, the report recommended that law enforcement officers, using the protective personnel carrier, "take" the Singer farm building by building until Mr. Singer had been taken into custody.

Some time during this same time period,[27] Mr. Lunnen, Sheriff Robinson, Mr. Christiansen, and Mr. Adkins, met with Governor Matheson. The purpose of this meeting was two-fold; Sheriff Robinson had asked Lunnen if he could arrange for a meeting with the governor that Robinson could attend, and the meeting was also to discuss with the governor a proposed plan involving the National Guard armored personnel carrier. *See* Deposition of Larry Lunnen at 37. The Summit County Attorneys apparently attended at the request of Sheriff Robinson. *See* Deposition of Robert Adkins at 46. At the meeting, Mr. Lunnen apparently outlined a proposed plan to the governor which called for the use of the troop carrier to move law enforcement officers close enough to the Singer home to put tear gas into the home. *See* Deposition of Larry Lunnen at 38; Deposition of Governor Scott Matheson at 71–72; Deposition of Terry L. Christiansen at 218–19. Apparently, the law enforcement people needed Governor Matheson's permission before they could get the per-

---

**27.** It is impossible from the record to determine an exact chronology of the planning events, beyond stating that they occurred between late October and early December.

sonnel carrier from the National Guard. *See* Deposition of Sheriff Robinson at 63. The governor expressed concern with the use of the personnel carrier and with the use of tear gas where children were involved, and said that he would like them to go back and consider alternatives. *See id.* at 63; Deposition of Larry Lunnen at 41; Deposition of Governor Scott Matheson at 72; Deposition of Terry L. Christiansen at 218–19.

Some time late in November, Governor Matheson had an additional meeting with Mr. Lunnen, Mr. Harald Singer and Mr. Singer's lawyer. The meeting was arranged by a Democratic friend of Harald Singer's, and Mr. Lunnen was there at the request of the governor. *See* Deposition of Harald Singer at 155; Deposition of Larry Lunnen at 47. The essence of the meeting, according to Governor Matheson, was a request by Harald Singer that the governor leave the John Singer matter alone. Deposition of Governor Scott Matheson at 81. According to Mr. Lunnen, Mr. Singer essentially asked the governor to pardon his brother and "put an end to the whole situation." Deposition of Larry Lunnen at 48. Mr. Lunnen described the meeting as follows:

To the best of my recollection, the Governor, first of all, in response to Mr. Singer's request that the Governor pardon Mr. Singer, Mr. John Singer, the Governor responded to that by telling him he was asking him to do something that was beyond his power and authority to do under state law, that he simply did not have that kind of authority in this State. Even though that might be the case in other states, it was not the case in Utah. He did not have that authority and simply couldn't do that. He told Mr. Singer that he sympathized with the situation. He told Mr. Singer that he had deep concerns about the safety and welfare of everyone involved in the situation and told him that we were committed to assist and to provide resources to the sheriff who had requested those resources. I

think, you know, it ended in that kind of a vein.

*Id.* at 50–51.

Mr. Harald Singer recalled that the governor first asked him whether he had any kind of compromise solution which could avert the matter. *See* Deposition of Harald Singer at 155. Harald recalled responding as follows: "I said, 'I am not coming as a representative of my brother to offer a compromise solution.' What I am asking, I said, is to pardon the man. He said, 'he hasn't done anything yet for which I could pardon him.'" *Id.* at 156. Harald recalled the meeting as continuing as follows:

I said, "Well, but the fact is, I personally feel the next time some arrest attempt will be made on him, somebody will get shot, because he promised that he has done all there is to do in terms of raising his standards of peace to these people to stop them from coming against him. He said that he will have to defend himself and I said, "I want you to just drop the whole thing."

I said, "You forget about this guy and six months from now no one will remember him. Everything that has gone before then will have been lost in the sands of time."

The governor said, "I can't do that." He said, "I am the chief executive officer of the State of Utah and I am intrusted with the enforcement of the laws of the State of Utah. It is alleged that your brother has broken the law and he has to be arrested." He said, "The law is the law and the law must be obeyed."

The governor asked me, of course, at that particular time whether the lives of the kids were in danger because at that time period we had the David Emmanuel or whatever his name was, that killed himself and his wife shoved all the kids off the International Dunes Hotel and jumped herself to her death, you know.

And I said, "No." I said, "My brother is a great respecter of life. He says that life is a gift of God from him to us and he is the only one, since he gave it, he can also take it." There is never a situa-

tion when you or I are permitted to take life except under circumstances when an individual is, according to the Doctrine and Covenants, pressed into the corner and where his own life is in danger and he can free himself.

I said to him, "But under no circumstances will my brother ever become the individual who will go to the offense. He will defend himself but he will never go to the offense" and then I said to him, "So you can rest assured that in all your negotiations that anybody has with him, my brother will never fire the first shot. He will never fire the first shot."

Talking about revelation, of course, let's back up. Of course, the governor said, "Well, I can't grant a pardon. I can't do this." He said, "But the fact is we have to arrest him and all arrest attempts, any further arrest attempts will be made only after they have cleared this office." He said, "No arrest attempts will be made without my express permission."

Deposition of Harald Singer at 156–58. Later in his deposition, Harald Singer testified as follows:

"Q. And I believe you told the Governor at that time if he didn't do that, if they kept trying to arrest John Singer, anything of that nature, that somebody was going to get hurt?

A. That is correct.

Q. And at that time you told them that some of the officers might get hurt?

A. When I indicated that somebody might get hurt, my brother as getting hurt or killed had not even entered my mind.

Q. So when you were talking to the Governor, you were talking about some of the officers might get killed, or some of the people who might try to enforce an order might be killed?

A. There would be bloodshed, yes.

Q. But you were talking about bloodshed by somebody other than your brother?

A. I was talking about bloodshed after he was attacked in another arrest attempt."

*Id.* at 213.

Mr. Lunnen recalled that in the meeting with Harald Singer, Harald advised the governor that someone could be hurt if the matter was further pursued. *See* Deposition of Larry Lunnen at 48. Neither Mr. Lunnen nor the governor could recall Harald Singer telling them that his brother would never be the first to shoot. *See id;* Deposition of Governor Scott Matheson at 97 & 100. With regard to whether he stated that he would approve any arrest plans, the governor stated the following:

I indicated that if I—and I don't remember what I said to him, but I said through the process that I wanted to be advised about the plans because I didn't want to get involved in the masquerade situation again. But I didn't indicate to him and I have never indicated that I am to be advised on every plan and every step of the way. I simply wanted to be kept advised on what they were doing. As Governor, that seemed to be the involvement that I should take.

107–108. With regard to the alternative of pardoning John Singer, the governor noted in his deposition that the Governor of Utah does not have pardoning power as is commonly believed. *See id.* at 82. The governor stated that the statutory authority to grant a pardon is vested in the Board of Pardons. *Id.*

In December, 1978, the law enforcement officials determined that additional information was needed with regard to Mr. Singers' behavior patterns in and around the Singer farm before a plan could be finalized. *See* Deposition of Robert Wadman, Exhibit 1 at 6; Deposition of Sheriff Ron Robinson at 73. To this end, a twenty-four hour surveillance was begun on December 27, lasting for eighteen days. Several officers from the Narcotics and Liquor Law Enforcement Division and two deputy sheriffs from Summit County rented a home near the Singer farm to carry out the surveillance. None of the officers under-

taking the surveillance were known by Mr. Singer, and efforts were made to lead the Singers to believe that the surveillers were not police officers, but vacationing skiers. A twenty-four hour log was maintained by the surveilling officers and turned over to Grant Larson each day. Deposition of Lewis Jolley at 52.

On January 12, 1979, Sheriff Robinson was served with an order to show cause why he should not be held in contempt for failing to take custody of the children of Dean Black, who were still living at the Singer farm. *See* Defendant Ron Robinson's Memorandum in Support of a Motion for Summary Judgment at Exhibit RR–6. At the hearing before Judge Bryant Croft on January 15, 1979, the order to show cause was continued until further order of the court. *See* Deposition of Ron Robinson, Exhibit 1 at 1. At about that same time, Sheriff Robinson had a conversation with Mr. Dean Black which Mr. Black told the sheriff that "he was afraid that he was going to get drinking and had, in fact, laid with his binoculars watching the Singers' home and he was afraid that he might snipe him." *Id.* at 89.

Also on January 15, the surveillance having ended, a rough draft plan for arresting Mr. Singer was developed. Wadman's report, as later updated, described the plan as follows:

1. Because of snow depth and immobility it was determined that snowmobiles would be the most effective means of transporting police officers.

2. It was determined that team # 1, 6 officers with 3 snowmobiles would be positioned at the Weller house north of the mailbox. Team # 2, 4 officers in an abandoned A-frame house southeast of the Singer compound.

3. Team # 1, at the time suspect Singer leaves his compound going west towards the loop road. Six officers will deploy south along the rear of the Weller family house approaching Singer with snowmobiles for the purpose of arrest.

4. Team # 2. At the time suspect Singer leaves his compound going west towards the loop road. Four officers will proceed from the A-frame north and west to compound on 2 snowmobiles to prevent a retreat of Singer.

5. a. All officers to be uniformed with standard issue raid jackets.

 b. All officers to wear flack vests.

 c. All officers to have radio communication with squad leader.

6. All officers to be briefed prior to operation regarding potential actions of Singer.

7. All efforts to take Singer will be made in a safe and professional manner.

Deposition of Robert Wadman, Exhibit 1 at 7.

At about this time, Commissioner Lunnen met with Governor Matheson informally in a hallway, at which time Lunnen informed the governor that "an arrest attempt would be made at some time." Deposition of Larry Lunnen at 33. "What I went to tell him was simply that, based upon the information that had been obtained during the surveillance, that we would probably work with Ron [Robinson] in attempting to effect an arrest. That's the essence of what I told him." *Id.* at 34. On January 16, 1979, Judge Larson sat next to the governor at a breakfast meeting at the Alta Club in Salt Lake City. Governor Matheson apparently told Judge Larson at this breakfast that "he believed the officers had come up with a plan to arrest Singer without any trouble." F.B.I. Investigation at 18. *See also* Deposition of Judge John Farr Larson at 199–200.

On January 17, Mr. Wadman and Sheriff Robinson presented the plan to the arrest team members in a meeting in Mr. Wadman's office. The ten officers were divided into teams, and the basic plan of arrest was laid out. At this briefing, the fact that Singer had previously drawn a weapon on officers attempting his arrest was discussed. Deposition of Robert A. Bates at 43. Wadman left it to the individual officers' discretion as to what they would do if a gun was pointed at them. *See* Deposition of Robert Hayward at 97; Deposition of Larry Henley at 60–61. At the briefing,

the court orders issued by Judge Larson and the felony warrant that was outstanding were also mentioned.

At the briefing, it was emphasized that the officers were to use extreme caution, and each of the officers was given a flak jacket and five shells of standard issue ammunition. The officers were instructed that there was no time limit on the plan, Deposition of Tom Carlson at 34, and moved into the rented house on January 18 with enough groceries to last for a week. The officers were instructed to wear well-marked clothing at the time of the arrest so they could be identified as police officers. Deposition of Robert A. Bates at 62.

On January 18, 1979, the arrest team took their positions around the Singer farm under the direction of Grant Larsen, the assistant director of the Narcotics and Liquor Law Enforcement Division. At approximately 8:30 or 9:00 o'clock in the morning, the officers saw Mr. Singer and Mrs. Black walking outside the Singer home. Mr. Singer was carrying a rifle, and no arrest was attempted at that time. At about 12:15 p.m., Mr. Singer walked out to the mailbox, carrying a rifle, and apparently left a letter to be picked up. Around 12:30, Mr. Singer started removing snow with a snowblower down the Singer lane and left his rifle by the gate to the farm. He then left the snowblower and again headed for the mailbox. Grant Larsen then gave the command to commence the operation by walkie-talkie.

In describing the events which followed, the court will attempt to describe each participant's account, as well as the accounts given by all other witnesses. The Summit County deputy sheriffs, defendants Henley and Bates, were wearing their standard police jackets with Summit County Sheriff patches on the shoulders and badges attached to the outside of their jackets. Answers of Henley and Bates to Plaintiffs' Interrogatories; Deposition of Robert A. Bates at 41. Defendant Floyd Farley was wearing his Utah Highway Patrol hardhat, coveralls with Utah Highway Patrol patches on them, and a jacket with Utah Highway Patrol patches on each sleeve. Deposition of Floyd Farley at 5. Robert Hayward was wearing a brown windbreaker with the Utah Highway Patrol patch and his Highway Patrol badge on the outside. Deposition of Robert Hayward at 114. The Narcotic and Liquor Law Enforcement agents were wearing blue jackets with gold law enforcement patches on each shoulder. The jackets had "police" across the back in gold letters, but had no insignia on the front except a badge holder. *See* Deposition of Robert Wadman, vol. 2 at 98–99.

Summit County Deputy Larry Henley described the arrest attempt as follows:

"A. Okay Grant, you know, said to go and try to effect the arrest.

Q. Okay.

A. And when he said that I was on the snowmobile here (indicating) and I headed for the fence.

. . . . .

A. When I got to the fence I was going to try to cut the wire and get the snowmobile through and then drive it over here to block the gate going back into the compound.

Q. Okay, and what happened there?

A. Okay this, as I was coming down, John started to walk back up the lane and the other two snowmobiles come from over here by Weller's.

. . . . .

Q. About how far distance between the snowmobiles and Mr. Singer, if you know?

A. Twenty to 25 feet.

Q. Okay, and were the snowmobiles moving?

A. Yes.

Q. And how about Mr. Singer?

A. Yes.

Q. How was Mr. Singer moving?

A. He was sideways.

Q. Okay. Was he running sideways?

A. Yes.

Q. Okay. At that point did you observe anything else about Mr. Singer; had he drawn his gun yet or could you tell?

A. Yes, he had.

Q. Did he have his gun out?

A. Yes.

Q. And he was running sideways with his gun pointed behind him?

A. Yes.

Q. And what next did you observe?

A. Can I demonstrate?

Q. Sure anything at all, Officer.

A. As he was running sideways he had his arm out like this (indicating) and he would look like this (witness demonstrating) his arm would be moving and he would turn to see where he was going and he would look back with his arm over—

Q. What you're doing for the record is you had your right arm extended turning back behind you and you would move your arm back and forth as if he was moving it from one—

A. One point to another.

Q. —one point to another and then he would turn his head away from the people on the snowmobiles behind him and look—

A. Up the lane.

Q. —up in the direction in which he was running?

A. Yes.

Q. And approximately how fast was he running during this period of time?

A. I would say he was about as fast as a person could run, you know, sideways.

. . . . .

Q. Okay. How far did you observe Mr. Singer run before anything else happened?

A. He took, well, from the point where he started to run would have been about 10 or 12 steps, running steps.

Q. Okay and during this period of time were the snowmobiles closing in on him, getting closer?

A. The snowmobiles were staying just about—were moving about the same speed he was.

Q. ... During this period of time had you just stopped at the fence and watched what was going on?

A. No I hadn't reached the fence yet.

Q. Okay when you reached the fence what, if anything, occurred?

A. Well it occurred before I reached the fence.

Q. Okay go ahead. While you were in the process of going towards the fence you were observing all of this. Okay what next occurred?

A. After he had taken about the ten to twelve steps as I was watching him his arm stopped and at that time it was almost instantaneously there was a shot fired.

Q. How many shots did you hear?

A. One.

Q. Okay and could you tell us what kind of a weapon it was that fired the shot?

A. Well just the sound itself.

Q. Yes, sir.

A. It was a shotgun.

Q. Okay and what did you observe Mr. Singer do?

A. Okay, when the shot was fired he was lifted off the ground and he turned sideways and come down.

Q. And did he land on his face, his stomach?

A. I'm not sure, I recall him as kind of being on his side, on his right side.

. . . . .

Q. Okay, now did you observe Officer Jolley and his snowmobile at the time the shot was fired?

A. No.

Q. Could you tell the position of Mr. Jolley at the time the shot was fired?

A. No.

Q. Were both of the snowmobiles pretty close together?

A. What do you mean?

Q. The two snowmobiles.

A. Side by side.

Q. The two that were coming up the lane they were occupied as you know now by Officer Jolley and he was being driven by Officer Schouten, is that correct?

A. Yes.

Q. And the other was occupied by Officer Gunderson?

. . . . . .

Q. When you saw Singer go down what did you next observe?

A. Okay, when he went down by that time I was to the fence instead of cutting the fence we turned and followed the fence line out and come around.

. . . . .

A. Okay, and I parked the snowmobile right here on the road.

Q. By the mailbox?

A. Yes."

Deposition of Larry Henley at 76–83 (January 6, 1981).

Officer Floyd Farley of the Utah Highway Patrol was on the back of the snowmobile driven by Officer Henley. Deposition of Floyd Farley at 6. These officers, along with Grant Larsen and Tom Carlson were posted at an abandoned A-frame about 400 yards on the other side of the lane from the rented house. *Id.* at 56. Officer Farley testified in his deposition about the arrest attempt as follows:

"A. Well, we got on the snowmobiles and proceeded in a north-westerly direction over towards the lane where Mr. Singer was at the time walking down toward the mailbox. But at that time I could observe the other officers from the other post coming in on their snowmobiles. As we got over toward the fence the officer in front of me, Henley, had turned the snowmobile and headed west running parallel along the fence line towards the mailbox. At that time, just before we got down towards the mailbox, I saw some of the officers that were already off their snowmobiles and I heard Lou Jolley holler something to the effect 'We are police officers. You are under arrest.'

At that time I remember Mr. Singer starting to move or a slow run, I would say, it looked slow to me, that he wasn't moving very fast back east towards the compound.

Q. Toward his home?

A. Yes.

Q. [sic]

A. And then I saw Mr. Singer pull a revolver and point it back at the officer. At that point it seemed like it was a long time when he was pointing the revolver back at the officer.

. . . . .

Q. (By Mr. Schuster) Sir, I think my question some minutes ago to you was: Did you observe Mr. Singer moving his arm in an arc that was roughly parallel to the ground so that there was movement of that arm or was it instead fixed?

Q. My observation, the way that I looked at the situation, was that the arm was fixed pointing at one man.

Q. Who was that man?

A. Lou Jolley.

Q. How far away were you when you made that observation?

A. I would say probably between 40 and 50 feet.

Q. And where were you in relationship to Mr. Singer?

A. I was right parallel with him, I would say about parallel with him. Right straight across with him. He was going to the east.

. . . . .

A. Then we went on down to the road.

. . . . .

A. We came on down to the road and stopped and turned and parked approximately in the driveway, as I recall.

Q. How much time do you estimate it took between the time you left the A-frame

and the time that the snow machine stopped?

A. Oh, less than a minute.

 . . . . .

Q. At the time he was shot, were there any officers between Mr. Singer and yourself?

A. No.

Q. Did you have your gun drawn?

A. I was packing my shotgun.

Q. Did you have it leveled at Mr. Singer?

A. No, sir.

Q. Did you believe you were going to get shot?

A. No.

 . . . . .

Q. ... When you noticed Mr. Singer running back to his home, did you say a slow run? Is that the way you described it?

A. Yes, sir.

Q. Were his feet pointed toward his home?

A. Yes.

 . . . . .

Q. (By Mr. Schuster) You have drawn two points on this diagram, have you not? [representing Mr. Singer and Mr. Jolley at the time Mr. Singer was shot]

A. Yes.

Q. How much distance have you intended that distance on this diagram to portray?

A. I would say 30 feet, somewhere along in there, 40.

Q. Describe for me the instance that you are portraying here. What is happening at this instance?

A. Mr. Jolley is telling Mr. Singer that he is a police officer, that he is under arrest, that Mr. Singer is trying to get back into his compound, that Mr. Singer pulls a revolver and points it at Mr. Jolley.

 . . . . .

A. That, again, Mr. Jolley told him who he was, that he was under arrest, that Mr. Singer pulled a revolver, pointed it back at him, and at that time I thought that Mr. Jolley was going to get shot, I really did, and then the shotgun went off and Mr. Singer fell down into the snow.

Q. How much time do you figure that process that you have described took?

A. I would say roughly four seconds but it seemed like hours.

Q. During that four seconds did you bring your shotgun down from its carrying position, the butt of the weapon against your shoulder, leveled down toward Mr. Singer?

A. No, sir.

Q. At no time during this four seconds?

A. No, sir.

Q. What was the position of your gun then?

A. I would say that the shotgun was pointing in the air."

*Id.* at 57–76.

Grant Larsen testified in his deposition of the arrest attempt as follows:

"Q. (By Mr. Spence) ... Where were you standing when you heard the shot?

A. I was on a snowmobile. There is a fence coming down approximately here. I was on a snowmobile approximately there.

 . . . . .

Q. (By Mr. Spence) How many shots did you hear?

A. Just one.

Q. What distance would you say you were from the Loop Road when you heard the shot?

A. 25 to 30 yards.

Q. ... Who was on the snowmobile with you?

A. Tom Carlson.

Q. Were you on the front or the back?

A. I was on the back.

Q. Did you have a shotgun?

A. Yes, sir.

Q. Where were the other officers at the time you heard the shot?

A. There was a snowmobile right with us with two agents on it.

Q. Who was there?

A. Larry Henley.

. . . . .

A. And Floyd Farley.

. . . . .

Q. All right, now how far would you say Mr. Singer was from the Upper Loop Road when he fell?

A. 40 feet maybe, 45 maybe.

Q. How far do you think you and Mr. Farley were from Mr. Singer at the time you heard the shot?

A. 50 yards.

. . . . .

Q. I want to ask you if you were watching John Singer at the time he was shot, at the exact instance he was shot?

A. Yes.

Q. You had your eyes on him when he was hit?

A. Yes.

Q. You saw him hit then?

A. I saw him go down.

Q. You saw him go down. Did you see who shot him?

A. No, sir.

Q. When you were watching Mr. Singer, what was Officer Hayward doing?

A. Standing at the corner of the house.

Q. Well, you didn't have your eye on both of them at the same time. What I want to know is exactly what you saw at the very instant when Mr. Singer was hit?

A. At that very instance I seen Mr. Singer go down.

Q. You weren't watching Officer Hayward, were you?

A. No.

. . . . .

Q. When was the first time after the shot that you saw Officer Hayward, how many seconds?

A. Probably a couple.

Q. Like one, two?

A. At the very most I would say.

Q. How long was it afterwards, after the shot that you saw Officer Bates?

A. Probably the same time.

Q. Like one, two?

A. Yes, sir.

Q. Did you see Officer Hayward and Officer Bates after the shot before or after you saw Fullmer and Gunderson?

A. After.

Q. So the first persons that you saw after Singer was shot was Fullmer and Gunderson?

A. Was Gunderson.

Q. How long after the shooting was it that you saw Gunderson, how many seconds?

A. Probably a second.

Q. Did you see Fullmer and Gunderson at the same time?

A. Probably.

Q. Did either of those people as you recall have their guns out, their handguns?

A. Mr. Gunderson did when he went up.

Q. Well, can you tell me whether Mr. Gunderson had his handgun out at the time that Singer fell?

A. No, sir.

Q. You don't know, do you?

A. No.

Q. Can you tell me whether Mr. Fullmer had his handgun out at the time Singer fell?

A. He had his shotgun, I could see that.

Q. Could you tell me who among Hayward and Bates had a shotgun?

A. Yes, sir.

Q. Who?

A. Hayward.

Q. Did Bates have his handgun out when Singer fell or do you know?

A. I don't know.

Q. Now the man that was driving the snowmobile for you was who?

A. Carlson.

Q. Would you be in front or behind of Singer or across from him when he fell?

A. Across and maybe up the lane just very little, almost straight across.

Q. How many feet up the lane?

A. I would say two or three—

Q. In other words, you were almost directly across from him, is that correct, at a right angle to the lane at the point where Singer fell?

A. That's correct.

Q. Now how far would you say Hayward was from Mr. Singer at the time Singer fell?

A. Just a guess 30 feet, 30 to 45 feet.

. . . . .

Q. ... How far were Fullmer and Gunderson from Mr. Singer when he fell?

A. Twelve feet maybe.

. . . . .

Q. ... Now did you hear an echo of the shot when it went off?

A. No, sir.

Q. Do you know of anybody in the world as a result of your investigation, whatever that may or may not have amounted to, who ever heard an echo to the shot?

A. No, sir.

Q. Would it be your best belief that the shot did not cause an echo?

A. My best belief is that there probably was.

. . . . .

Q. Where was Mr. Schouten when this shooting occurred?

A. Sitting on his snowmobile.

. . . . .

Q. Well, did you think there was something wrong with him?

A. Yes, sir.

Q. What?

A. I thought he had been shot.

Q. Why?

A. Because he went down. He was down so low behind a snowmobile—

Q. You thought that Mr. Schouten had been shot. You saw Mr. Singer fall. You knew that came from a shot, didn't you?

A. Yes, sir.

Q. So you knew somebody had shot at Singer?

A. I knew, yes.

Q. And that takes one shot, wouldn't it?

A. Yes.

Q. But you saw Mr. Schouten down, too, didn't you?

A. Yes, sir.

Q. You didn't think that he was shot at the same time that Singer was shot, did you?

A. Yes, if he had been hit.

. . . . .

Q. Now I'm interested in your best recollection as to what Mr. Singer did when he fell down?

A. I couldn't see him.

Q. You didn't see him fall?

A. I seen him fall but I couldn't see him after he hit the ground.

Q. What did he do when he fell? Did he fall forward or backward or sidewards.

A. Forward.

Q. Would you say that he fell in the direction he was running?

A. Yes, sir.

Q. Was he running at the time that he fell?

A. Yes, sir.

Q. Would you tell me how he was running?

A. Stepping sideways running.

Q. Running sideways with his feet pointed in what direction.

A. One foot over the other, like this, running.

. . . . .

Q. How long had Mr. Singer been running in that way before he was shot, how long a time?

A. Fifteen or 20 steps.

Q. During that period of time did you see him make any motions with his arm?

A. I couldn't tell. His arm was straight west to me.

Q. Did you ever see anything in his hand?

A. Yes, sir.

Q. What did you see?

A. What appeared to be a gun.

Q. Did you later see the gun?

A. No, sir.

. . . . .

Q. ... Was Mr. Jolley's snowmobile moving?

A. When?

Q. Just immediately before the shot.

A. Well, it was—I was watching Singer. As I remember, the snowmobile was coming to a stop. I mean, there was a stopping process there.

Q. Would you say that Jolley shot at the time that the snowmobile stopped?

A. I would say it was possibly still in motion.

Q. But he was almost stopped?

A. I would say yes.

Q. He was in the process of stopping?

A. Yes, sir.

. . . . .

Q. Did you see Mr. Singer draw his gun?

A. No, I seen him after he had his gun out and his arm extended.

Q. Well, did you see any agents draw their guns?

A. No.

Q. At the time that Mr. Singer fell, how many agents had their guns out?

A. Mr. Gunderson was the only one that I seen with his gun out at that time and that was as he went up to Mr. Singer.

Q. There may have been others you didn't see?

A. There may have been.

. . . . .

Q. You said that Mr. Singer had been running for some 15 steps?

A. I would say yes, guessing.

Q. All during the period of time that he was running he had his gun out?

A. Yes, sir.

Q. Did Mr. Singer ever fire a shot?

A. Not that I know of."

Deposition of Grant Larsen at 65–77, 176–77, 181, 239, 241–43.

Tom Carlson testified at his deposition about the arrest attempt as follows:

"Q. ... Did you see Mr. Singer shot?

. . . . .

A. No, I didn't.

Q. Did you hear the shot?

A. Yes.

Q. Did you see him fall?

A. No.

Q. Did you see him laying on the ground?

A. Yes. I saw him prior to being shot.

Q. I want you to show me where you were when you heard the shot.

A. Okay, I was approximately this position, 50 to 75 yards from the road, the compound road, maybe 100 yards.

. . . . .

Q. There was a second snowmobile. Where was it when the shot was fired?

A. He was in this position.

Q. ... Who was the head of the other machine?

A. Henley was and Farley. He's the trooper.

. . . . .

Q. When the shot was fired, were you in sight of Singer?

A. Yes.

Q. You just weren't looking at the moment when the shot was fired, is that right?

A. I was driving and I observed the two snowmobiles coming this direction and I observed Mr. Singer here and then I was trying to judge my distance here and stay low so Grant Larsen could see over me.

Q. He was behind you?

A. He was the second man on my machine, yes, sir.

Q. He had a gun?

A. Yes, sir, he did.

Q. A shotgun?

A. Yes, sir, he did.

. . . . .

Q. So the point is, I guess, that you could have seen Mr. Singer when he was shot had you been looking at that particular moment but your attention was to the business at the moment.

A. Correct. I observed him, you know, stepping backwards, double-stepping backwards but I kept looking—

Q. He was double-stepping backwards?

A. Moving backwards.

. . . . .

A. ... I only took a quick glance as the snowmobile goes around and he turned. I noticed this type of effect and I seen his head and his arm and then I diverted my attention to the snowmobiles that were proceeding up the Loop Road and then I looked back where I was going and my position and I heard the shot at that time and I looked up and the first thing I looked at was our snowmobiles because the lead agent, Joe Schouten, kind of went like this and I thought he had been hit and then I looked over and observed Mr. Singer.

Q. What did you see when you observed him?

A. He was lying on the ground.

. . . . .

A. When I first saw him? Well, he was in this type of position. He was looking like he was running, running and leaning back over his shoulder like this.

. . . . .

Q. ... Did you hear the shot?

A. Yes, sir, I did.

Q. Did you hear any echo?

A. Just heard the shot.

Q. No echo?

A. No.

Q. Your snow machine was going rapidly?

A. Yes.

Q. High rate of speed?

A. Yes.

Q. Relative to the speed of a snow machine?

A. Yes.

. . . . .

Q. (By Mr. Spence) When you looked up the next time, where were the other snow machines?

. . . . . .

A. When I looked up the next time?

Q. That is when you looked up and saw Mr. Singer down, at the time you saw him down

. . . . .

A. And the snow machines at that time were not quite to him. I would say, gee, ten feet.

Q. Behind him?

A. They were moving, yes.

. . . .

Q. ... Were the snow machines side-by-side in the lane?

A. No.

. . . . .

THE WITNESS: The one on the right was ahead.

Q. (By Mr. Spence) How far ahead?

A. Six feet, eight feet, six feet.

Q. All right, who was on the one on the right [snowmobilers' right]?

A. This machine?

Q. Yes, draw a line to it and who was on that one. Jolley and Schouten?

A. Correct, he's the driver.

Q. Schouten was the driver?

A. Uh-huh (affirmative).

Q. Since this was six feet closer, would you say that that machine was about 14 or 15 feet from Mr. Singer?

A. I would say it was 20.

Q. Then the other one must have been—

A. That's where I went between 20 and 30. The first one is 20 to 25 and the other one five, six feet behind him.

Q. So you think Mr. Jolley was about 20 feet from Mr. Singer at the time you last saw them before the shot?

A. In that area.

Q. And that would be seconds, wouldn't it, fracture [sic] of a second?

A. Yes.

Q. So based upon that it would be your best judgment that Mr. Singer was running, the snow machine was moving forward and it was just a fraction of a second, so your best judgment, if I asked you, and I'm going to ask you, would be that Jolley was approximately 20 feet from Singer when he pulled the trigger?

A. I would say about 20 feet, yes, sir.

Q. Could you swear that Jolley pulled the trigger?

A. No, sir.

Q. Any other agents down in the area?

A. Yes, there was. There was Hayward.

Q. Where was he?

A. He came up between the houses.

A. He came out between the houses. He went through there."
Deposition of Tom Carlson at 54, 56–65.

Summit County Deputy Sheriff Bates and Robert Hayward were assigned to a snowmobile which was to isolate John Singer from the houses in the area. Mr. Hayward described the arrest attempt as follows:

"A. Okay, this is the road I took.

A. Yes, through this gulley right here and around on the other side of this board fence that was open, 12, 14 inches of snow and this is kind of dumb but just as we come around the edge of that fence, I could here [sic] the commotion over here, the hollering and as I did that I put a shell in my barrel and as I took my hands off of holding on, he hit the gas and I fell off. I landed on my back down the fence a ways in the snow.

A. Okay, I lit on my back in the snow and I come up a running and I run alongside this board fence this way and the man that was driving the snowmobile [Bates] had driven the snowmobile up there.

Q. He didn't stop to wait for you?

A. No, he was going.

Q. Because he was ahead of you?

A. He was in front of me there and I run along this board fence.

Q. Were you behind the snowmobile?

A. Yeah, he had parked the snowmobile and got off.

THE WITNESS: We were pretty well even across. He was at the snowmobile and bounced off the snowmobile and I run across the fence.

Q. (By Mr. Spence) Let's mark this point B. Now at point B you and the man on the snowmobile were both off the snowmobile and were across from each other, is that correct?

A. Yes.

Q. You've marked that with point B. Now at point B where was John Singer?

A. Okay, John Singer was running.

A. ... I could see John Singer running up the lane but I couldn't see the snowmobiles. I could hear the hollering and I could hear the snowmobiles but I couldn't see them for the house and the fence.

Q. What did you see when you saw John Singer?

A. John Singer was running up the lane with an arm extended, a gun in it and he had his full back towards me.

Q. All right, go ahead.

A. Okay, and I pulled my gun up and aimed it right at him. I put it right between his shoulder blades and I pulled it up and I was watching him as far as I could see. Then he had the gun and he was running but he hadn't fired and I pulled it up and I was just taking aim like that and a shot went off.

Q. Were you getting ready to kill him?

A. I don't know. If it had to be done, I guess it had to be done.

Q. Then somebody fired a shot and he fell?

A. I heard a shot and John Singer went down. There is a driveway right here and John Singer laid right in front of that driveway right there.

A. Yeah, it was in this driveway from that first house there.

Q. ... Where was the other officer now?

A. Well, I'm thinking he was right alongside of me, ... He was coming along the side of the house and we was trying to get out here and cut this thing off and I am saying he was right here because as soon as the shot was fired and he went down, he ran right out in front of me so he had to have been right in back of me somewhere.

Q. Where do you think the snowmobile was?

A. I'm thinking it was either—he dropped it there or right alongside of that house somewhere.

Q. ... Officer, when you first saw John Singer, where was he?

A. Okay, he came into view from off the side of the house. He was in about this area right here.

Q. ... Now I'd like you to tell me approximately how far he ran between the time you first saw him and the time when he was shot, just your best estimation?

A. Okay, I would say it was probably somewhere around 15 feet.

Q. Fifteen feet, so where do you think he was when you saw him shot?

A. Shot, he would be—there was a driveway that come out here from that house and he was right there.

A. Yeah, he was right on the edge of the road, on the mouth of that driveway.

Q. ... Did you see the position of any of the other officers at the time that the shooting occurred?

A. At the time the firing took place, no, I was there. I didn't see this man. He had to be right behind me because he run right past me.

Q. Where did he run to?

A. He ran out to Mr. Singer.

Q. What exactly, if you can remember, and I'd like this to be as exact as you can remember, did you hear when you say you heard the officers shouting before John Singer came into view?

A. There was more than one saying it. One said—I heard the one say 'Give it up, John, you are under arrest.' I heard one say, 'Police officers, John, give it up.' I could hear that commotion going on.

Q. How many times did you hear that?

A. Two or three times.

Q. Did he say anything?

A. Never heard a word.

Q. You say when you saw him and I think you said at the time he was shot he was running, is that correct?

A. Right.

. . . . .

Q. . . . Did he seem to be running as well as he could under the circumstances, as fast as he could under the circumstances?

A. He was jogging. He wasn't full bore running but he was jogging sidewards and under the conditions and the snow and things like that, that's as best as he could do.

. . . . .

Q. How many shots did you hear, Officer?

A. One shot."

Deposition of Robert Hayward at 36–43, 54–55, 60.

Summit County Deputy Sheriff Bates testified about the arrest attempt as follows:

"A. Okay, as I recall, I got the snowmobile started up and Bob and I lost sight of Mr. Singer while he was going in front of his house.

. . . . .

A. Okay, the next time I saw him he was headed east and had a pistol in his hand and was pointing back at the—

. . . . .

A. Okay, by this time Bob [Hayward] had been dumped off right about in here . . . .

. . . . .

A. . . . Okay, the snowmobile last rounded—I could hear him yelling here, the officers down here yelling.

Q. What were the officers yelling?

A. I couldn't tell exactly.

Q. Okay.

A. But I was looking back to see if Bob was all right because he had fallen off, because all I heard—remember hearing was, 'Oh, whoa' or 'Oh' or something to that effect and my snowmobile went just a little ways, maybe two, three links more, something like that. When I was doing this, I was looking around.

. . . . .

Q. . . . That was your location when you next saw John Singer, is that correct?

A. Yes.

. . . . .

Q. You had no problem seeing Mr. Singer at that point, did you?

A. No.

Q. Would you please describe what observation you made about Mr. Singer at that point?

A. Mr. Singer had a pistol in his right hand and was pointing it west and looking west and then back and running east or trotting. I couldn't see his feet because of a wooden fence.

. . . . .

A. Yes, when I first saw him he had his arm stretched out with a pistol in it and he was—

Q. This is his back down here.

A. He was more interested in looking back than he was this—east.

. . . . .

Q. What was he doing at that point?

A. Looking west and pointing a pistol down west.

Q. Was his back to you?

A. Yes.

Q. Was he running backwards?

A. Sidewards he was. He would be running east.

Q. Are you sure of that?

A. Yes.

Q. Then did he change positions?

A. He looked a time or two, just glanced back like that to see where he was going as he was going sideways.

Q. Okay, running at all times?

A. More or less a shuffle type run.

Q. Approximately how fast was he moving?

A. Oh, I don't know how to describe that, just shuffling along about, you know, if you was running, I would imagine about quarter of speed.

Q. Okay, how much distance did he cover between the time you first saw him at point A and when he changed his position substantially next?

A. The body position stayed pretty near the same all the way through. He just more or less looked like this, just glanced.

Q. Then while you are doing that, what you are doing so the record can follow you, you are turning your head back and forth indicating that he would be looking where he was going and then turning around looking back at the officers.

A. Just glancing where he was going.

Q. Is that correct?

A. More or less, paying more attention to the west than he was to the east.

Q. How about his arm that you saw that contained a pistol, was he holding that steadily pointing at any one direction or was he waving it back and forth?

A. He had his arm straight and going like this.

Q. There again, sir, what you are doing is you are holding your arm relatively straight and you are moving it in a radius of about how many inches? You tell me, that he was moving?

A. Twelve, 14 inches.

Q. He was moving in a 12 to 14 inch radius to cover several people, would that be correct?

A. Yes, pointed right just about human level, just about what you would point at somebody if you was pointing a gun at somebody.

Q. Then, sir, what was the next observation you made?

A. He glanced a couple of times back to the east while shuffling sideways and then it seemed like things had kind of slowed up and it was just kind of a stop motion and just for a split second and then back and he dropped out of sight. I heard a gunshot and he dropped out of sight.

. . . . .

Q. Where were you at the time you observed Mr. Singer having been shot?

A. I had got off my snowmobile and taken my service revolver out of its holster and was headed in kind of a southwesterly direction like this.

. . . . .

Q. Where was Mr. Hayward?

A. As I recall, I was paying a lot of attention right here to Mr. Singer because the weapon was involved and it seems to me that he was behind me but I don't really remember seeing him.

Q. Alongside you or behind you?

A. Could have been but I was, you know, like this and paying more attention here than I was there.

Q. Fair enough.

A. Or back.

Q. Approximately how far were you, Mr. Bates, from Mr. Singer at the time he was shot?

A. Oh, gee, approximately 75 feet, something like that, 65, right around in there.

. . . . .

Q. ... So Mr. Singer was located almost right directly in front of a driveway, is that true?

A. Yes.

. . . . .

Q. ... [W]hat, if anything, did you hear being said by anyone?

A. Okay, I heard, as I recall, I heard 'Police, drop your gun.'

Q. When was that?

A. Oh, just before the shot was fired.

Q. Just moments before the shot was fired?

A. Yes, just two or three seconds, whatever, maybe not even that long.

Q. Do you know who stated that?

A. No, I don't. Officers from down here.

Q. By that you are referring to the officers that were west of Mr. Singer, is that correct?

A. Yes.

Q. Did you hear anything else other than what you just described?

A. I heard them yelling just prior to this when I still had my snowmobile running but I really was paying more attention to Bob than what was going on.

Q. I believe your testimony was at that time you didn't know what was said or who said anything other than you just heard voices?

A. I heard yelling, yeah.

Q. So the only yelling that you were able to hear and distinguish was what you just testified to, 'Police, drop your gun'?

A. Something to that effect.

Q. Just a couple [sic] seconds before the actual shooting, is that correct?

A. Yes.

Q. Anything else that you heard at all?

A. No, not that I can remember offhand.

Q. Did you hear Mr. Singer say anything?

A. No."

Deposition of Robert A. Bates at 84–99.

Officers Jolley, Schouten, Gunderson, and Fullmer were on the two snowmobiles closest to Mr. Singer—the ones following him west to east up the lane—at the time of the shooting. Mr. Schouten described the arrest attempt as follows:

"Q. Just before Mr. Jolley shot Mr. Singer did he say anything to you?

A. Did Mr. Jolley state anything to me?

Q. Yes.

A. No, he did not.

Q. Did you hear him say anything to anybody?

A. Yes, I did.

Q. Just before Mr. Jolley shot did you know he was about to shoot?

A. No, I did not.

Q. Was the snowmobile going?

A. Yes it was.

Q. How fast?

A. Walking speed.

Q. You weren't in a hurry?

A. At which time are you talking about?

Q. Just before the shot occurred you said you were going at walking speed.

. . . . .

THE WITNESS: We were more or less at a type of a stand-off, a gun being pointed at us.

Q. Did you slow down the machine?

A. Yes.

Q. You had?

A. From the speed we was previously going.

Q. What speed were you previously going?

. . . . .

A. It is really hard for me to estimate the speed we was going.

. . . . .

Q. And did Mr. Jolley put his gun up in front of you or along the side of your head?

A. It was over my head.

Q. Over your head. Where were you?

A. Where was I? In front of the snowmobile.

Q. Uh-huh, and you knew he was going to shoot, didn't you?

A. No, I did not.

Q. Well, you knew he was pointing his rifle, didn't you—or his shotgun, didn't you?

A. Yes, I did.

Q. So you were sitting there and he was sitting behind you?

A. Correct.

Q. Or was he standing?

A. He could have been half standing on the runners of the snowmobile, I'm not—

Q. Well, what do you think, would he have to kind of be half standing do you think to do what he did?

A. No, he wouldn't have to be.

. . . . .

Q. (By Mr. Spence) Was it over your head?

A. I can't be sure whether it was exactly directly over my head or on the side of my head.

Q. Well, if it was to the side of your head would it have been the area above your ear?

A. Yes.

. . . . .

A. ... My position at the time I was ducking trying to get behind the engine of the snowmobile.

Q. When he put the gun over your head didn't you kind of duck down to get out of the way of the blast?

A. No, I was ducking because of the gun being pointed at me by Mr. Singer.

Q. He pointed at other officers too, didn't he?

A. Yes, but he pointed it directly—

Q. Did any of them get down?

A. I can't recall.

Q. Did you look.

A. I was looking at the weapon being pointed at me not at the other officers.

Q. Did you pull your weapon?

A. No, I did not.

Q. What did you do with it.

A. It was in a holster on my side.

Q. What was it there for?

A. It is for my protection.

Q. So did you ever pull your weapon?

A. Yes I did.

Q. When?

A. After the shooting and after I pulled the snowmobile in front of Mr. Singer.

Q. After the shooting?

A. Yes.

Q. But before the shooting you never did, is that correct?

A. No, I did not.

Q. Do you know of anyone else who pulled their weapon before the shooting?

A. No, I do not.

Q. Even though they were pointed at?

A. No, I do not.

. . . . .

Q. (By Mr. Spence) How far was Mr. Singer in front of your snowmobile at the time of the shooting?

A. Thirty, thirty-five feet—excuse me.

Q. Thirty-five feet?

A. Thirty, thirty-five feet, yeah in that range.

. . . . .

Q. ... Were you as close as ten feet?

A. No.

Q. Twelve feet?

A. No.

. . . . .

Q. Was Mr. Singer walking or running, or what? What was he doing when the shot was fired?

A. Not a walk, not a run; it's just a fast walk I would say.

Q. But not a walk, not a run?

A. A fast walk.

Q. A fast walk?

A. Yeah, you know, like a side step, a quick side step.

. . . . .

Q. You didn't have your weapon drawn on this circumstance, did you?

A. No, I did not.

Q. You could have, couldn't you?

A. It was really hard to hold a weapon and drive the snowmobile at the same time.

Q. But could you draw a weapon at the same time, do you think?

A. No, not safely.

**246**

Q. When you slowed it down to five miles and [sic] hour or less or to a walking speed did you draw your gun?

A. No, I did not.

Q. When Singer pulled his gun did you say anything?

A. No.

. . . . .

Q. Isn't it true that at the time of this arrest that your snowmobile was closing the gap between you and Singer, that is, you were getting closer to him all the time?

A. At the beginning we were, in the end it was about even.

. . . . .

Q. You had a shotgun behind you?

A. Yes, Mr. Jolley had one, I didn't have one.

Q. You had a man behind you on a snowmobile who had a shotgun?

A. Yes.

Q. How far behind was he?

A. I couldn't answer that I'm not aware how far he was.

Q. Did you hear the snowmobile behind you?

A. Yes.

Q. Did you hear what those people were saying?

A. They didn't say a thing.

Q. They didn't say anything or at least you didn't hear it, is that correct.

A. Correct.

Q. How do you know they didn't say anything?

A. I believe I had good hearing.

Q. Did the snowmobiles make any noise?

A. Of course.

. . . . .

Q. When Mr. Singer pulled his gun and waved it back and forth between the officers what did that mean to you.

. . . . .

Q. Did it convey any thought to you.

A. Yes, fear.

Q. It conveyed fear?

A. Correct.

Q. What did you think he was trying to do?

A. I have no idea what he was thinking.

Q. Well, how did you react to that, there is a man waving a gun back and forth.

A. I slowed my snowmobile down is how I reacted.

Q. All right, you saw it as—

A. A threat.

Q. —as a threat, as a warning?

A. No, a threat.

Q. Yes. Threat to what?

A. To my safety and the safety of the officers with me.

. . . . .

Q. Would you say that he was moving, whether we use the word running or walking, was he moving as fast as he could under the circumstances?

A. No.

. . . . .

Q. So you were really frightened when he started to wave his gun back and forth, is that right?

A. When he started to wave that was right when he pulled the gun.

Q. Yeah.

A. I got more frightened when he stopped moving from snowmobile to snowmobile and pointed it in my direction.

Q. Yours was the one out in front, wasn't it?

A. Correct.

Q. So yours was the one that was the closest threat to him, isn't that right?

A. Yes.

. . . . .

Q. How far were you from him at that time?

A. I can't recall the distance.

. . . . .

Q. Did he [Hayward] ever get there before Singer was shot?

A. I—speaking now or at the time?

Q. Now. Do you know whether he got there?

A. No, he did not.

Q. What happened?

A. They hit a ditch or something on the snowmobile and were unable to get there.

. . . . .

Q. All right, now, what was your speed at the time Mr. Singer was shot?

A. The walking speed, five miles an hour, maybe four.

. . . . .

Q. Where were you—where was Mr. Singer when you first saw him, when you first saw him?

A. At the mailboxes.

Q. Where were you when you first saw him?

A. On the Upper Loop Road.

. . . . .

Q. How far were you from Mr. Singer at that time, approximately?

A. Fifty to seventy-five yards.

. . . . .

Q. Okay, where was the other snowmobile at that time?

A. Behind.

Q. Whereabouts behind you?

A. I didn't look back to see.

Q. Was there ever a time when the other snowmobile was in front of you?

A. No.

Q. What's the next thing you can now recall after you first saw Singer?

When did he first start to wave his gun in relationship to where he was and where you were?

A. At the entering of the lane in the upper loop road.

. . . . .

Q. How far do you think you were apart at that time?

A. About thirty feet.

. . . . .

Q. And how far apart were you when he was shot?

A. About thirty feet.

Q. So it is your testimony that between the time he started to wave his gun and the time he was shot that the gap didn't get any closer?

A. Correct.

Q. You maintained the same distance, is that correct?

A. Yes.

. . . . .

Q. Did you see the machines that came down from the other direction at that time, were they in sight?

A. At which time?

Q. At the time that Singer was shot.

A. I wasn't paying any attention to that.

Q. You don't know where they were?

A. No, I do not.

. . . . .

Q. ... Well, give me your position at the time of the shooting.

A. My position?

Q. Yeah.

A. On a snowmobile.

Q. Well, were you on the snowmobile or off the snowmobile?

A. On the snowmobile.

. . . . .

Q. You never did get off of the snowmobile, did you?

A. Yes, I did.

Q. When? I mean before the firing you never got off?

A. No, I did not.

Q. And you went to one side or the other on the snowmobile, you just simply slouched down, isn't that right?

A. I was to the right side when I did.

. . . . .

Q. (By Mr. Hanni) ... You described him just taking his gun out and that he was moving it back and forth?

A. I wouldn't say he was moving it back—what he did after he removed his gun, I believe he pointed it at us and then went over to the snowmobile and came back to us.

Q. When he came back, tell us what he did?

A. When he came back to us he maintained the sighting on myself and Mr. Jolley.

Q. Was it after that the shot was fired?

A. Correct.

Q. How many shots were fired?

A. One.

. . . . .

Q. (By Mr. Spence) ... Mr. Singer first started to move his gun back and forth between the positions of the two snowmobiles and the time he was shot, how much time elapsed?

A. Maybe 15 seconds at the most."
Deposition of Joe Schouten at 5, 10–13, 16–18, 55–57, 60–64, 70, 74, 77–81, 84, 126–27.

Officer Ron Gunderson testified about the arrest attempt as follows:

"A. ... About the same time we approached he looked at us and didn't seem to be too excited, and then all of a sudden he looked again, realized that we were police officers—we had patches and so forth identifying ourselves. At that time he ran east toward the compound. At this time both snowmobiles caught up to Mr. Singer and almost immediately he pulled a revolver from what appeared to be his waist area. At this time both snowmobiles dropped back a considerable distance hoping to maintain some type of safe distance and not get people too excited.

. . . . .

Q. Where were you when that [Singer drawing gun] occurred?

A. We were approximately to his left, about thirty to fifty feet to his left.

Q. ... You were on the Fullmer snowmobile?

A. That's correct.

. . . . .

Q. And where, at that time, was the Jolley snowmobile?

A. It was to my right.

Q. How far apart was the Jolley and the Fullmer snowmobile, [sic] if you can remember, at that time?

A. Almost right next to each other. Probably five feet apart, maybe; I don't know, I don't remember exactly.

. . . . .

Q. And how far were you from Mr. Singer at that time.

A. Thirty to fifty feet.

. . . . .

Q. Who was ahead, your snowmobile or the Jolley snowmobile?

A. I don't remember.

Q. Would they be fairly close together—

A. Very close.

. . . . .

Q. All right, how fast were the snow machines going at that time?

A. Half speed.

. . . . .

Q. Just your best estimate?

A. Twenty miles an hour, maybe.

Q. All right, and when Mr. Singer drew his gun what was he doing, running?

A. He was running towards the house at that time.

Q. Would you say that under the circumstances that existed at the time, that he was running as fast [sic] an ordinary man could run under those circumstances?

A. No. And the reason for that is, he wasn't running direct. He was on about a three quarter's angle. He had pulled the gun with his right hand and put it over his shoulder, so I'm sure that hampered his speed and mobility.

Q. What did he do with the gun?

A. He waved the gun back and forth between the two snowmobiles similar to a fending off type of situation.

Q. All right, what you were seeing him do, in effect, was to warn or threaten the men that were chasing him, isn't that correct?

A. No. At that immediate time I was in fear of my life that I would be shot.

Q. I understand, but you say he was fending you off?

A. Only because he was going back and forth.

Q. Yes?

A. He did not take a dead aim at that point on any one individual.

Q. He was telling you not to chase him, isn't that right?

A. I didn't read it that way.

Q. How did you read it?

A. I didn't read it any way at all. All I knew is that at that point he was under arrest and we were in pursuit and he pulled the gun. That's all I—that's all that went through my mind.

Q. All right, when he did that, when he used this fending off motion what did you do?

A. We slowed the snowmobiles down and maintained a distance of probably—distances are very hard here because you're so concentrating on what's going on.

. . . . .

Q. (By Mr. Spence) Anyway, when he was using this fending off motion you slowed down, to what speed did you slow down?

A. The approximate speed to keep pace with Mr. Singer, which was about a three-quarters run and we were approximately thirty to forty feet behind him at the time.

Q. All right, would you say that you slowed down to about three to five miles per hour, something like that?

A. Approximately.

Q. And how far did you move toward— or how far did you follow Mr. Singer at that speed after you slowed down to the place where he was shot.

A. It is hard to say but somewhere not quite halfway, maybe a quarter of the way.

Q. How far in feet would that be, approximately?

A. That would be—it is really hard to determine, but I'm just going to take a wild guess at about fifty yards.

Q. You moved about fifty yards at that speed, is that correct?

A. Yes. And during that time he was pointing the gun back and forth between the two snowmobiles and we were identifying ourselves as police officers and telling him that he was under arrest, to put down the gun. Everybody was saying that.

Q. All right, so we can keep this in speed—I mean in feet and keep it consistent, you would say that after you slowed your snowmobile down you moved a hundred and fifty feet before he was shot, is that correct?

A. I can't give you—

Q. Approximately. I'm trying to change fifty yards to feet.

A. Okay.

Q. A hundred and fifty feet?

A. Okay, approximately.

Q. All right, and so during a period that you moved one hundred and fifty feet you were moving that one hundred and fifty feet at a rate of about three to five miles an hour and he was moving that one hundred and fifty feet at about three to five miles an hour?

A. That's correct.

Q. Was the distance between you and Singer maintained or did you gain on him.

A. It went back and forth. Sometimes my snowmobile was ahead and then I

would have to cut it back and then sometimes the other snowmobile was ahead to my right, and then we would cut it back, and we just tried to keep the same base and the same distance but it was very difficult to do so.

Q. Uh-huh, how long do you think, in minutes or seconds, it took to cover this one hundred and fifty feet?

A. I'm going to say somewhere between thirty seconds and one minute.

Q. Okay, and during that thirty seconds to one minute did Mr. Singer continue to do this fending off business?

A. Yes, he did.

. . . . .

Q. Between these two snowmobiles you say you were ahead, and then the other one would be ahead?

A. A little bit.

Q. At the time of the shooting which one was ahead?

A. I really don't know, I really don't. And the reason I don't know is because my full intent was on John Singer.

Q. All right.

A. My full concentration was on the man who was pointing a gun at me, so I really didn't care about the snowmobile over there on my right.

Q. All right, did you have your gun drawn?

A. No, I did not. The drivers of the snowmobiles had revolvers and the personnel on the back had shotguns, so we left it up to them.

Q. Would it have been impossible for you to draw your revolver and drive the snowmobile?

A. I don't think so. It was pretty hard.

. . . . .

Q. What were they [the other snowmobiles] doing?

A. They were doing the same thing that I was doing. The driver was driving and the man on the back was pointing the shotgun at Mr. Singer.

Q. Did they have their shotgun pointed at Mr. Singer, both people?

A. Yes, they did.

Q. And—

A. Well, I couldn't tell about my partner on the back because I wasn't looking back there. I was just—out of my peripheral vision I could see—

Q. The other man had his shotgun pointed?

A. That's correct.

Q. That would be Mr. Jolley?

A. That's correct.

Q. How long do you think Mr. Jolley had his shotgun pointed? Would it be for the full hundred and fifty feet?

A. I think from the onset, I would just assume. Now, I didn't observe him the entire length of that, so that's just an assumption.

. . . . .

Q. . . . All right, now, I want you to just tell me in your own words what you saw at the time that Mr. Singer was shot.

A. Okay, I just heard the shot and I saw Mr. Singer fall. He just dropped suddenly to the ground.

Q. I'm sorry to interrupt you. Had you been looking at Mr. Singer when the shot occurred?

A. Yes.

Q. You were watching Mr. Singer when the shot occurred?

A. Yes. So I didn't see the shot, I just heard the shot.

Q. All right, but did you have your eye on Mr. Singer when you heard the shot?

A. Yes.

Q. When you watched Mr. Singer, what did you see?

A. He just fell. He didn't take another step, he just fell direct.

Q. All right, what was he doing at the time of the shot?

A. He was pointing the gun at the other snowmobile.

Q. Anything else that you can recall that he was doing?

A. Well, he was on a three-quarter's run facing back towards the snowmobiles pointing the pistol directly at that snowmobile at the time the shot was fired.

Q. Did you have his face clearly in view?

A. Not really.

Q. Did you have it in view as well as anybody else did there?

A. Probably not as well as the other snowmobile because he had the gun in his right hand, which means he was turned this way, and I was to the left of the Jolley snowmobile, which meant that the back of him was more towards me and—

Q. Could you see his eyes?

A. No.

Q. Did he say anything?

A. I didn't hear him say a word.

Q. You saw him fall?

A. I saw him fall.

Q. Then what happened?

A. He fell face down in the lane. We stopped the snowmobiles. I jumped off the snowmobile and as I approached him I then took my revolver out of my holster.

. . . . .

Q. ... [H]ow far were you from Singer?

A. Oh—

Q. At the time of the shot?

A. I'm going to say thirty to fifty feet because I really don't know.

. . . . .

Q. [By Mr. Hanni] Officer Gunderson, in getting down to the day of the arrest effort, ... can you tell me during the time between the time that Mr. Singer drew his gun and the time of the shooting, tell us just what the officers were saying.

A. We were all saying, 'Drop your gun, you're under arrest, we are police officers', pretty much along those lines, over and over again.

Q. How many times would you say that was said, do you have any estimate of that?

A. I said it myself at least three or four times so—

Q. Did others say it?

A. Yes.

Q. And were you saying it in a loud voice?

A. Yes, I was.

. . . . .

A. I heard Lew Jolley say it over the noise of the snowmobiles and he was approximately ten to fifteen feet to my right.

. . . . .

Q. Okay, what was Mr. Singer—you have described what he was doing and he was moving that gun back and forth on the two snowmobiles. Did he keep doing that all the time or what did he do?

A. At various points he would stop waving the gun and point directly. At one point in particular I remember him pointing it directly at me without a waving motion and it was at that point that I felt that he was going to fire at me at that instant.

Q. How long was that before the shot was actually fired?

A. I don't know.

Q. Very shortly?

A. It is very hard for me to have a concept of time when all of this was going on so it seemed like a long time, but I'm sure it was very brief because he only traveled approximately a hundred feet or so. So I'm sure it was very brief. I don't have any idea, and then he pointed the gun at the other snowmobile directly without a waving motion also.

Q. Did you see him do that?

A. Yes, I did.

Q. And was that when the shot was fired?

A. All I remember is that he was pointing at that snowmobile when the shot was fired. Whether he was waving it or not I don't know."

Deposition of Ron Gunderson at 33–44, 46–47, 73–76.

Officer Lewis Jolley testified in his deposition about the arrest attempt as follows:

"Q. Well, tell me what you know, what actually happened, what you did.

A. I got on behind Schouten, I don't recall which one of the three snowmobiles I got on, Schouten was driving.

. . . . .

Q. All right. So you got on Schouten's snowmobile, and where did you go?

A. Yes, sir, we came out and down the driveway, and . . . started onto the upper loop road. At that time Mr. Singer was at the mailbox.

. . . . .

Q. All right, then what happened?

A. He looked down towards us.

. . . . .

Q. Where were the other snowmobiles by this time?

A. I don't know where the two from the A-frame were. I don't know where the one that Bates and Hayward were on was. Fullmer and Gunderson were approximately here. (indicating).

. . . . .

Q. They were ahead of you?

A. Yes, sir.

. . . . .

Q. And Singer is looking at you. What do you perceive? Were you looking at him?

A. Yes, sir.

Q. Did you say anything to him at that time?

A. No, sir.

Q. How far away were you from him . . .?

A. I don't know, from the driveway of the Weller home to the lane.

Q. Well, give me an estimation of the distance.

A. Oh, roughly 300, 350 yards.

. . . . .

Q. . . . [W]hat did Singer say or do when you looked at him and he looked at you?

A. Nothing.

. . . . .

Q. It would have been, if he looked up, he would have seen somebody, two men, four men on snowmobiles with blue jackets, correct?

A. Yes, sir.

Q. Because you were facing him, he was facing you?

A. Yes, sir.

. . . . .

Q. He saw guns undoubtedly?

A. At that time I don't think so.

Q. Why not?

A. I don't think there were any guns at that time where he could see them.

Q. Where would you have kept the shotgun?

A. Just right standing on the seat between Schouten and myself.

Q. Do you think that would have been concealed from him?

A. If he could have seen any of it, it would have been the very tip of the barrel.

Q. Did he say anything?

A. No, sir.

Q. Did you say anything?

A. Not at that time, no, sir.

Q. Did you hear anything, any machines coming from the A-frame?

A. No, sir.

. . . . .

Q. What did Singer next do?

A. Turned and started back towards the lane and up the lane.

Q. All right. So where is the next place do you remember seeing Singer on that lane?

A. Probably right at the entrance.

. . . . .

Q. . . . [H]ow far were you apart?

A. One hundred and fifty to 175, maybe 200 feet. It would have cut the distance in about half.

.　.　.　.　.

Q. All right. Now, what's the next thing that Singer—Did Singer do anything at that time?

A. Yes, he looked back again towards us.

Q. Would your front still be to him?

A. Yes, sir.

Q. Did you say anything to him then?

A. Yes, sir, at that time I hollered at him, 'Halt. Police. Drop your—'

Q. How far apart were you?

A. Oh, roughly 150 to 175 feet.

Q. That would be over a half a block away.

A. No, that would be about a quarter of a block away.

.　.　.　.　.

Q. Okay. All right, then where did you go, Officer?

A. At that particular time we continued towards the lane, and Mr. Singer at that point started running up the lane.

.　.　.　.　.

Q. So how many times at that distance did you say 'halt'?

A. At that distance, once.

Q. Just once?

A. Yes, sir.

Q. Then what did he did?

A. At that particular point in time he started running up the lane. He reached with his right hand into the waist area of his coat and pants, I couldn't tell exactly where he went, and came out with a shiney object that I recognized as a semi-automatic pistol.

Q. And how far was he from you at that time?

A. Oh, I would imagine at that time the distance would probably have been down roughly around 100 feet.

.　.　.　.　.

Q. Did anything happen then that you recall except that he was running?

A. When I observed the gun come out, I at that time again hollered, 'Halt. Police. Drop your gun.'

Q. What did he say?

A. He didn't say anything.

.　.　.　.　.

Q. Do you think he could see your guns by now?

A. Possibly.

.　.　.　.　.

Q. And where do you recall seeing him next?

A. Well, from this point of time he was always in my vision. I saw him the whole period of time.

.　.　.　.　.

Q. What do you think the distance was between you then [at the time Jolley shot Singer]?

.　.　.　.　.

A. Twenty-five, 30 feet.

.　.　.　.　.

Q. Where was the other snowmobile that was with you at that time [when Jolley first saw Singer point a gun at the officers]?

A. Behind me somewhere, I don't know where they were.

Q. How did you happen to pass it since it started ahead of you?

A. Schouten was driving faster than Gunderson.

.　.　.　.　.

Q. How far were you apart ...?

A. The two of us?

Q. Yes.

A. Oh, I would say maybe 50 to 75 feet.

.　.　.　.　.

A. Well, at this particular time [at the moment of firing] he [Schouten] was almost off the snowmobile down on the right-hand running board behind the engine compartment of the snowmobile.

Q. Uh-huh. Had he stopped the snow-mobile?

A. No, sir.

Q. It was still moving?

A. Yes, sir.

Q. How was he off the snowmobile if he was driving?

A. Well, he was down on the running board, so at this particular time he was almost completely out of my—out from in front of me.

Q. He got out of your way, in other words?

A. Yes, sir.

Q. And did you tell him to do that?

A. No, sir.

Q. Did you tell him to get down?

A. No, sir.

Q. What's the distance that you have between the two of you now?

A. Oh, roughly 20 to 30 feet.

Q. ... Had he not gotten around on the side, he would have been between you and Mr. Singer, isn't that true?

A. Yes, sir.

. . . . .

Q. Do you remember aiming at Mr. Singer?

A. Yes, sir.

Q. Did you close an eye to aim?

A. Yes, sir.

Q. Which eye did you close?

A. The left one.

Q. Do you generally close an eye to aim?

A. Yes, sir.

Q. Have you been taught to do that?

A. Yes, sir.

. . . . .

Q. All right, which hand did Mr. Singer have his gun in?

A. The right hand.

. . . . .

Q. (By Mr. Spence) I want to make something very clear in the record. I want you to tell me the moment that you shot were you on or off the snowmobile?

A. I was on the snowmobile.

Q. And at the moment that you shot were you standing or sitting?

A. I was still sitting.

Q. You are certain of that?

A. Yes, sir.

. . . . .

Q. (By Mr. Spence) Now, while this was all happening ... I take it that Mr. Singer was running?

A. Yes, sir.

Q. He wasn't trying to—Was he still waving his gun?

A. No, sir.

Q. He had stopped waving his gun, had he?

A. Yes, sir.

Q. And I think you claim that you saw him squint an eye?

A. Yes, sir.

Q. With his head sticking back over his shoulder, running?

A. Yes, sir.

Q. You think it was a squint?

A. No, it wasn't a squint, it was a definite closure of the left eye.

. . . . .

Q. How long between the time he started waving his gun, when he first started waving his gun back and forth, pulled his gun out and started waving it back and forth between the officers—he did that, didn't he?

A. Yes, sir.

Q. And the time when you shot him, how long a time elapsed?

A. Well, it seemed like an eternity, but I would imagine maybe three or four seconds at the most.

Q. And how far did he travel in that three or four seconds?

A. I don't know.

. . . . .

Q. At that particular point [when Singer was shot] where are the other snowmobiles?

A. ... [T]he snowmobile with Fullmer on was somewhere behind me.

Q. Do you know where?

A. No, sir, I don't know exactly where it was. It was out of my peripheral vision, but it was somewhere behind me.

Q. Where were the other snowmobiles?

A. This one with Hayward and Bates on it, I never saw it again. I don't know where—

Q. Did they ever get up there to block him off?

A. They came out somewhere in this general area on foot (witness indicating).

Q. But did they ever get to the place where they could adequately block him?

A. I don't think so.

. . . . .

Q. Did any other officers say or do anything at the time you shot Singer?

A. No, sir.

Q. Did you hear anybody say anything immediately before that other than yourself?

A. No, sir.

. . . . .

Q. At what level was Mr. Singer holding his gun, was he holding it at shoulder level or waist level?

A. Approximately shoulder level.

Q. Are you sure of that?

A. Yes, sir.

Q. How many times did you holler, 'Halt. Police. Drop your gun'?

A. Three.

Q. Did you say, 'Drop your gun'?

A. Yes, sir.

Q. What did Singer do after you shot him?

A. He fell to the ground face down.

. . . . .

Q. Did you hear anybody else say that you were police officers other than yourself?

A. No, sir.

. . . . .

Q. Did you hear Gunderson or Fullmer say, 'Drop your gun,' or hear them say, 'We are police officers'?

A. No, sir.

Q. Well, they were close by to you, weren't they?

A. Yes, sir.

Q. They were as close to you as you were to Mr. Singer at the time of the shooting, isn't that true?

A. I would assume so, yes, sir.

. . . . .

Q. When he was running, would you say he was running fast or slow?

A. Well—

Q. Let me say it this way: Would you say he was running as fast as he could under the snow conditions that existed?

A. Well, that combined with the way his body was turned to the side—

Q. Yes.

A.—probably yes.

Q. He was trying to move as fast as he could?

A. Yes, I think so.

. . . . .

Q. When Mr. Singer looked back at you did he look over his right shoulder or his left shoulder?

A. His right shoulder—now which time?

Q. At the time that you shot him.

A. Over his right shoulder.

**256**

Q. At the time he was looking over his right shoulder how many times did you yell at him?

A. Three—two.

. . . . .

THE WITNESS: Two while he was looking over his right shoulder.

Q. (By Mr. Spence) Do you remember that?

A. Yes.

Q. Well, when were the other times that you yelled at him?

A. The first time was just as he was pulling the gun out. When I saw the gun I hollered at him to halt and drop his gun.

Q. Well, at the time he stopped waving his gun back and forth and you claim he aimed directly at you, how far were you from him at that time?

A. Roughly twenty to thirty feet.

. . . . .

Q. [By Mr. Hanni] Did you hear any other shot at the scene other than the one that you fired?

A. No, sir."

Deposition of Lewis Jolley at 105–116, 123–24, 126–28, 131–33, 137, 141, 145–48, 154, 195.

Immediately following the events described above, Officer Henley parked the snowmobile on which he and Officer Farley were riding on the Upper Loop Road by the mailboxes. Deposition of Larry Henley at 83. Henley moved up the lane towards where Mr. Singer lay, and Officer Farley stayed behind a telephone pole near the Upper Loop Road. *Id.* at 84–85; Deposition of Floyd Farley at 80. Officer Carlson also drove his snowmobile down to the main road, where he dropped Grant Larsen off, who proceeded up to the scene. Carlson then went down the road to obtain a pickup truck, following Grant Larsen's instructions. Deposition of Tom Carlson at 65.

Officers Gunderson and Bates were the first to reach Mr. Singer after he was shot. Gunderson testified in his deposition that after Singer fell, Gunderson "jumped off the snowmobile" and took his revolver out of his holster as he approached Singer. Deposition of Ron Gunderson at 44. As Bates approached, Gunderson was already standing four or five feet from Mr. Singer with a gun pointed at him. Deposition of Robert A. Bates at 102. Bates recalled Gunderson repeating several times "Police, drop the gun." Gunderson's recollection was as follows:

"So when I reached Mr. Singer, he was laying face down with his arms out. At that time I placed the gun to the back of his head to make sure he didn't turn over. I reached over, I grabbed the gun and I believe I gave it to a highway patrolman, then I put the gun back in my holster and at this time Grant Larson [sic] approached. I turned him over about three-quarters. At that time he was still alive...."

. . . . .

THE WITNESS: Then as I reached over here, the other officer was almost simultaneously there at about the same time. I put my gun in my holster. I grabbed the gun and handed it to the officer, Hayes or Bates or somebody. At that time my gun was holstered ....

. . . . .

Q. And you have described for us how you tried to get the gun out of his right hand and I think you told us that some other officer helped you or it was about the same time?

A. It was almost simultaneously and he was there and he just took it.

Q. And you thought it was a Highway Patrolman but at one point you said, 'I think it was Hayward or it may have been Bates', is that right?

A. I believe it was Bates."

Deposition of Ron Gunderson at 45, 60, 78–79. Bates recalled that as he approached Singer, he put his pistol in his holster and got the pistol out of Singer's right hand. Deposition of Robert A. Bates at 103. Officer Schouten testified in his deposition that Gunderson kicked the pistol out of Singer's hand, and Bates picked it up

about a foot away from the hand. *See* Deposition of Joe Schouten at 89–90. Officer Jolley also recalled that Gunderson kicked the pistol out of Mr. Singer's hand. *See* Deposition of Lewis Jolley at 142.

Officer Jolley testified in addition that Gunderson put his gun in the upper back portion of Mr. Singer as if holding him there. *Id.* at 142, 146–47. Grant Larsen testified that Gunderson may have placed his gun in either Mr. Singer's back or head. *See* Deposition of Grant Larsen at 75–76.

After Officer Bates picked up the gun, he turned and walked back towards Officer Hayward. He looked at the gun and noticed that it was in the firing position with the safety off. Deposition of Robert A. Bates at 104. Officer Hayward testified in his deposition that Bates walked back towards him with the gun, pulled the clip out, showed him the gun, and said " '[l]ook, the safety is off.' " Deposition of Robert Hayward at 43–44. Bates then put the pistol in his pocket.

By this time, Gunderson and Grant Larsen had turned Mr. Singer over, and Larsen removed another revolver and a large bowie knife from Singer's belt area. Deposition of Ron Gunderson at 45–46; Deposition of Grant Larsen at 227.

One of the Singers' neighbors, Esther Watson, was also present at the scene of the shooting. Esther Watson testified in her deposition as follows:

"Q. I need to ask you about a couple of things. It says here: [28] "Upon hearing the shouting "drop it" I did look up, and turned around and I see John pointing a gun at the oncoming ski-doo coming up the driveway.' Is it your testimony that that is what you heard, 'drop it'?

A. Yes.

Q. And that is all you heard; is that right?

A. Yes.

. . . . .

Q. ... Do you have any idea who was saying 'drop it'?

A. No. It seemed to me to be the oncoming ski-doo up the lane.

Q. How much distance was there between you and that ski-doo?

A. In feet or whatever, I can't answer that. A short distance, not too far away.

Q. Now, it doesn't say anything else about anything else that you heard. Is that all you heard?

A. Just that they had shouted several times, 'drop it,' to drop the gun. 'Drop it.'

. . . . .

Q. Later on you are talking about Mr. Singer pointing a gun.

A. Yes.

Q. Did you actually see that?

A. Yes.

. . . . .

Q. I was talking to a guy yesterday and he said that John was moving back up toward the house, to his house. Does that fit with your recollection?

A. No.

Q. It doesn't?

A. No.

Q. He said that he was slowly running back up toward the house. Does that fit with your recollection.

A. No, I didn't see that.

Q. Can you tell me whether his feet were pointing in the same direction as the gun was?

28. Counsel for plaintiffs is apparently referring to a statement given by Esther Watson on January 21, 1979, to County Attorney Adkins and Deputy Sheriff Leon Wilde. The statement attached as Exhibit 1 to Mrs. Watson's deposition is a statement which she gave to agents of the Federal Bureau of Investigation on January 26, 1979. The F.B.I. statement is in some respects contradictory to the statement given on January 21 and to Mrs. Watson's testimony in her deposition. Because the F.B.I. statement has never been properly authenticated, the court will not consider it with regard to these motions. In any event, viewing the evidence in a light most favorable to the plaintiffs, the court would accept as true the statements of Esther Watson contained in her deposition.

**258**

A. Yes. It seemed that his body was pointing in that direction.

Q. Was he moving toward the mailbox or was he moving toward the house?

A. When I saw him he was standing still.

Q. He wasn't moving at all?

A. No.

Q. Did you see who shot John?

A. No.

Q. Did you actually see the shooting?

A. No, I was reading.

. . . . .

Q. Did you ever see any officer or anybody else go up to see if John was alive or dead?

A. In what way do you mean? When I looked out about three of them were standing there and about that time the truck drove up and that's when they started putting him in the cab.

. . . . .

BY MR. HANNI: Q. Mrs. Watson, how many shots were fired?

A. One."

Deposition of Esther Watson at 6–8, 11, 22.

Of the Singer family, Charlotte Singer most directly observed the events described above. Charlotte testified in her deposition of November 8, 1980, at which time she was twelve years old, as follows:

"Q. You saw your dad stop the snow machine?

A. Yes.

Q. And walk down to the mailbox?

A. Yes.

Q. You were watching him all that time?

A. Yes.

Q. Through the binoculars?

A. Yes.

Q. You were at, what, your front window in the house or what?

A. Yes.

Q. And this is the house that you lived in?

A. Yes.

Q. Tell me in your own words, Charlotte, what you saw. What happened?

A. Well, I seen him go down to the mailbox and get the mail and while he was coming up, these two Ski Doos were chasing him up, and then I seen him fall.

Q. Can you describe for me how your dad was running?

A. He was running face up, like running home.

Q. Was he running to the side or was he running just straight home?

A. Straight home.

Q. Did you hear any shooting?

A. No.

Q. You didn't hear a shot fired at all?

A. No.

Q. Do you have any idea how far your dad ran before you saw him fall?

A. Two or three steps.

Q. And at the time, just before he fell, you didn't hear anything like a gunshot or anything like that?

A. No.

Q. Were you actually watching him through the binoculars at that time?

A. Yes.

Q. Do you know whether your dad had a gun in his hand or not?

A. No.

Q. You don't know whether he did or didn't; is that it?

A. Yes.

Q. You just didn't notice that?

A. Yes.

Q. What happened then, after you saw your father fall.

A. I went and got Mom and told her to get the gun and I was in her room helping her find her boots too.

Q. What happened then?

A. Well, what do you mean?

Q. Well, you went to get your mother. Did she get her boots on?

A. Yes.

Q. And then did all of you leave the house?

A. Well, I had a headache and an earache and I was sick, so I just watched out the window.

Q. You didn't go with your mother and your other sisters, then?

A. No.

Q. What else did you see?

A. Well, I just seen them walking down.

Q. What did the people on the snowmobiles do that were following behind your father?

A. I can't remember.

Q. You didn't see what happened to them after your father fell?

A. No.

Q. Did you watch everything that was going on?

A. Yes.

Q. Now, what did your mother and Shirley Black do? Did they have a gun?

A. Yes.

Q. What kind of a gun did your mother carry?

A. I think a .22.

Q. Was it a rifle?

A. Yes.

Q. Did you notice whether anyone else had a gun of any kind?

A. Yes.

Q. Who else had a gun?

A. Shirley.

Q. What kind did she have?

A. I don't know. It was a pistol.

. . . . .

Q. Did you notice how many people were on the snowmobiles?

A. There were two people on one.

Q. Two men?

A. Yeah.

Q. Did you notice how they were dressed?

A. No.

Q. Could you tell they were police officers, looking through your binoculars?

A. No.

Q. Did you suspect they were?

A. No, I didn't know.

. . . . .

Q. Now, go ahead and tell me just what you did see as you were watching your father through the binoculars and the men on the snow machines turning into your lane and coming up behind him. Tell me what happened.

A. Well, I seen him start running while they were chasing him up on the snowmobiles. Then I went in the room and told Mom to get her boots and, you know, the gun. Then she got that and then I went back in and got the binoculars and looked down there and then I seen him take a few steps and then fall and then blood came out of his mouth.

Q. Let me see if I'm understanding you right. You saw the snow machines turn into the lane, and did your father start running right at that time.

A. I don't know. Let's see. I don't know, I can't remember. I don't think so.

Q. Did you get the impression or did you think when you saw those snow machines turn into the lane, that they were after your father?

A. Yes.

Q. And did you, right then, go talk to your mother, leave the window and go in to [sic] where your mother was?

A. Yes.

Q. So at that point, then, what was your father doing when you left the window?

A. I don't know.

. . . . .

Q. Where were these snow machines when you left the window to go in to [sic]

your mother? Had they just turned into the lane?

A. Yeah, they started coming up.

Q. Whereabouts would your father have been at that point in time?

A. Close by Esther's gate.

. . . . .

Q. ... Did it look like to you that your father was even aware of the snow machines?

A. Yes.

Q. Or could you tell?

A. Well, he looked behind him. When he went down there to get the mail, he looked up and he seen those to Ski Doos. Well, he just got the mail and he saw them and so he—I don't know what happened then.

. . . . .

Q. Did you notice whether your father looked at the Ski Doos? When did he first notice the Ski Doos?

A. Well, let's see. When he first noticed them?

Q. Yes.

A. When they were here (indicating).

Q. When they were in the No. 2 position?

A. Yes.

Q. Could you see him looking back over his shoulder? How do you know he noticed them when they got to position 2?

A. Yeah, he looked like—back over his shoulder like you did.

Q. Looked over his left shoulder?

A. Yes.

Q. Then what did he do?

A. Well, then I ran into the bedroom.

Q. Then you left the window?

A. Yes.

Q. Because you knew, or you thought, anyway, that the men on the Ski Doos were after your father?

A. Yes.

Q. Did they do anything that made you believe they were after your father?

A. No, not that I can remember.

Q. They were just two men on two Ski Doos and you just thought that's what they were?

A. Yes.

. . . . .

Q. What did you say to your mother?

A. I said, They're getting Dad. Get the gun; something like that.

Q. What did your mother then do?

A. She got the gun and she was getting—finding her boots.

Q. Did you help her find your boots?

A. Yes.

Q. Where had you put the binoculars at that time?

A. I set them back on the windowsill.

Q. How long were you in the bedroom there, would you say, Charlotte, trying to help your mother find her boots?

A. I don't know, I can't remember.

. . . . .

Q. How long would you think you were in that bedroom, Charlotte, with your mother?

A. Well, then she went out.

Q. Oh, she went out then?

A. Yes.

Q. So you stayed with your mother, then—

A. Well, she went out in the living room, I guess to look out the window and see what happened.

Q. Is the window that you were looking out of in your living room?

A. Yes.

Q. Now, let me see if I'm clear on this. Did you stay in this bedroom with your mother until she got her boots on?

A. No. I was looking for her boots and she was in the living room.

Q. She went out of the bedroom before she got her boots on?

A. Yes.

. . . . .

Q. What did you do then?

A. Then I got back by the window and was looking out again.

Q. Did you take her boots out into the living room for her?

A. No, I think she came in again.

. . . . .

A. Oh, she didn't have the gun so she came back in and got the gun and got her boots.

Q. Did she stop in the bedroom long enough to put her boots on?

A. Yes, and then I went back in the living room.

Q. While she was putting her boots on?

A. Yes.

Q. Did you pick up the binoculars again?

A. Yes.

Q. Did you look at your dad?

A. Yes.

Q. Can you tell me where he was at that time? What was he doing?

A. Well, he came up, like here's the driveway (indicating).

Q. Let me ask you this: Had he fallen by this time?

A. No.

Q. What was he doing when you came back to the window?

A. He ran about four more steps and then he fell.

Q. So when you came back to the window, you saw him run another four steps?

A. Yes.

. . . . .

Q. ... What direction was he looking when you came back to the window and looked at him just before he fell?

A. He was looking upward.

Q. Looking—Ms. Collard: Was he facing you?

THE WITNESS: Yes, he was facing me.

Q. (By Mr. Hanni) How would you describe him? Was he walking, was he—

A. He was running.

Q. Was he running as fast as he could or just a medium run?

A. Let me think. He was running, I think, as fast as he could.

. . . . .

Q. This second time when you came out of the bedroom, did he look back at all at those Ski Doos?

A. No.

Q. What was he doing with his hands? Did you notice that?

A. No, I didn't.

Q. You don't know what he was doing with his hands?

A. No.

Q. And you don't know whether he had a gun in either hand?

A. No, I don't know.

Q. You don't know whether he did have one or whether he did not have one? Is that the way it is?

A. Yes.

Q. Did you see any guns in the hands of the men on the Ski Doos?

A. Well, I seen one gun, a guy pointing it at him.

Q. You saw what?

A. I seen a guy pointing at him with a long rifle or something. It wasn't a pistol, it was a long gun.

Q. Which Ski Doo was the man on that was pointing the gun at your father?

A. He wasn't on one, he was standing.

Q. Oh, the man was standing that pointed the gun?

A. Yes.

Q. Where was he ...?

A. Well, he was down here, about here (indicating [in front of Watson home at side of lane]).

Q. ... Is that the only man that you saw with the gun pointing it at your father?

A. Yes.

. . . . .

Q. ... Was the man just standing there, Charlotte?

A. He was standing there, and then when Dad fell, he ran.

. . . . .

Q. Where did this man come from that you saw with the gun that he was pointing at your father?

A. I don't know, I wasn't watching him.

Q. He was in that position when you first noticed him?

A. Yes.

Q. You've already told me you did not hear a shot fired?

A. Yes.

Q. Let me ask it a different way. Did you hear a shot fired?

A. No.

Q. Did you hear a shot fired before your father fell?

A. No.

Q. Or at the time he fell?

A. No.

Q. Or did you hear a shot fired after he fell?

A. No.

Q. You didn't hear one at all?

A. Huh-uh (negative).

. . . . .

Q. What did you do then, Charlotte, when you saw your father fall? Did you continue looking through the binoculars?

A. No.

Q. You put them down?

A. Yes.

. . . . .

Q. You put the binoculars down, though; is that right?

A. Yes.

Q. Did you leave the window?

A. Yes.

Q. You didn't stay there and watch what was going on?

A. No.

Q. Did you go out of the house at all?

A. No.

. . . . .

Q. Was anyone else in the house when this was going on besides you and your mother?

A. And Suzanne.

Q. Suzanne was there, too?

A. Yes.

. . . . .

Q. Now, Charlotte, when your father fell, is there anything else you want to tell me that you saw?

A. Well, I seen his mouth go open and blood come out.

Q. You were looking through the binoculars when you saw that?

A. Yes.

Q. That's when you laid the binoculars down; is that right?

A. Yes.

. . . . .

Q. You talked about this man that was off to the side who had the long gun in his hands?

A. Yes.

Q. What did that man look like? Could you tell from the binoculars?

A. No, I couldn't.

Q. Could you tell how he was dressed?

A. He just had black clothes on.

. . . . .

Q. You say black clothes? Were they black or were they just dark in color?

A. They were black. It was like a Ski Doo suit.

Q. Could you tell whether he had ski colored boots or anything like that, or was it too far away?

A. No, he was behind a fence, standing up.

. . . . .

THE WITNESS: I could see him because the fence was low. You know, it was low, half way.

Q. (By Mr. Dewsnup) So you only saw him from the waist up?

A. Yes.

. . . . .

Q. Did you, at any time, see any smoke or anything come out of the barrel of the gun that he was holding?

A. No.

Q. Did you see any smoke or anything come from where the Ski Doos were when you saw your father fall?

A. What do you mean, smoke?

Q. Well, a lot of times when a gun is fired you'll see a puff of smoke or something like that. Did you see anything like that?

A. I don't know; I can't remember.

Q. When your father fell, did he fall slowly? Did he fall suddenly?

A. I don't know.

Q. Did he seem to come up off the ground and fall or did he just fall all at once?

A. He just fell.

Q. Did he fall face forward?

A. Yes.

Q. Had he glanced over his shoulder or anything that you could see in those last few steps that you watched him take.

A. No.

Q. Did you see any other man standing in the area off of a snowmobile besides the one you talked about? Any other person at all?

A. No, I can't remember, if I did.

. . . . .

Q. Were you aware that there were police officers watching the farm at that time?

A. Yes.

Q. How did you become aware of that?

A. Well, we seen all these Ski Doos riding all over around on the outside of our place, you know, and then we seen them have guns on the side of the Ski Doos, and we'd watch them with the binoculars and we knew what they were going to try to do."

Deposition of Charlotte Singer at 10–37, 49–52, 59–60.

Vickie Singer testified in her deposition about the arrest attempt and shooting as follows:

"A. ... 'It was Thursday, the 18th of January. There had been a lot of excitement going on in the morning with snowmobiles up on the hill that were seemingly surveiling our property. In fact, for days there were guys always encircling our property on snowmobiles. We had suspected them to be lawmen or hired men to stake out the property.

'It was about 15 minutes to 1 o'clock p.m. or so when John took the snowblower down the road or lane to clear the road for Brenda, Shirley's daughter, to bring some groceries to us. I was finishing up school or putting away the school material when someone yelled, They're fighting down there, or, Daddy is fighting, something to that effect.

'I looked out the window and saw John encircled by men. John had his pistol out and seemed to be warning them, like the Mexican standoff. Then I turned and was going to get Timmy's rifle to go help and as I took a couple of steps toward the hallway I heard a shot. I grabbed Timmy's rifle and ran fast out of the house.' I forgot about finding my boots. I tried to find my snow boots to go down there and it took a few minutes.

'Shirley came running. She had a pistol, and Timmy and John's .22 rifle. Heidi had her bow and arrow. We ran four abreast down the lane.

'There was a light blue pickup truck with a camper on it and some men were crouched behind it. Other men ran toward Miriam and Dick's house, Watson's house and others ran towards Jared's place. The men behind the truck and by Miriam's house yelled for us to put down our weapons. They yelled for us to stop or someone would get hurt. We didn't drop our weapons but we were terribly confused.

'We couldn't see John anywhere and we didn't know where he was.' That took a few seconds. There was a pause, there was a hesitation for awhile; I don't know how long that was. They kept shouting, somebody shouted at me, Vickie, stop, and I don't know who would call me by my first name, that puzzled me....

But it seemed—We stood there for a while, I don't know how long, and we were so confused and we didn't know what to do. After that time, 'The truck pulled slowly out of the lane and we suspected that they must have put John in there and we continued down the road. As we did, the men ran like scared rabbits to Jared's front lawn.' ....

. . . . .

Q. Let me ask you this: Have you told me all you can recall about the actual shooting and what you did at the compound out there at the time your husband was shot? I mean, you've gone now to where you're going to Salt Lake. Is there anything else you can tell me about the time your husband was shot?

A. Oh, yes. He was standing in the middle of the road about right there, where—down there by, let's see, down there by Watsons' place, and he was encircled by about eight or so men; it was quite a few men. They were forming a semicircle around him ... They were forming a semicircle around him and he was right in the middle and that's where he had his pistol, just going like this, like Leave me alone, just like this. I mean, they were all around him, and this opening coming up to our home was the only place open. I saw that.

. . . . .

THE WITNESS: Now, I saw men around him and they were in a semicircle fashion, men standing around him, a group of men.

Q. (By Mr. Hanson) Do you have any estimate as to how many men there were?

A. Seven-eight, something like that. I just saw men clustered around him in this fashion. I saw John pointing his pistol, going around like this (indicating), going back and forth like this, like Leave me alone, just warning like, Leave me alone.

Q. Was he standing at the time he was pointing his pistol?

A. Yes.

Q. He wasn't running?

A. No.

Mr. Wallace: May the record show she's motioning with her hand, going back and forth from side to side.

THE WITNESS: Yes, like fanning, just like this (indicating). Just like, Leave me alone. I don't know.

. . . . .

Q. But you've indicated there were no men between John and your home?

A. This was open, this area was open.

Q. The area you are indicating is in the direction of your home; is that correct?

A. This is open in the direction of my home.

Q. What direction was John facing when he was making this motion?

A. Let's see. He was facing south, he would be facing south.

Q. Did he make a complete half circle arc?

A. Oh, man, I didn't stand there watching when I saw him going like that, you know, I just—then I ran.

. . . . .

Q. You ran which direction?

A. Oh, I mean, I ran to try and find my boots.

Q. In other words, you saw this when you were up at the home?

A. I saw it at the window when Charlotte alerted me.

Q. And then you ran to get your boots; is that correct?

A. I can't remember whether I went to get first my rifle or my boots.

Q. Did you get both your rifle and your boots?

A. Oh, yes.

Q. And then where did you go after you got your rifle and your boots?

A. I ran out of this back door ....

. . . . .

Q. And you ran around the east side of your house, which would mean John would not be in your view?

A. That's right.

. . . . .

Q. ... Now, after Charlotte told you there was a fight going on at the end of the lane you went in to get your boots and gun, as I understand it, you heard a shot; is that correct?

A. I heard it very shortly after I glanced out to see, when she drew my attention to what was happening. I looked out and then on my way to try and go get prepared to leave, I heard a shot.

Q. You only heard one shot?

A. I heard one shot then.

Q. That's the only shot you ever heard?

A. When I heard that one shot, I immediately, after hearing that shot, I ran into my bedroom.

Q. That's the only shot you ever heard?

A. That's the only shot that I heard."

Deposition of Vickie Singer at 299–303, 306–09, 317.

Heidi Singer Swapp testified at her deposition on November 3, 1981, at which time she was sixteen years old, as follows:

"A. Well, I was outside coming down from Shirley's house. Her son was next to me and he was building on a little place, a little house. I saw these Ski Doos coming down from the mountain and they were all going together and coming towards the mailbox. I stood there watching them and I heard a shot, then I ran over to the house and I was going to run behind the pantry to see what was going on and I heard another shot and I thought, no way, so I ran into the house and I looked out the window and Charlotte—well, Charlotte was looking through the binocs and I saw a guy at the end of the lane pick up a rifle and Dad's truck going down the lane.

Me and Mom and Timmy, we got our boots on and we went out with our weapons and started walking down the road.... We started walking down and a guy yelled to us, Don't come any further or we'll shoot.

So we stopped and then they ran to the Wellers' house and then we started walking down again and we came to where Dad was shot ...."

Deposition of Heidi Singer Swapp at 74–75. Heidi testified that the shots she heard were about five to six seconds apart. *Id.* at 222–23. Grant Black, and both Timothy and Joseph Singer were behind the Singer house, where Grant was chopping on a tree. Grant testified at his deposition in December, 1980, at which time he was twelve years old, that he "heard two shots" and he "run and told Mom and we come out and started walking down there." Deposition of Grant Black at 26. He testified as follows as to the time period between the two shots that he heard:

"Q. Can you give me an idea of how long it was between the two shots? If I look at my watch right here now and have you say, 'Bang, bang' and I want you to think back. You are up there chopping the tree and think back at the first shot and say, 'Bang' and then wait the period of time that it was betwee [sic] the second shot and then say, 'Bang.'

. . . . .

A. It was just 'Bang, bang.'

Q. Just 'Bang, bang'?

A. Yes.

Q. Not even a second in between?

A. I guess not. Just, 'Bang. Bang.'

Q. Rapidly 'Bang. Bang'?

A. Yes."

*Id.* at 27–28. Both Joseph and Benjamin Singer testified at their depositions that they also heard two shots. Deposition of Benjamin Singer at 5; Deposition of Joseph Singer at 5. These boys were eight and six years old, respectively, at the time of the shooting. Benjamin could not remember the amount of time between the two shots, and Joseph testified that there was a little bit of time in between the shots he heard. Timothy Singer, who was twelve years old at the time, was behind the Singer home with Grant, Benjamin, and Joseph. He testified in his deposition that he heard one shot. *See* Deposition of Timothy Singer at 32. None of the other members of the Singer or Black family, including Mrs. Black, heard any shots. Deposition of Shirley Black at 115; Deposition of Suzanne Singer Bates at 61; Deposition of Nancy Black at 33; Deposition of Julie Black at 16–17.

Following the shooting, the following events occurred. In his deposition, Officer Jolley testified that while the officers were "still in the lane and waiting to get Mr. Singer loaded into the pickup," Officer Gunderson told him that Gunderson had fired too. Deposition of Lewis Jolley at 71–72. Officer Gunderson testified in his deposition that he did not tell anyone that he had shot Mr. Singer. Deposition of Ron Gunderson at 53. Gunderson testified:

> I had told some of the people that I had considered firing a warning shot while I was driving but due to the fact that it is almost impossible to drive the snowmobile and second, I reconsidered because I was afraid that it would make a dangerous situation worse. I just drove the snowmobile.

*Id. See also id.* at 80–81.

After the shooting, Mr. Singer was placed in the cab of Officer Carlson's truck and driven by Carlson, Grant Larsen, and Schouten, to the Coalville Hospital. To avoid a confrontation with the Singer family, which had approached as close as the gate to the Singer farm, armed with various weapons, the remaining officers withdrew to the house they had rented. Officer Henley testified in his deposition dated October 3, 1980, that while the officers were at the rented house, someone commented that "Gunderson thought he had shot. He said that he was squeezing the bastard so hard he had to have shot." Deposition of Larry Henley (October 3, 1980) at 7. Henley attributed this comment to an officer other than Officer Gunderson. Officer Bates also recalled in his deposition: "[S]omebody said something about somebody thought they had shot their gun at him but after looking they hadn't." Deposition of Robert Bates at 114.

The officers stayed at the rented house for approximately an hour and a half, loading their supplies and food, and then went to Coalville and gave statements to Sheriff Robinson. *See* Deposition of Floyd Farley at 95–96; Deposition of Robert Hayward at 130; Deposition of Ron Gunderson at 63. Mr. Singer was transported to the Coalville Hospital in the cab of Officer Carlson's truck. Officer Carlson was driving, Officer Schouten was in the rear portion of the truck, and Officer Larsen knelt on the floorboard, where he tried to keep Mr. Singer's air passage clear. *See* Deposition of Grant Larsen at 97–99; Deposition of Joe Schouten at 109; Deposition of Tom Carlson at 69–70. During the drive to the hospital, which took about thirty minutes, *see* Deposition of Grant Larsen at 102, Officer Larsen made radio contact with the sheriff's office in Coalville. *See id.* at 115–16; Deposition of Sheriff Ron Robinson, Exhibit 3 at 5–6 (radio log). Prior to leaving the scene, Officer Larsen had telephoned his office, told them to send a helicopter, that they would be enroute to the Coalville Hospital, and that they would be in radio contact. *See* Deposition of Grant Larsen at 97. Mr. Singer was pronounced dead on arrival at the Coalville Hospital.

Officer Larsen went from the hospital to Sheriff Robinson's office. Deposition of Grant Larsen at 121. Sheriff Robinson learned of the shooting when the Summit

County dispatcher telephoned him at a Coalville cafe. Deposition of Sheriff Ron Robinson at 84. Sheriff Robinson then telephoned Vickie Singer and told her that they would have to come up and get her, her children and the Black children. Deposition of Sheriff Robinson at 37. Vickie Singer recorded in her journal that Sheriff Robinson told her that deputies would come to pick them up and take them in to see the judge. Vickie Singer Journal at 930. Sheriff Robinson did not tell Mrs. Singer that her husband was dead. Deposition of Sheriff Robinson at 36–37; Vickie Singer Journal at 930. The Singers were picked up by Summit County Deputy Stephens and Wilde. The children were taken to a Salt Lake City detention center, and Vickie Singer was taken to the Salt Lake County Jail. While at the jail, a psychologist or social worker told Vickie Singer that her husband was dead. Vickie Singer Journal at 932–33.

It was some time after the shooting before any procedures were initiated to secure the scene of the shooting. No efforts were made to secure the scene while the arrest team was at the rented house, and it was probably not until the Singer family had been picked up that the scene was secured. See Deposition of Robert Wadman, vol. 2 at 84. When the scene was secured and investigated, no measurements were made of the locations of the various officers, and the shell casing which ejected from Officer Jolley's shotgun was not recovered.

On the afternoon of January 18, Summit County Attorney Adkins issued a one-page press release at the Summit County Courthouse. See Deposition of Robert Adkins at 83–84 & Exhibit 3. Also on the day of the shooting, Sheriff Robinson called the Federal Bureau of Investigation and requested an investigation of the shooting. See Affidavit of Defendant Ron Robinson in Support of Motion for Summary Judgment.

On January 19, a hearing was held in Judge Larson's chambers, at which time Mrs. Singer was represented by four attorneys. See Transcript of Hearings (January 19, 1979) at 274. Mrs. Singer was released from custody, and the children remained in protective custody for a time. On that same day, Judge Larson wrote a letter to Governor Matheson, responding to a request for an "update" on the matter, which was relayed to Judge Larson by John McNamara, the Administrator of the Juvenile Court. See Deposition of Governor Scott Matheson at 138 & Exhibit 5. The letter briefly discusses the status of the Singer family and the hearing held earlier that day.

Following the Singer shooting, several investigations were initiated. As mentioned above, the F.B.I. undertook an investigation. The Summit County Attorney's Office also conducted an investigation with the limited purpose of determining whether there were criminal charges that should be brought. Deposition of Terry L. Christiansen at 197. This investigation resulted in a rough draft of a report which was placed in the county attorney's file and never made public. See Deposition of Robert Adkins, Exhibit 5.

The Utah Attorney General's Office also undertook a limited investigation "to gather whatever information might be needed at a later time" in the event of a wrongful death claim. Deposition of Robert B. Hansen at 86. Both the Attorney General's office and the Summit County Attorney's office responded to requests for a grand jury investigation by various public groups, including a Salt Lake City group called Concerned Citizens for the Singer Family. The head of the latter group provided Attorney General Hansen with a list of twenty-eight questions to which a grand jury should respond. Id. at 90 & Exhibit 6. Hansen submitted those questions to the Summit County Attorney's office, which responded by a letter dated January 29, 1979. See id. Exhibit 7; Deposition of Robert Adkins, Exhibit 2. In the January 29 letter, Christiansen stated that he had reviewed the questions with County Attor-

ney Adkins,[29] and the two of them were of the opinion that the information sought would be revealed by the F.B.I. investigation and the investigation conducted by their office. The letter also stated that "other information requested such as the names of the persons participating in the arrest attempt and identification of the officer who fired the weapon should not be revealed at this time and would only serve to endanger the lives of the officers involved."[30] Christiansen's January 29 letter to Attorney General Hansen concluded as follows: "Either Mr. Adkins or myself would be willing to discuss the case with you or Bonnie Lee to provide relevant information regarding the Singer matter. We feel that such a discussion would be more meaningful than responding to the questions proposed by Bonnie Lee." Accordingly, Mr. Christiansen, Attorney General Hansen, Bonnie Lee, and an unidentified gentleman, met together about two weeks after the shooting. *See* Deposition of Terry L. Christiansen at 212; Deposition of Bonnie Lee Peters at 52. On February 13, 1979, the Summit County Attorney's office issued a statement that they "didn't feel that there were grounds to file any criminal complaints against any of the officers." Deposition of Terry L. Christiansen at 202–03.

In the autopsy of Mr. Singer's body, the State Medical Examiner, J. Wallace Graham, recovered two shotgun pellets from the body of Mr. Singer and two from Mr. Singer's clothing.[31] Deposition of J. Wallace Graham at 5, 20. The four buckshot were given to Summit County Deputy Sheriff Fred Eley on January 18, 1979. *See id.* at 15 & Exhibit 50. Deputy Eley recalled at his deposition that he signed a receipt for the pellets, but does not specifically remember ever receiving the pellets, as he

signed for several different types of physical evidence. *See* Deposition of Fred Eley at 5. Late in September of 1980, it was discovered that the pellets from Mr. Singer's body and shirt were missing. *See* discussion of counsel in Deposition of Grant Larsen at 137–38. Between the time of the shooting and the time the pellets were discovered missing, the Summit County Sheriff had moved from one office to another and had moved the location of their evidence room. *See* Deposition of Fred Eley at 8.

The names of the arresting officers were never made public following the shooting. When plaintiffs filed their complaint in this action, they listed the arrest team as John Doe defendants. On August 28, 1980, this court ordered the identity of the arresting officers to be disclosed to plaintiffs.

In December of 1981, it was discovered that the pistol previously believed to have been carried by Mr. Gundersen during the arrest attempt was not in fact the pistol he had in his possession on that day. The discovery was brought to the attention of plaintiffs' counsel by defense counsel as follows:

"Mr. Tim Hanson: Last week during Professor Turner's deposition, he mentioned that he had tested a model 36 Smith and Wesson revolver.

. . . . .

. . . At that time the thought went through my mind that I thought Mr. Gunderson, the police officer, was carrying a .357 Magnum. Knowing that a model 36 is not a .357 Magnum, I asked Dave what his recollection was and so we looked in Gunderson's deposition and I don't know who deposed him, but I think it was Spence asked him what type of a handgun he carried and he said he always carried

---

**29.** Mr. Adkins was in the hospital at the time undergoing an operation.

**30.** Many of the people involved in the Singer matter had received threatening communications during this period of time. The Concerned Citizens for the Singer Family group itself cancelled a public meeting with Attorney General Hansen because of the threats it re-

ceived. *See* Deposition of Robert B. Hansen at Exhibit 10.

**31.** An additional 00 buckshot pellet was recovered from the left armpit area of Mr. Singer's coat by one of defendants' experts while he was examining the coat on May 20, 1981. *See* Deposition of Lucien Haag at 5.

a .357. That gave us a little concern. So we checked some other depositions and could find nowhere where anyone had referred to specifically what gun Gunderson was carrying that day.

So I called Gunderson, seeing he was my client, I thought it was prudent that I call him and ask him and he said he was carrying a Colt Python .357 Magnum. That's not a model 36 Smith and Wesson. So I had him bring it to me and he brought it to me and I've got it. So it looks like we have tested a gun that was issued to him but he was not carrying that day."

Deposition of Galyn Stahl at 3–4. Apparently, Officer Gunderson was carrying his personal pistol on the day Mr. Singer was shot, and not his state-issued pistol. The pistol produced by defendants in response to a discovery request was the state-issued pistol. Mr. Gunderson did not recall in his deposition when he turned in the Smith and Wesson .38 issued him by the Department of Public Safety. Deposition of Ron Gunderson (December 9, 1981) at 46.

## II. BACKGROUND LEGAL ANALYSIS

### A. *Standard on Summary Judgment Motions*

The standard the court must apply in ruling on summary judgment motions is contained in Rule 56 of the Federal Rules of Civil Procedure: "[J]udgment ... shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The summary judgment procedure is perhaps poorly understood by most laymen. Under the American jury system, there are two key actors in resolving a dispute between two parties. The role of a judge is to determine what law applies to a given dispute, aided by the legal counsel representing both parties to the dispute, while the facts or occurrences giving rise to the legal action are determined by a jury.

■ The granting of a summary judgment is proper when there are no factual issues to be determined by a jury. In essence, a summary judgment motion requests that the court rule on the case as a matter of law either because there is no dispute as to the facts of the case or because any such dispute is immaterial to a legal resolution. If there is no dispute as to the facts underlying the claims of the parties or if the resolution of any issues of fact will not affect the outcome of the case, the court should grant a summary judgment. Summary judgment, however, is not intended to resolve genuine factual issues, which are reserved for resolution by a jury under our system of justice.

■ In ruling on a summary judgment motion, the court must consider the pleadings and any other material in the record that would be admissible at trial. Thus, for example, the court may utilize deposition testimony as long as it would be admissible as evidence at a trial on the merits. Likewise, exhibits and documents that are sufficiently authenticated can be considered by the court.

The burden of showing that there is no "genuine issue of material fact" rests with the party seeking a summary judgment in its favor. Any doubt as to whether an issue of fact genuinely exists or whether that fact is material must be resolved in favor of the party opposing the summary judgment motion. 10 Wright & Miller, Federal Practice & Procedure, § 2727 at 524–26 (1973). All evidence relied on in deciding a summary judgment motion must be viewed in the light most favorable to the party opposing the motion. Any facts asserted by the party opposing the motion must be regarded as true, and that party is given the benefit of all reasonable inferences that can be drawn from those facts. *Id.* at 528–30.

■ The party opposing the motion, however, cannot rely on the allegations of the pleadings to demonstrate an issue of material fact when the party seeking judgment establishes credible facts on the

record which would, if uncontroverted, entitle him to that judgment. *Id.* at 531–34.

> If the movant presents credible evidence that would entitle him to a directed verdict if not controverted at trial, this evidence must be accepted as true on a motion for summary judgment when the party opposing the motion does not offer counter-affidavits or other evidentiary material supporting his contention that an issue of fact remains ....

*Id.* at 532–34 (footnotes omitted). In such a situation, the party opposing the motion must "show specific facts, as opposed to general allegations, that present a genuine issue worthy of trial." *Id.* at 538 (footnote omitted). Rule 56(e), Federal Rules of Civil Procedure. *See also Bankers Trust Co. v. Transamerica Title Insurance Co.,* 594 F.2d 231, 235 (10th Cir.1979). As one court stated: "The non-movant should not be able to rest on the mere conclusory allegations or denials to overcome a convincing presentation by the movant, but rather he must present an affirmative indication that his version of the events is not fanciful." *Genzer v. Cunningham,* 498 F.Supp. 682, 697 (E.D.Mich.1980).

While the specific test for summary judgment in the context of the various claims and defenses in this case will be further discussed in the court's analysis, these general rules will govern the court's determination of these motions.

B. *Elements of and Summary Judgment Standard Applicable to Conspiracy Claims.*

Central to examining the potential liability of each defendant for the deprivations alleged in this case is an analysis of the scope and applicability of joint activity and civil conspiracy under section 1983. The Amended Complaint alleges in each claim for relief under section 1983 that the acts of each specified defendant were "joint and several" and "in furtherance of a conspiracy." Obviously the individual defendants'

liability depends in part on the extent to which the actions of alleged co-conspirators are chargeable to each defendant personally; a defendant could possibly avoid liability for his own actions or failure to act and yet prove liable under a conspiracy theory.

▇ A civil conspiracy has been defined as follows:

> "[A] combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties 'to inflict a wrong against or injury upon another; and an overt act that results in damage.'" *Rotermund v. United States Steel Corp.,* 474 F.2d 1139 (8th Cir.1973) (citation omitted).

*Hampton v. Hanrahan,* 600 F.2d 600, 620–21 (7th Cir.1979), *rev'd in part on other grounds, sub. nom., Hanrahan v. Hampton,* 446 U.S. 754, 100 S.Ct. 1987, 64 L.Ed.2d 670 (1980). This "agreement" has been described as a "meeting of the minds" or an "understanding" to achieve the conspiracy's objectives. *See Adickes v. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970). A conspirator must have been a "willful participant" in the conspiracy. *See Dennis v. Sparks,* 449 U.S. 24, 27, 101 S.Ct. 183, 186, 66 L.Ed.2d 185 (1980); *Adickes v. Kress & Co.,* 398 U.S. at 152, 90 S.Ct. at 1605; *Celano v. Celano,* 537 F.Supp. 690, 695 (E.D.Pa. 1982); *Simpson v. Weeks,* 530 F.Supp. 196, 204 (E.D.Ark.1977), *aff'd in part, rev'd in part,* 570 F.2d 240 (8th Cir.1978), *cert. denied,* 443 U.S. 911, 99 S.Ct. 3101, 61 L.Ed.2d 876 (1979), (finding that a conspiracy was "willfully and knowingly formed").[32] At the same time, it is unnecessary that each participant in a conspiracy expressly agreed and knew the "exact limits of the illegal plan or the identity of all participants therein." *Hampton v. Hanrahan,* 600 F.2d at 621 (citation omitted).

---

**32.** The *Dennis* and *Adickes* cases required a private conspirator to be a "willful participant" in joint action with the State or its agents to act under color of law. There is no reason to require anything less to show that public officials conspired, as *Simpson* implicitly recognized. Nor is there any reason to confuse this requirement looking to the agreement with the "invidiously discriminatory animus" requirement of 42 U.S.C. § 1985(3).

The participants in the conspiracy must share the general conspiratorial objective, but they need not know all the details of the plan designed to achieve the objective or possess the same motives for desiring the intended conspiratorial result. To demonstrate the existence of a conspiratorial agreement, it simply must be shown that there was 'a single plan, the essential nature and general scope of which [was] known to each person who is to be held responsible for its consequences.' "

*Id.*

A conspiracy claim can have two advantages over a nonconspiracy claim under section 1983. First, a conspiracy can be the paintbrush by which private individuals are colored with state law, *Adickes v. Kress & Co.,* 398 U.S. at 150–52, 90 S.Ct. at 1604–05 (1970), devoid of the immunities possessed by any conspiring state actor. *See Dennis v. Sparks,* 449 U.S. 24, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980). Second, a conspiracy claim under section 1983 can "impose liability on one defendant for the acts of others performed in pursuance of the conspiracy." *Landrigan v. City of Warwick,* 628 F.2d 736, 742 (1st Cir.1980). *See also Slavin v. Curry,* 574 F.2d 1256, 1261 (5th Cir.1978); *Nesmith v. Alford,* 318 F.2d 110, 126 (5th Cir.1963), *cert. denied,* 375 U.S. 975, 84 S.Ct. 489, 11 L.Ed.2d 420 (1964).

■■■ This does not mean that a conspiracy allegation, even if established, gives rise to liability under section 1983, for the other elements of that section must also be proven by the plaintiff. Thus, section 1983 expressly requires the acts to be performed under color of law, while its counterpart statute, 42 U.S.C. section 1985(3), does not contain such requirement. *See Griffin v. Breckenridge,* 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971). Likewise, the language of section 1983 expressly requires an actual deprivation of rights, while sec-

tion 1985(3) may be satisfied by the showing of an injury to person or property. *Id.* at 103, 91 S.Ct. at 1798; *Fisher v. Shamburg,* 624 F.2d 156, 158 (10th Cir.1980).[33] Quite clearly, " '[t]he gist of [a section 1983] cause of action is the deprivation and not the conspiracy.' " *Landrigan v. City of Warwick,* 628 F.2d 736, 742 (1st Cir. 1980) (quoting *Lesser v. Braniff Airways, Inc.,* 518 F.2d 538, 540 n. 2 (7th Cir.1975)). At the same time, however, it is the *conspiracy* that permits liability for damages based on the acts of others. *See id.,* 628 F.2d at 742. *See also Slavin v. Curry,* 574 F.2d 1256, 1261 (5th Cir.1978); *Nesmith v. Alford* 318 F.2d 110, 126 (5th Cir.1963), *cert. denied,* 375 U.S. 975, 84 S.Ct. 489, 11 L.Ed.2d 420 (1964).

■■ Because of this latter characteristic of *conspiracy* claims under section 1983, the court must circumspectly analyze an allegation of conspiracy, lest such an allegation circumvent the existing prohibitions on other forms of vicarious liability under section 1983. Since *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), there has been a strict and uniform curtailment of section 1983 liability founded on principles of respondeat superior. *See Bowen v. Watkins,* 669 F.2d 979, 989 n. 15 (5th Cir. 1982), and authorities cited therein. The elimination of respondeat superior liability recognizes the need for personal participation under section 1983 and the need for a causal connection between one's act and a deprivation of a constitutional right.[34] Under a conspiracy theory, this participation need not extend to each act leading to a deprivation of a right, but it must at least extend to the conspiracy itself, which in turn, *must cause the deprivation.* A conspiracy can be the "cause" of a deprivation of rights much as a policy or a custom of a governmental unit can "cause" an employee to violate another's rights, *cf. Monell v.*

---

**33.** Section 1985(3), of course, does require an invidiously discriminatory animus, which is not required under section 1983.

**34.** The causation requirement is perhaps based on the express language of section 1983 that, to be liable, a person must be one who "subjects, or causes to be subjected," another person to a deprivation of rights.

*Department of Social Services,* 436 U.S. at 692, 98 S.Ct. at 2036, but a plaintiff must establish the existence of a conspiracy, just as it must the existence of a governmental policy or custom, and demonstrate a causal connection between that conspiracy and the deprivation of a constitutional right.

For present purposes, the critical question is what is required for the establishment of a genuine issue of material fact sufficient to avoid a summary judgment on the allegation of conspiracy. The most difficult element of a conspiracy to prove is the agreement to achieve the conspiracy's objectives. As proof of the agreement necessarily entails an examination of the subjective mental state of the alleged conspirators, there most often is not direct evidence of the agreement, unless one of the co-conspirators so testifies. Therefore, a party attempting to demonstrate a conspiracy must rely on circumstantial evidence from which the factfinder could infer the agreement.

In determining on a summary judgment motion whether such inferences exist, there are two potentially conflicting lines of cases that must be harmonized. On the one hand, there are numerous decisions stating that vague or conclusory allegations are insufficient to support conspiracy claims. *E.g., Mosher v. Saalfeld,* 589 F.2d 438, 441 (9th Cir.1978) (affirming summary judgment in section 1983 action); *Ostrer v. Aronwald,* 567 F.2d 551, 553 (2nd Cir. 1977); *Sowell v. Israel,* 500 F.Supp. 209, 211 (E.D.Wis.1980) (granting summary judgment in section 1983 action). "In an effort to control frivolous conspiracy suits under section 1983, federal courts have come to insist that the complaint state with specificity the facts that, in the plaintiffs' mind, show the existence and scope of the alleged conspiracy." *Slotnick v. Staviskey,* 560 F.2d 31, 33 (1st Cir.1977).

On the other hand, some cases seem to indicate that conspiracy claims must of necessity be submitted to the jury. As the Tenth Circuit stated in *Fisher v. Shamburg,* 624 F.2d 156, 162 (10th Cir.1980) (quoting *Adickes v. Kress & Co.,* 398 U.S.

at 176, 90 S.Ct. at 1618) Black, J., concurring:

"The existence or nonexistence of a conspiracy is essentially a factual issue that the jury, not the trial judge, should decide. In this case petitioner may have had to prove her case by impeaching the store's witnesses and appealing to the jury to disbelieve all that they said was true in the affidavits. The right to confront, cross-examine and impeach adverse witnesses is one of the most fundamental rights sought to be preserved by the 7th Amendment provision for jury trials in civil cases. The advantages of trial before a live jury with live witnesses, and all the possibilities of considering the human factors, should not be eliminated by substituting trial by affidavit and the sterile barrenness of summary judgment."

*See also Hampton v. Hanrahan,* 600 F.2d at 621.

There is a precarious line to be drawn in resolving the potential conflict between these two positions, perhaps best approached by strict adherence to the language of Rule 56. Recent statements of the United States Supreme Court can perhaps be helpful in illuminating the interplay between summary judgment and conspiracy claims under section 1983. Justice Powell, concurring and dissenting in *Hanrahan v. Hampton,* specifically addressed this issue. *Hampton* involved numerous conspiracy claims arising from a gun battle between "Black Panthers," and state and federal law enforcement officers. The district court directed a verdict for many defendants, including all federal defendants, at the close of plaintiffs' presentation of evidence, expressly finding the record "devoid of proof of ... participation [by the federal defendants] in a conspiratorial plan among themselves or with the state defendants." *See Hanrahan v. Hampton,* 446 U.S. 754, 761, 100 S.Ct. 1987, 1991, 64 L.Ed.2d 670 (1980) (Powell, J., concurring and dissenting). The Seventh Circuit panel, in a split decision, reversed, concluding that the evidence was sufficient to send the

conspiracy question to the jury. In so doing, the court relied in part on the statement of Justice Black in *Adickes*, quoted above.

The Supreme Court granted certiorari on the limited issue of attorney's fees and summarily reversed. 446 U.S. at 759, 100 S.Ct. at 1990. Justice Powell wrote a separate opinion, joined by Chief Justice Burger and Justice Rehnquist, concurring with the majority decision, but dissenting from the denial of certiorari on other issues. The Powell opinion, noting that the "Court ordinarily leaves questions as to the sufficiency of the evidence in a particular case to the courts below," nevertheless challenged the circuit court's reversal of the directed verdict as to the federal defendants.[35] Justice Powell reasoned that the apparent trial strategy of attacking the Federal Bureau of Investigation broadly was an objective "related only tangentially, if at all to the recovery of damages." This collateral objective "imposed a special duty on the courts to bear in mind the admonition of *Butz v. Economou*, 438 U.S. 478, 508 [98 S.Ct. 2894, 2911, 57 L.Ed.2d 895] (1978), that 'federal officials [not be] harrassed by frivolous lawsuits.'" 446 U.S. at 764, 100 S.Ct. at 1992. Justice Powell went on in *Hampton* to quote *Butz* for the proposition that "'damage suits concerning constitutional violations need not proceed to trial, but can be terminated on a properly supported motion for summary judgment....'" *Id.*

Justice Powell's major concern with the decision of the Court of Appeals concerned the inferences drawn from the evidence.

[E]ach federal defendant testified that he did not know of and did not participate in any planning or joint activity regarding the operation at any time. This uncontradicted testimony was fully corroborated by the state defendants. In these circumstances, inferences drawn from a program not shown to have been related to the events in question are of dubious value.

*Id.* at 762, 100 S.Ct. at 1991. Justice Powell cited the dissent to the circuit court decision as follows:

"Going next to the ... remaining state defendants and the federal defendants, I cannot agree that there was a basis for reasonable inferences that there was any kind of an agreement among them express or implicit, to cause a raid to be made with the object of killing or wounding various Black Panther Party members. It is true that at the time in question, the federal authorities thought it would be in the public good to neutralize the Black Panther Party so that it would not carry out its avowed purpose, among others, of killing policemen. Indeed, the idea perhaps could have been entertained by some, if not all, of those defendants who were engaged in law enforcement work that the community would be a safer place for law-abiding citizens to live and work in if Fred Hampton and his cohorts were not on the scene. This human feeling is far removed from a basis for an inference that they deliberately set a course to accomplish that by violence.

"In our jurisprudence a person cannot be convicted of a traffic offense unless proven guilty beyond a reasonable doubt. Even though the present case is of the civil variety, I cannot believe that the law should permit a determination that any person has deliberately planned a homicide on nothing more than speculative conjecture or mere suspicion. The hard basic reasonable inference-creating facts just did not exist in this case." [600 F.2d at 660–61.]

446 U.S. at 762–63, 100 S.Ct. at 1991–92.

Although Justice Powell's *Hampton* opinion was with regard to directed verdicts, he made it clear that his concern extended to summary judgment motions as well. "If a new trial may be ordered in

**35.** While the dissent was confined to the federal defendants, it noted that it was "not clear that the Court of Appeals properly reversed the directed verdicts as to many of the other defendants," citing the dissent below. 446 U.S. at 760 n. 1, 100 S.Ct. at 1990 n. 1.

this case, similar allegations could survive properly supported motions for summary judgment on the basis of speculative inferences from unrelated evidence." *Id.* at 754, 100 S.Ct. at 1992. In line with the general principles of law applicable to summary judgment, Justice Powell concluded that on the facts of the Hampton case, "[i]n the absence of positive evidence or 'reasonable inference—creating facts,' there was no reason to include the federal defendants in the remand for a second trial." *Id.*

The importance of sparing public officials from the spectre of frivolous lawsuits was quite recently reemphasized by the Supreme Court, in the context of analyzing a qualified immunity defense to a "Bivens" constitutional tort allegation. See *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), and discussion *infra* in Part C. There, the court stated: "In identifying qualified immunity as the best attainable accommodation of competing values, in *Butz,* ... we relied on the assumption that this standard would permit '[i]nsubstantial lawsuits [to] be quickly terminated.'" *Id.* at 814, 102 S.Ct. at 2737 (citing *Butz,* 438 U.S. at 507–08, 98 S.Ct. at 2911–12 and *Hanrahan,* 446 U.S. at 765, 100 S.Ct. at 1993 (Powell, J., concurring in part and dissenting in part)) (citations omitted). Following this statement, in a footnote, the court in *Harlow* stated:

> The importance of this consideration hardly needs emphasis. This Court has noted the risk imposed upon political officials who must defend their actions and motives before a jury. See *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency,* 440 U.S. 391, 405 [99 S.Ct. 1171, 1179, 59 L.Ed.2d 401] (1979); *Tenney v. Brandhove,* 341 U.S. 367, 377–378 [71 S.Ct. 783, 788–789, 95 L.Ed. 1019] (1951). As the court observed in *Tenney,* "In times of political passion, dishonest or vindictive motives are readily attributed ... and as readily believed." 341 U.S. at 378, 71 S.Ct. at 789.

*Id.* at 814 n. 23, 102 S.Ct. at 2737 n. 23. Because the court's assumption that insubstantial lawsuits would be dismissed without trial was incorrect, the court in *Harlow*

went on to abolish the subjective element of the qualified or "good faith" immunity. *Id.* at 818, 102 S.Ct. at 2738.

The *Hampton* and *Harlow* decisions do not require an abandonment of summary judgment standards in a conspiracy context. This court believes that any implication to the contrary would be entirely erroneous. The lesson of these cases, however, is a reaffirmation of the general principles of Rule 56(e). Much as a court cannot abdicate its responsibility to deny a summary judgment when genuine issues of material fact exist, a court cannot circumvent its responsibility to grant a summary judgment merely because a conspiracy is alleged. This court will bear these admonitions in mind in deciding the present motions consistent with the general principles of Rule 56.

### C. *Analysis of Immunity Under § 1983.*

■ 42 U.S.C. § 1983 provides a remedy for a deprivation of "any rights, privileges, or immunity secured by the Constitution and laws" of the United States. To recover damages in a civil action under § 1983, a plaintiff must prove that he possessed a right, that the right was deprived, and that the deprivation was caused by the actions of a person acting under color of state law. While § 1983 is silent concerning any immunities from suits for civil damages, the United States Supreme Court has consistently recognized some form of immunity for government officials sued as individuals. *See, e.g., Nixon v. Fitzgerald,* 457 U.S. 731, 102 S.Ct. 2690, 73 L.Ed.2d 349 (1982) (granting absolute immunity to President of the United States from suit alleging constitutional tort claim); *Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978) (federal hearing examiners and agency officials performing functions analogous to those of a prosecutor absolutely immune from constitutional tort claim); *Stump v. Sparkman,* 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978) (state judge absolutely immune from all judicial acts under § 1983); *Procunier v. Navarette,* 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d

24 (1978) (prison officials have qualified immunity under § 1983); *Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976) (state prosecutors absolutely immune under § 1983 with respect to initiation and pursuit of prosecutions); *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975) (school officials possess qualified immunity under § 1983); *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) (state executive branch officials possess qualified immunity under § 1983); *Pierson v. Ray,* 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967) (state judges absolutely immune, state police officers possess qualified immunity under § 1983); *Tenney v. Brandhove,* 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951) (state legislators absolutely immune from § 1983 suit). This immunity, derived from the common law, recognizes the "necessity of permitting officials to perform their official functions free from the threat of suits for personal liability." *Scheuer v. Rhodes,* 416 U.S. at 232, 94 S.Ct. at 1683.

The rationale of granting government officials an immunity from suit for damages consists of two "mutually dependent" aspects:

> (1) The injustice, particularly in the absence of bad faith, of subjecting to liability an officer who is required, by the legal obligations of his position, to exercise discretion; (2) the danger that the threat of such liability would deter his willingness to execute his office with the decisiveness and the judgment required by the public good.

*Id.* at 240, 94 S.Ct. at 1688. Public officials must act and make decisions in the public interest. In so carrying out their public duties, officials will undoubtedly err on occasion. "The concept of immunity assumes this and goes on to assume that it is better to risk some error and possible injury from such error than not to decide or act at all." *Id.* at 242, 94 S.Ct. at 1689.

In determining the liability of the defendants in this case under § 1983, the court must first determine if a question of fact exists as to whether any constitutional rights possessed by the plaintiffs were deprived by these defendants' conduct and then determine whether, even in the face of such a deprivation, the defendants are immune as a matter of law from suit under that statute. All of the defendants to this suit have claimed at least a qualified immunity from liability for their actions. Given recent changes in the proper legal analysis of qualified immunity, the court must, preliminary to addressing the claims presented in this case, describe the newly changed standard.

■ It is clear that a defendant must plead a qualified or good faith immunity as an affirmative defense. *Gomez v. Toledo,* 446 U.S. 635, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980). Until quite recently, decisions of the United States Supreme Court recognized both an objective and a subjective analysis in determining the existence of a "good faith" defense.

> The objective element involves a presumptive knowledge of and respect for "basic, unquestioned constitutional rights." *Wood v. Strickland,* 420 U.S. 308, 320 [95 S.Ct. 992, 1000, 43 L.Ed.2d 214] (1975). The subjective component refers to " 'permissible intentions.' " ... Referring both to the objective and subjective elements, ... qualified immunity would be defeated if an official *"knew or reasonably should have known* that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff], *or* if he took the action *with malicious intention,* to cause a deprivation of constitutional rights or other injury...." *Id.* at 321–322, 95 S.Ct. at 1000–1001 (emphasis added).

*Harlow v. Fitzgerald,* 457 U.S. 800, 814, 102 S.Ct. 2727, 2737, 73 L.Ed.2d 396 (1982).

Thus, prior to *Harlow v. Fitzgerald,* an analysis of qualified immunity under § 1983 proceeded as follows. First, the public official-defendant was required to plead qualified immunity as an affirmative defense. Next, the defendant must have shown that he acted within the scope of his discretionary authority. This required a

showing, by competent summary judgment evidence, of objective circumstances compelling the conclusion that "the complained-of actions were undertaken pursuant to the performance of his duties and within the scope of his discretionary authority." *Barker v. Norman*, 651 F.2d 1107, 1124–25 (5th Cir.1981). Once a defendant has made such a showing, for purposes of summary judgment, the burden of proof shifted to the plaintiff "to establish that the immunity should be breached because either the defendant harbored a subjective malicious intent or he knew or should have known that his actions violated a clearly established constitutional right of the plaintiff." *Id.* at 1125.

The Supreme Court's decision in *Harlow* modified this analysis. In *Harlow*, the defendants were alleged to have participated in a conspiracy to remove the plaintiff from his public employment in retaliation for his testimony before a congressional committee, thus violating his First Amendment right to free speech. The district court denied defendants' motion for summary judgment, and defendants, invoking the collateral order doctrine, appealed the denial of their immunity defense to the Court of Appeals and the Supreme Court. The Supreme Court, utilizing a functional approach to immunity law, rejected defendants' contention that they were entitled to an absolute immunity. 457 U.S. at 814, 102 S.Ct. at 2737. In analyzing the defendants' entitlement to a qualified immunity defense, the Court stated as follows:

> The subjective element of the good faith defense frequently has proved incompatible with our admonition in *Butz* that insubstantial claims should not proceed to trial. Rule 56 of the Federal Rules of Civil Procedure provides that disputed questions of fact ordinarily may not be decided on motions for summary judgment. And an official's subjective good faith has been considered to be a question of fact that some courts have regarded as inherently requiring resolution by a jury.
>
> In the context of *Butz's* attempted balancing of competing values, it now is

clear that substantial costs attend the litigation of the subjective good faith of government officials. Not only are there the general costs of subjecting officials to the risks of trial—distraction of officials from their governmental duties, inhibition of discretionary action, and deterrence of able people from public service. There are special costs to "subjective" inquiries of this kind. Immunity generally is available only to officials performing discretionary functions. In contrast with the thought processes accompanying "ministerial" tasks, the judgments surrounding discretionary action almost inevitably are influenced by the decisionmaker's experiences, values, and emotions. These variables explain in part why questions of subjective intent so rarely can be decided by summary judgment. Yet they also frame a background in which there often is no clear end to the relevant evidence. Judicial inquiry into subjective motivation therefore may entail broad-ranging discovery and the deposing of numerous persons, including an official's professional colleagues. Inquiries of this kind can be particularly disruptive of effective government.

> Consistent with the balance of which we aimed in *Butz*, we conclude today that bare allegations of malice should not suffice to subject government officials either to the costs of trial or to the burdens of broad-reaching discovery. *We therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. See Procunier v. Navarette*, 434 U.S. 555, 565 [98 S.Ct. 855, 861, 55 L.Ed.2d 24] (1978); *Wood v. Strickland, supra*, 420 U.S. at 321 [95 S.Ct. at 1000].

> Reliance on the objective reasonableness of an official's conduct, as measured by reference to clearly established law,

should avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment. On summary judgment, the judge appropriately may determine, not only the currently applicable law, but whether that law was clearly established at the time an action occurred. If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to "know" that the law forbade conduct not previously identified as unlawful. Until this threshold immunity question is resolved, discovery should not be allowed. If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct. Nevertheless, if the official pleading the defense claims extraordinary circumstances and can prove that he neither knew nor should have known of the relevant legal standard, the defense should be sustained. But again, the defense would turn primarily on objective factors.

By defining the limits of qualified immunity essentially in objective terms, we provide no license to lawless conduct. The public interest in deterrence of unlawful conduct and in compensation of victims remains protected by a test that focuses on the objective legal reasonableness of an official's acts. Where an official could be expected to know that certain conduct would violate statutory or constitutional rights, he should be made to hesitate; and a person who suffers injury caused by such conduct may have a cause of action. But where an official's duties legitimately require action in which clearly established rights are not implicated, the public interest may be better served by action taken "with independent and without fear of consequences." *Pierson v. Ray*, 386 U.S. 547, 554 [87 S.Ct. 1213, 1217, 18 L.Ed.2d 288] (1967).

*Id.* 457 U.S. at 814–18, 102 S.Ct. at 2737–38 (Emphasis added and footnotes deleted).

It should be noted that the *Harlow* discussion of immunity was in the context of a constitutional tort allegation against federal defendants and not an action under § 1983. At the same time, however, the Supreme Court adopted the immunity defense for federal officials, in *Butz v. Economou*, relying at least in part on the immunity defined under § 1983. The court in *Harlow* made it quite clear how they expected the immunity analysis to be applicable under § 1983:

This case involves no issue concerning the elements of the immunity available to state officials sued for constitutional violations under § 1983. We have found previously, however, that "it would be untenable to draw a distinction for purposes of immunity law between suits brought against state officials under § 1983 and suits brought directly under the Constitution against federal officials." *Butz v. Economou*, 438 U.S. at 504, 98 S.Ct. at 2909.

*Id.* at 818 n. 30, 102 S.Ct. at 2738 n. 30.

■ In effect, the *Harlow* decision abolishes the subjective analysis in determining the availability of an immunity defense to a § 1983 action. Thus, to avoid a summary judgment based on a public official's immunity, a plaintiff must positively raise a question of fact to rebut a showing that the defendant acted within the scope of his authority and was performing a discretionary function. A plaintiff must further demonstrate an issue of fact as to whether the defendant, based on objective factors, actually knew or should have known that his conduct would violate the plaintiff's constitutional rights.

The court must utilize these standards in determining the availability of a qualified immunity defense for the conduct of these defendants. Of course, it is one thing to say that a defendant is immune from suit and a very different thing to determine that no constitutional rights have been deprived. Therefore, in analyzing the plaintiffs' claims for relief in this case, the court will attempt first to analyze whether any

rights have been deprived before reaching the immunity question.

## III. LEGAL ANALYSIS OF CLAIMS FOR RELIEF

### A. *Statement of Claims*

Plaintiffs' sixty-five page complaint alleges nine causes of action, five of which are based on 42 U.S.C. § 1983. The first claim for relief alleges the deprivation of various constitutional rights by the actions of defendants Edrington, South Summit School District, Adkins, and Christiansen, through and including January 18, 1979.[36] The claim alleges that the acts of these defendants were undertaken in the furtherance of a conspiracy between themselves, the several juvenile court judges, the sheriff and deputies of Summit County, and "other officers who acted in accordance with certain orders of the court."

The second claim for relief alleges deprivation of various of plaintiffs' constitutional rights arising from the arrest attempt of October 19, 1978. This claim essentially alleges that defendants Wadman, Lunnen, Grant Larsen, Riggs, Robinson, Adkins, and Christiansen, knowing that they lacked authority to arrest Mr. Singer, conspired unlawfully to make such an arrest. The fifth claim for relief alleges, pursuant to 42 U.S.C. § 1983, the deprivation of various of plaintiffs' constitutional rights arising from the plan of arrest and the attempted arrest of Mr. Singer in January, 1979. This claim, brought on behalf of Vickie Singer as personal representative of the heirs of John Singer, alleges joint and several action and a conspiracy between defendants Robinson, Governor Matheson, former Attorney General Hansen,[37] Lunnen, Reid, Wadman, Adkins, Christiansen, Henley, Bates, Farley,

Hayward, Larsen, Jolley, Carlson, Fullmer, Gunderson, and Schouten.[38]

The eighth claim for relief alleges, pursuant to 42 U.S.C. § 1983, the deprivation of various of plaintiffs' constitutional rights arising out of the actions "on and after January 18, 1979." This claim, which alleges joint and several action and a conspiracy between defendants South Summit School District, Governor Matheson, former Attorney General Hansen, Adkins, Robinson, Lunnen, Reid, Wadman, Edrington, and the arrest team, states that the defendants "knew, or reasonably should have known, that the various contempt orders and warrants for arrest were null and void and that the defendants' actions thereby subjected the plaintiffs to the deprivation of various constitutional rights." Claim nine alleges, pursuant to 42 U.S.C. § 1983, the deprivation of various of plaintiffs' constitutional rights arising out of the acts of the defendants to cover up and conceal their wrongful acts and to secrete the names of the persons responsible for the shooting of Mr. Singer. This claim alleges joint and several action and a conspiracy between defendants Robinson, Matheson, Lunnen, Reid, Wadman, Adkins, Hansen, Christiansen, and the arrest team.

Claims three, four, six, and seven, are claims under Utah law brought pursuant to this court's pendent jurisdiction. Claim three, brought by Vickie Singer as personal representative of the heirs of John Singer, alleges that the plan of arrest was devised negligently, grossly negligently, wilfully and wantonly, and "in complete and reckless disregard" for the life of John Singer, by defendants Robinson, Matheson, Hansen, Lunnen, Reid, Wadman, Adkins, and Christiansen, and seeks damages for the wrongful death of John Singer. Claim four, also brought by Vickie Singer as per-

---

**36.** All defendants, except South Summit School District, are sued both as individuals and in their respective official capacities.

**37.** Defendants Hansen and Superintendent Reid of the Utah Highway Patrol are no longer parties to this action as their respective motions for summary judgment were granted by the court during oral argument on June 15 and 16, 1982.

**38.** The last ten individuals are the officers who participated in the January 18, 1979, arrest attempt at which Mr. Singer was fatally shot. They will collectively be referred to hereafter as the arrest team.

sonal representative of John Singer, alleges that all of the defendants named in claim three, along with the arrest team, negligently, grossly negligently, willfully and wantonly, and with reckless disregard for the life of John Singer, carried out the plan of arrest. Claim six, which is brought against all defendants except Riggs, alleges a cause of action for "outrage" based on the shooting of John Singer and the events immediately subsequent to the shooting. Claim seven alleges a cause of action for negligent and intentional infliction of emotional harm against the same defendants and arising out of the same events as alleged in claim six.

## B. *Count One*

For the purposes of a summary judgment motion on count one, the court cannot find on this extensive record a genuine issue of fact as to the objective conduct of defendants Edrington, South Summit School District, Adkins, or Christiansen.[39] The parties dispute vehemently, however, both the factual inferences drawable from this conduct and the resultant legal implications. Plaintiffs claim that the action of these defendants in bringing criminal actions against John and Vickie Singer amounted to a conspiracy that deprived the plaintiffs of several constitutional rights. Reserving for a moment an analysis of the constitutional rights alleged to have been deprived, the court must first address the issue of whether a conspiracy can be inferred from the defendants' conduct.

■ The focus of such an inquiry must initially be whether each of these defendants agreed to commit an unlawful act or to commit a lawful act by unlawful means. This requirement is not satisfied by showing merely that the defendants met together and jointly determined to prosecute the Singers pursuant to the Utah Compulsory Attendance statute. Rather, what must be inferable from the objective evidence in the case is either that the defendants *willfully* combined to pursue an unlawful prosecution or that the defendants willfully agreed to pursue a lawful prosecution in an unlawful manner.

With regard to the first of these possibilities, the court must examine the Utah statutes under which these defendants pursued the prosecution of John and Vickie Singer. So the emphasis in determining the existence of a willful agreement is on what the defendants knew or should have known concerning the lawfulness of their conduct—from which could perhaps be inferred the "willfulness" of their participation—an understanding of the state of the law is appropriately considered in determining what inferences may be derived from the defendants' objective conduct. Utah Code Ann. § 53-24-1 (1981) provides:

> Every parent, guardian or other person having control of any minor between six and eighteen years of age shall be required to send such minor to a public or regularly established private school during the regularly established school year of the district in which he resides; provided:
>
> . . . . .
>
> b. That in each year the parent, guardian or other person having control of such minor may be excused by the board of education of the district from sending such minor to a public, regularly established private or part time school or class for any of the following reasons:
>
> . . . . .
>
> (2) That such minor is taught at home in the branches prescribed by law for the same length of time as children are re-

**39.** With regard to the issue of conspiracy, the court also examines the conduct of the several juvenile court judges, the sheriff of Summit County, and Dr. Talbot, the superintendent of schools for the State of Utah, who are, for the purposes of count one, alleged co-conspirators. Dr. Talbot is not a party to this action, because a motion to amend the complaint to include him

as a defendant was denied as untimely on January 26, 1982. The plaintiffs subsequently brought a separate action against Dr. Talbot and have moved in this action to consolidate the actions for trial. The motion to consolidate is addressed *infra,* but for purposes of this count, the court includes Dr. Talbot as an allowed co-conspirator.

quired by law to be taught in the district schools ....

. . . . .

d. The evidence of the existence of any reasons for nonattendance must be in each case sufficient to satisfy the board of education of the district in which the child resides, which, if so satisfied, shall issue a certificate stating that the holder is exempt from attendance during the time therein specified.

Utah Code Ann. § 53–24–3 provides: "Any parent, guardian or other person having control of any minor coming within the foregoing provisions who willfully fails to comply with their requirements is guilty of a misdemeanor."

Section 53–24–4 establishes the duties of the school districts and juvenile court authorities when the compulsory attendance law appears to have been violated:

It shall be the duty of the board of education of each district to inquire into all cases of misdemeanor herein defined, and to report the same and the offenders concerned to the juvenile court of the district within which the offense has been committed; and it is hereby made the duty of the officers of such juvenile court to proceed immediately to investigate and take appropriate action.

Nowhere in Utah's compulsory attendance statute are there definitions of any of the terms in these sections.

Chapter 2 of Title 53 describes the duties and functions of the State Board of Education. Section 53–2–12 vests the "general control and supervision of the public school system" in the State Board of Education. *Id.* § 53–2–12(1). "General control and supervision" is defined "to mean comprehending or directing to the whole, as distinguished from authority or power to govern or manage a specific division ... except as otherwise specifically directed by statute." *Id.* Section 53–2–13 provides as follows:

Failure on the part of the State Board of Education to carry out the provisions of the preceding section shall be deemed gross neglect of duty. Failure on the part of any governing board of any branch or division of the public school system to comply with the decisions, rules and regulations of the State Board of Education adopted in accordance with the provisions of the next preceding section shall likewise be deemed gross neglect of duty. No claim for salary or expenses of such board or boards or of any employee of such board or boards shall be allowed when incurred for any work or instruction in violation of the decisions, rules and regulations adopted by the State Board of Education as provided in the next preceding section.

The state superintendent is given "full power to investigate all matters pertaining to the public schools and he shall perform such other duties as the State Board of Education may require." *Id.* at 53–3–2. Section 53–3–4 gives the State School Superintendent a rather unusual duty:

The State Superintendent shall advise with superintendents and with school boards and other school officers upon all matters involving the welfare of the schools. He shall when requested by superintendents or other school officers give them written answers to all questions concerning the school law. His decision shall be held to be correct and final until set aside by a court of competent jurisdiction or by subsequent legislation.

Plaintiffs advance three reasons for their contention that these defendants willfully and conspiratorially agreed to commit an unlawful act in prosecuting the Singers under these statutes. First, plaintiffs contend that they were at all times in compliance with § 53–24–1 because the children were taught at home in the subjects prescribed by law for the prescribed length of time and number of days. While this is contrary to the facts in the record, since Mr. Singer testified at the hearing on August 23, 1977, that the children were taught for two and a half hours per day, Mr. Singer did tell the school board at its March 9, 1977, meeting, that he was meeting these requirements. As these requirements are sufficient for the granting of an exemption from attendance, plaintiffs contend that the

school board's subsequent revocation of the exemption was unlawful and known by these defendants to be unlawful. In essence, plaintiffs' argument is that the school board's efforts to monitor the children's school work and to test the children were beyond their authority and jurisdiction under § 53–24–1.

█ The court cannot agree with plaintiffs' interpretation of § 53–24–1 and therefore can permit no inference from the law and defendants' conduct that they knew their actions were unlawful. Section 53–24–1(b) does not *require* the local school board to issue an exemption to each parent whose children are taught at home for the same length of time as children are required by law to be taught in the district schools. Subsection (b) states that the parents *may* be exempted, thereby positing at least some discretion in the local school board. These defendants had the duty and responsibility to interpret these statutes in the first instance. The fact that they interpreted their duties broadly cannot give rise to an inference that they willfully agreed to act unlawfully.

█ The defendants were further entitled, if not required under § 53–3–4, to rely on the instruction which they had received from Superintendent Talbot regarding the school board's responsibility pertaining to home education. Responding to questions submitted by Superintendent Edrington, Dr. Talbot's letter of May 9, 1973, analyzed the statutory requirements for a home education exemption. That letter stated, as noted *supra* in the statement of facts, that "the Board of Education should be satisfied that [home] instruction meets a minimum quality." *See* Deposition of Walter D. Talbot at Exhibit 12. The letter also stated, in response to a question as to whether the local school district should monitor home education, that "[t]he local board of education must satisfy itself that the evidence of the existence for non-attendance is sufficient in accordance with the above criteria." *Id.* The latter statement is, of course, a paraphrase of Utah Code Ann. § 53–24–1(d). The above statutory provi-

sions and instruction from Superintendent Talbot amply support these defendants' contention that the school board could lawfully require that they be permitted to monitor the home education of the Singer children to insure that Mr. Singer's representations were accurate. The school board was probably also within the bounds of the law in requiring that the Singer children be tested as to their educational progress. While the court need not rule on the legality of the school board's actions, the compulsory attendance laws of the State of Utah cannot give rise to an inference that these defendants should have known their actions thereunder to be unlawful.

Moreover, in the face of these statutes, the court must require stronger facts than appear on this record to infer that these defendants knew or should have known their actions to be unlawful. Without such an inference, it is, of course, impossible to further infer that these defendants willfully agreed to jointly carry out this unlawful conduct. The court can therefore find no question of fact on the issue of conspiracy based on this allegation.

█ Plaintiffs further contend that a conspiratorial agreement is inferable from these defendants' knowledge that they had no jurisdiction over the Singers because they had established a "regularly established private school." This argument also fails, in this court's opinion. It is true that the Utah Code contains neither a definition of a "regularly established private school" nor requirements regarding the operation of or the relative quality of education in a private school. Section 53–24–1 does, however, distinguish clearly between private schools and home education. Subsection (b) allows an exemption from attendance at a "public, regularly established private or part-time school" if the minor is taught at home.

Defendants were not even notified of Mr. Singer's claim of a private school until at least October of 1977, after the juvenile court had already found the Singers guilty of neglect. Any inference that the defend-

ants should have promptly withdrawn the charges against the Singers following the Singers' filing of incorporation is undermined by the Attorney General's opinion of November, 1977, circulated by Superintendent Talbot to all local superintendents. This memorandum made it clear that, in the opinion of the Attorney General's office and presumably Dr. Talbot, the local school boards had the "responsibility of determining whether or not any school is a 'regularly established private school.'"

Further, the Singer matter was already to the courts by the time of the incorporation of the school, and the Singers notified the court at the November 1, 1977, hearing that they had incorporated a private school. At that point, any question regarding the legality of the school district's jurisdiction could be decided by the juvenile court in the course of the legal proceeding.

It simply cannot be inferred from these facts that the defendants agreed to combine to commit the "unlawful" act of prosecuting the Singers under the compulsory attendance statutes while their children were attending a regularly established private school. To contend otherwise would require an inference that these defendants knew or should have known that the Utah Compulsory Attendance law was a complete nullity, as it could be circumvented at any time by the simple declaration of the existence of a private school. No evidence on the record supports such an inference.

■ Plaintiffs' third rationale for their contention that these defendants wilfully conspired to commit an unlawful act is that such a conspiracy is inferable based on these defendants' knowledge that the Utah Compulsory Attendance laws were unconstitutional as applied to the Singers. The defendants certainly knew that Mr. Singer justified his actions, both in removing the children from the public schools and in contesting the criminal action brought against him, on religious grounds.

It would require a tremendous leap of faith, however, to infer from this knowledge that these defendants not only knew the compulsory attendance statute to be unconstitutional but agreed willfully to enforce it based on such knowledge. The religion issue and the issue of the constitutionality of the compulsory attendance law was discussed and debated throughout the course of the juvenile court proceedings. While the court will not pause at this point to discuss the constitutional issues, it suffices to say that the compulsory education statute is not so obviously unconstitutional that it can be inferred that these defendants knew their actions pursuant to this statute to be lawful. Plaintiffs even admitted in a memorandum to the court that the compulsory education statute is not unconstitutional on its face. *See* Plaintiffs' Response to Motion in Limine of Defendants Adkins and Robinson at 1–2. Quite simply, there can be no other conclusion than that the facts in the record do not support an inference that the defendants conspired to commit unlawful acts, the willful element of which was inferable from their knowledge that the statute was unconstitutional.

Plaintiffs further seek to establish a conspiracy on the premise that these defendants combined to commit a lawful act by unlawful means. The essential element of this conspiracy allegation is that the defendants "engineered and manipulated witnesses, parties, and procedures." Included in this allegation is that the defendants manipulated the several juvenile court judges presiding over the Singer case and that they manipulated the press so that their abuse of public power would be perceived as an appropriate exercise of that power. *See* Plaintiffs' Memorandum in Opposition to Motions for Summary Judgment of Defendants South Summit School District and Edrington at 3–4; Plaintiffs' Response to Motion for Summary Judgment of Defendants Edrington and School District at 14–15. Only disciples of Jacob and Wilhelm Grimm could accept as reasonable the inferences which plaintiffs' counsel seeks to foist on this court, based on the facts in the record, with regard to these alleged "manipulations."

■ There are no objective facts in the record from which it can be inferred that

the defendants manipulated witnesses to present false and misleading information to the juvenile courts in order to obtain their objectives. The only facts that plaintiffs point out in their memoranda to the court in support of this allegation are of the following type:

> Representatives of the School District appeared against the Singers at the different juvenile proceedings .... At those meetings they did not argue to the Court that the Singers' position was based on proper and recognized constitutional ground, nor did the representatives of the School District remind the presiding judges of the original attitude of Judge Bradford.

Memorandum in Opposition to Motions for Summary Judgment of Defendant South Summit School District and Edrington at 15. Of course they didn't; nor is there any reason why they should have. The constitutionality of the compulsory attendance law as applied to the Singers was for the court to decide in the context of the judicial proceedings. Judge Bradford's personal attitude, of course, was and is completely immaterial. An inference from these facts that defendants agreed conspiratorialy to "manipulate" witnesses at the juvenile court proceedings is ludicrous and merits no further response from this court.

█ Plaintiffs' more serious allegation that the defendants conspired to manipulate the judges of the Summit County Juvenile Court warrants more elaborate analysis. This allegation is based on the deposition testimony of Edrington and the written communications between Summit County Attorney Adkins, Superintendent Edrington, Dr. Talbot, and Judge Bradford in late 1976. Alternatively, the defendants allegedly conspired either to change Judge Bradford's "attitude" or conspired to have him removed from the bench. Regarding this latter possibility, there is no evidence that Dr. Talbot acted improperly as a member of the Juvenile Court Commission. The objective evidence shows, to the contrary, that, while he may have voted

against Judge Bradford on the initial submission of names to the governor, Dr. Talbot personally saw to the reconsideration by the commission which led to the submission of Judge Bradford's name. There is also no evidence that the governor's decision to appoint Judge Bachman, instead of reappointing Judge Bradford, had anything to do with the actions of these defendants. Indeed, there is no evidence on the record to show that Governor Matheson had any communications with these defendants at this point in time. Considering the unrebutted facts concerning the propriety of Dr. Talbot's actions as a member of the Juvenile Court Commission, it would require more than the fact that Judge Bradford was not reappointed to infer an agreement or a conspiracy to have a different judge appointed to the juvenile court bench.

Nor can it be inferred from the communications between these defendants, Dr. Talbot, and Judge Bradford, that these parties willfully agreed to change unlawfully the "attitude" of the court. The evidence most supportive of plaintiffs' contention is found in Mr. Edrington's statement in the school board agenda for February, 1977. Even countenancing this statement despite its sometimes double hearsay, it does not in any way indicate clearly unlawful conduct from which an inference of conspiracy could be made. Without attempting to become embroiled in a debate as to the propriety or impropriety of these alleged contacts, the court states only that this objective evidence does not give rise to an inference that the defendants conspired to commit a lawful act by an unlawful means.

The court concludes for the above reasons that there is no evidence on which to support a conspiracy claim under count one. The above analysis can hardly be said to have exhausted all of the facts on which plaintiffs rely, but given the voluminosity of the record and memoranda concerning these issues, the court believes the above discussion adequately and exhaustively disposes of plaintiffs' claims on this issue.[40]

40. Plaintiffs also would infer a conspiracy based on "ex parte" contacts between defendants and

The court must next turn to the question of whether any of these individual defendants' conduct [41] deprived plaintiffs of any constitutional rights. Plaintiffs claim under count one that the defendants deprived them of the following rights: The right of religious freedom under the First Amendment to the Constitution of the United States; the right of privacy; the right to due process of law; the right to be free from "a systematic scheme of harassment and intimidation by law enforcement officers;" the right to be free from unlawful assaults; the right of freedom from malicious prosecution; and the right to be free from discrimination because of their religious beliefs. *See* Plaintiffs' Amended Complaint at 26. The court notes that while this discussion will concern the acts of the defendants individually, if a conspiracy were found to exist, plaintiffs would still be required to demonstrate how a deprivation of their constitutional rights resulted therefrom. The court, of course, evaluates these allegations in the context of whether a summary judgment is appropriate.

The central element of plaintiffs' allegations under count one concerns unlawful prosecution. Simply stated, plaintiffs contend that defendants' conduct in prosecuting John and Vickie Singer deprived them of the above rights. The deprivations alleged under this count which bear no close relationship to the initiation of and carrying out of the prosecution can be summarily disposed of by the court.

The court first notes that there is no specific constitutional provision protecting persons from systematic schemes of harassment and intimidation by law enforcement officials. While it is true that, as stated in 1 C. Antieau, Federal Civil Rights Acts, § 130 at 238 (1980), "[c]itizens subjected to a systematic scheme of harassment and intimidation by the police have been protected in section 1983 actions," the cases cited for this proposition were not creating a new constitutional right; these cases recognized a cause of action *based on*

---

the juvenile court judges succeeding Judge Bradford. Without positive evidence of any misconduct which might destroy these judges' impartiality, the ex parte contacts cannot give rise to an inference of a conspiracy. *Cf. Celano v. Celano,* 537 F.Supp. 690, 695–697 (E.D.Pa. 1982) (granting a summary judgment despite allegations of conspiracy between judge, defendant, and defense counsel based on ex parte contacts).

The alleged manipulations of the press warrant little discussion. Any inference that these evidence a conspiracy is simply far-fetched.

**41.** Plaintiffs have never articulated the basis for South Summit School District's liability under this count. Insofar as the school district is a state entity, it cannot be sued for damages in federal court under the Eleventh Amendment to the United States Constitution. *See Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Harris v. Tooele County School District,* 471 F.2d 218 (10th Cir.1973). Assuming the school district to be a local government entity, it may be sued under § 1983. In *Monell v. New York City Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the United States Supreme Court held that while a local governmental entity may be sued under § 1983, "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Id.* at 694,

98 S.Ct. at 2037. A local government may be liable "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Id.*

The court has difficulty conceptualizing South Summit School District's liability under this count based on the *Monell* standard. The school district cannot be liable under principles of respondeat superior for the actions of the school board or defendant Edrington. At the same time, the compulsory education statute cannot fairly be said to represent a policy or custom of the school district. That law was established by the Utah Legislature, and the local school district has no control over that law. If plaintiffs' claim is that the school board's interpretation of the statutes in this particular instance represented a "policy or custom," the court cannot agree with their interpretation. The school board's decisions with regard to the Singers were specific to that situation and did not represent general policy or custom. If a deprivation of constitutional rights flowed from those decisions, the proper recourse would appear to this court to be an action against the school board members individually and not against the school district as an entity. In any event, the court's discussion in the text of the defendants' conduct adequately encompasses the conduct of the school board.

*conduct amounting to harassment* that were alleged to have deprived the plaintiffs of specific constitutional rights. *See Philadelphia Yearly Meeting of the Religious Society of Friends v. Tate*, 519 F.2d 1335 (3rd Cir.1975) (alleging deprivation of rights of speech, assembly, and association); *Hernandez v. Noel*, 323 F.Supp. 779 (D.Conn.1970) (alleging deprivation of free speech, assembly, due process, equal protection, right of counsel, and right to remain silent). There is thus no valid claim based on a deprivation of this "right".

■■■ Regarding the plaintiffs' allegation that they have been deprived under this count of their right to be free from unlawful assaults, the court can find no evidence in the record that these defendants assaulted the plaintiffs or Mr. Singer. The record is also devoid of evidence from which a conspiracy could be inferred, the object of which was to assault either the plaintiffs or John Singer. Nor can it be stated that the conduct of these defendants in prosecuting Mr. Singer "caused" him to be assaulted. This also does not state a cause of action based on the facts in the record.

■■■ Neither were the plaintiffs deprived of substantive due process [42] or privacy rights, aside from any such deprivation occurring as a result of an unlawful prosecution. The United States Supreme Court has held that the liberty interest protected by the due process clause of the Fourteenth Amendment includes the right "to acquire useful knowledge, to marry, establish a home and bring up children." *Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923). Two years after *Meyer v. Nebraska*, the court in *Pierce v. Society of Sisters*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925), held unconstitutional on substantive due process grounds an Oregon law that required parents to send their children to public schools, on penalty of criminal liability. The right defined by *Meyer* and *Pierce*, however, does not extend so far as to include a right to be free from any state regulation of education or a right not to be prosecuted pursuant to valid state law.

In *Runyon v. McCrary*, 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976), the United States Supreme Court detailed the limited nature of the right defined by *Meyer* and *Pierce*. *Runyon* was an action for declaratory and injunctive relief and damages under 42 U.S.C. § 1981, alleging that the defendants had violated that statute by refusing on racial grounds to permit the plaintiffs to contract to attend the defendants' schools. In affirming the lower courts' determination that § 1981 had been violated, the Court addressed whether that section, as applied to private, commercially operated, nonsectarian schools, violated a parent's right to direct the education of his children under the liberty prong of the due process clause of the Fourteenth Amendment. The Court noted that in *Wisconsin v. Yoder*, 406 U.S. 205, 239, 92 S.Ct. 1526, 1545, 32 L.Ed.2d 15 (1972), (White, J., concurring),

> the Court stressed the limited scope of *Pierce*, pointing out that it lent "no support to the contention that parents may replace state educational requirements with their own idiosyncratic views of what knowledge a child needs to be a productive and happy member of society" but rather "held simply that while a state may posit [educational] standards, it may not pre-empt the educational process by requiring children to attend public schools."

*Runyon v. McCrary*, 427 U.S. at 177, 96 S.Ct. at 2597. The Court concluded that "the ... application of § 1981 infringes no parental right recognized in *Meyer, Pierce, Yoder,* or *Norwood* [*v. Harrison*, 413 U.S. 455, 93 S.Ct. 2804, 37 L.Ed.2d 723]." *Id.*

Following *Runyon*, these defendants' actions in attempting to regulate the Singer children's education could not deprive plaintiffs of their substantive due process right unless such conduct was in some other

---

**42.** Plaintiffs do not differentiate in their complaint between a substantive or procedural due process violation under count one. The court, viewing the allegations of the complaint in a light most favorable to the plaintiffs, will proceed to analyze both allegations.

respect unlawful or dictated either directly or indirectly the values and standards required as a part of the children's education. There is no evidence in this case to support the latter; the former will be further discussed, *infra*.

The case law provides additional support for the court's conclusion that the defendants' conduct in seeking to enforce the compulsory attendance laws did not violate plaintiffs' right to educate their children. In *Hanson v. Cushman*, 490 F.Supp. 109 (W.D.Mich.1980), parents brought an action under 42 U.S.C. § 1983, seeking a declaratory judgment that the Michigan compulsory attendance law was unconstitutional as applied to them because it denied them the right to educate their children in their own home. The Court noted that the question of whether the parents had a right to educate their children at home was not an issue because the state conceded that "parents have that right so long as state laws are complied with." *Id.* at 111–12. The Court dismissed the action on the narrower issue of whether "parents have the right to educate their children at home without complying with the state law requiring state certification of all persons who give instruction to children within the state." *Id.* at 112. In so holding, the Court discussed at length the *Meyer, Pierce,* and *Yoder* decisions of the United States Supreme Court.

Likewise, the very similar [43] constitutional right to privacy has not been deprived the plaintiffs by these defendants' conduct in seeking to enforce the compulsory education law, unless such conduct was independently unlawful. In *Runyon v. McCrary*, the Supreme Court stated that a state is not "restricted by the Constitution from regulating the implementation of parental decisions concerning a child's education." 427 U.S. at 178, 96 S.Ct. at 2598.

The Court has repeatedly stressed that while parents have a constitutional right to send their children to private schools

and a constitutional right to select private schools that offer specialized instruction, they have no constitutional right to provide their children with private school education unfettered by *reasonable* government regulation.

*Id.* (Emphasis added.) To be protected, these rights must be those which are " 'fundamental' or 'implicit in the concept of ordered liberty.' " *Paul v. Davis*, 424 U.S. 693, 713, 96 S.Ct. 1155, 1166, 47 L.Ed.2d 405 (1976) (quoting *Palko v. Connecticut*, 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937)). *See also Hanson v. Cushman*, 490 F.Supp. at 112.

▮ Following similar reasoning, the free exercise right asserted by plaintiffs, standing apart from any malicious or unlawful prosecution, does not state a cause of action under the facts of this case. There is no right under the free exercise clause of the Constitution of the United States to be free from criminal prosecution. If defendants' conduct in prosecuting the Singers was sufficiently unlawful, that conduct may also have deprived the plaintiffs of their free exercise right. *Cf. Landrigan v. City of Warwick*, 628 F.2d 736, 745 (1st Cir.1980) (recognizing independent constitutional deprivations flowing from malicious prosecution or abuse of process).

▮ Of course, not all religiously grounded conduct is within the protection of the free exercise clause. As stated by the United States Supreme Court:

It is true that activities of individuals, even when religiously based, are often subject to regulation by the States, in the exercise of their undoubted power to promote the health, safety, and general welfare, or the Federal Government in the exercise of its delegated powers. *See, e.g., Gillette v. United States*, 401 U.S. 437 [91 S.Ct. 828, 28 L.Ed.2d 168] (1971); *Braunfeld v. Brown*, 366 U.S. 599 [81 S.Ct. 1144, 6 L.Ed.2d 563] (1961); *Prince v. Massachusetts*, 321 U.S. 158 [64 S.Ct. 438, 88 L.Ed. 645] (1944); *Reynolds v.*

---

**43.** The court noted in *Runyon v. McCrary* that the parental right to educate children and the privacy right "may be no more than verbal variations of a single constitutional right." 427 U.S. at 178 n. 15, 96 S.Ct. at 2598 n. 15.

*United States*, 98 U.S. 145 [25 L.Ed. 244] (1879).

*Wisconsin v. Yoder*, 406 U.S. 205, 220, 92 S.Ct. 1526, 1535, 32 L.Ed.2d 15 (1972). A citizen may be justified in resisting state regulation which unlawfully infringes on his constitutional rights, but he must do so pursuant to his legal remedies. There are well-established judicial avenues to challenge unconstitutional state laws. A citizen may no more resist judicial processes in determining his constitutional rights than may an innocent person resist arrest or prosecution based solely on his proclamation of innocence.

 The principal inquiry thus becomes whether the defendants' actions in initiating and prosecuting the Singers under the compulsory attendance statutes was unlawful or, in other words, without probable cause. The court need not rehearse the statutes on which defendants based their actions. In light of the facts previously discussed, there can be no question of fact that the defendants here had probable cause to believe that John Singer was in violation of the Utah Compulsory Education laws. While the court makes this determination independently, it does not overlook the fact that the juvenile court found Mr. and Mrs. Singer guilty of violating the compulsory education statutes.

In finding that probable cause existed to prosecute the Singers, the court does not reach the issue of the constitutionality of the compulsory education law as applied to the Singers.[44] The critical issue is one of probable cause and not constitutionality. The defendants conceivably could have acted with probable cause even if the statute were unconstitutional, provided that they had reason to believe it was not unconstitutional.

 With the finding that the prosecution of the Singers was based on probable cause, the court is constrained to find as a matter of law that the defendants did not deprive the plaintiffs of their rights of free exercise, privacy, substantive due process, or the right to be free from malicious prosecution. The only remaining allegations are that the defendants' conduct deprived the plaintiffs of procedural due process and the rights to be free from religious discrimination. There is no evidence to support the allegations that the prosecution was discriminatory. The procedural due process allegation presumably relates to the alleged manipulations of the juvenile court judges, witnesses, and procedures. Giving full consideration to the facts giving rise to these allegations, the court can find no evidence to support an allegation that these actions deprived plaintiffs of their constitutional right to procedural due process or any other independent rights. There is no evidence that the juvenile court judges were influenced by any improper behavior. The court therefore rules that under the allegations of count one, these defendants are entitled to summary judgment.

 While the court need not address the immunity question under this count, having concluded that the record does not support any allegations of a deprivation of constitutional rights, the court offers as additional support for its holding the fact that the defendants, excepting South Summit School District, *see Owen v. City of Independence*, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980), would be entitled to immunity as defined above. De-

---

**44.** Were the court to reach the constitutionality issue, it would first hold that plaintiffs are barred by principles of collateral estoppel from raising the issue in the present action, following *Allen v. McCurry*, 449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980). Second, the court would undoubtedly uphold the constitutionality of the compulsory attendance law as applied to the Singers, under the principles enunciated in *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). *Cf. Prettyman v. State of Nebraska, County of Cass*, 537 F.Supp. 712

(D.Neb.1982) ("The challenged statutes do not prevent the plaintiffs from operating a school which inculcates their children with their religious convictions, they only require that the school meet the *de minimus* certification and attendance standards imposed on all Nebraska schools to insure that the state meets its educational obligations to its young people."); *State v. Riddle*, 285 S.E.2d 359, 365 (W.Va.1981) (holding that "sincerely held religious convictions are never a defense to total compliance with compulsory school attendance law.").

fendants Christiansen and Adkins, in initiating the prosecution and carrying out the prosecution are absolutely immune from suit under § 1983. These two defendants' conduct in consulting with and advising the law enforcement officers attempting to arrest John Singer will be addressed under other causes of action. Utilizing the functional immunity analysis defined in *Harlow*, it may very well be that defendant Edrington is also absolutely immune from liability for his conduct in initiating the prosecution. *See Butz v. Economou*, 438 U.S. 478, 515, 98 S.Ct. 2894, 2915, 57 L.Ed.2d 895 (1978). Insofar as Mr. Edrington is not absolutely immune, he would merit a qualified immunity for the conduct alleged under this count. There is no issue in the present record as to the fact that Edrington was acting within the scope of his discretionary authority, and there is no question of fact, based on the objective evidence, as to whether he knew or should have known that his actions would violate the Singers' constitutional rights, consistent with the court's earlier discussion.

## C. *Count Two*

Count two alleges that defendants Robinson, Wadman, Grant Larsen, Riggs, Lunnen, Adkins, and Christiansen, deprived the plaintiffs of their constitutional rights by their conduct in attempting to arrest John Singer on October 19, 1978. This count alleges the deprivation of the following rights: Religious freedom; freedom from "unwarrantable seizures and arrests" under the Fourth Amendment to the Constitution; due process of law; freedom from a "systematic scheme of harassment and intimidation by law enforcement officers;" freedom from unlawful assaults and batteries; freedom from malicious prosecution and discrimination based on religious grounds.

This count contains two basic allegations in this court's view. First, defendants Wadman, Larsen, and Riggs "were not authorized to arrest Mr. Singer, and they knew, or should have reasonably known, that they lacked such authority. Defend-

ants Robinson and Lunnen were aware of this absence of authority and knowingly permitted and encouraged ... this attempt." Second, plaintiffs allege that these defendants carried out the arrest attempt in an unlawful manner. The court, finding no genuine issue of material fact, will grant the defendants' summary judgment on this count.

 Regarding the allegation of conspiracy under count two, the only evidence on the record from which a conspiracy could be inferred is the same evidence by which plaintiffs attempt to show that the arrest attempt was unlawful or carried out in an unlawful manner. Even assuming one of the two latter propositions to be correct, which later discussion will show to be unsupported by the facts, there still is no evidence from which to infer a willful agreement to commit an unlawful act or to commit an act in an unlawful manner.

 The court turns, then, to the allegation that the arrest attempt was unlawful. It should be noted at the outset that this arrest was not based on mere probable cause or undertaken pursuant to a warrant based on probable cause. Mr. Singer had been adjudicated guilty of the misdemeanor of neglecting his children and sentenced to sixty days in jail and a $299.00 fine. Commitment orders were issued to Sheriff Robinson, but stayed various times for various reasons. Later, when Mr. Singer failed to comply with the court's orders and conditions, he was found in contempt of court and sentenced to thirty days in jail and fined $200.00. Sheriff Robinson was ordered to place him in custody, and Robinson attempted many times to have Mr. Singer submit to his custody peaceably. All in all, the juvenile court judges, the prosecutors, and the law enforcement officials "bent over backwards" for a period of over one year to resolve the matter short of incarceration. To argue that the law enforcement officers had no authority in the face of these court orders of commitment borders on the absurd. To claim that an attempt to place Mr. Singer in custody was unlawful because the Sheriff did not

undertake to second-guess two juvenile court judges would make a mockery of our society's legal system. This was not a false arrest.

 Plaintiffs also claim that defendants Wadman, Larson, and Riggs lacked authority to arrest Mr. Singer. These defendants were all agents of the Utah Narcotic and Liquor Law Enforcement Division, and as such, they had the following responsibility and jurisdiction:

> The liquor division shall:
>
> (a) have specific responsibility for the enforcement of all laws and regulations of the state pertaining to liquor; and,
>
> (b) have general law enforcement jurisdiction throughout the state; and,
>
> (c) have concurrent law enforcement jurisdiction with all local law enforcement agencies and officers thereof....

Utah Code Ann. § 32–10–2. Section 32–10–7 states as follows:

> The director of liquor division, and each enforcement officer thereof, is vested with the powers of peace officers throughout the several counties of the state, with the exception of the power to serve civil process .... They may serve criminal process and arrest and prosecute violators of *any law* of this state and shall have the same rights as other peace officers to require aid in executing their duties....

(Emphasis added).

These officers were acting at the specific request of Sheriff Robinson and in their capacity as peace officers possessing statewide jurisdiction. Plaintiffs argue, however, that these officers lacked authority because they were not deputized pursuant to Utah Code Ann. § 17–16–7. This fact does not detract *in any way* from these officers' general authority under the above statutes, regardless of whether they had authority as deputies to Sheriff Robinson, to assist in placing Mr. Singer in custody. Plaintiffs' other challenges to the authority of the state officers to effect the arrest of Mr. Singer are also outlandishly meritless. The court therefore finds that, for all of the above reasons, the attempt to place Mr. Singer in custody was lawful and pursuant to lawful authority.

 Plaintiffs also claim that the arrest attempt of October 19, 1978, was in some way violative of the plaintiffs' constitutional rights because it was carried out in an unlawful manner. This allegation is spurious. It cannot be claimed, despite plaintiffs' attempt, that a law enforcement officer struggling with someone resisting arrest is using excessive force. None of the officers who attempted to take Mr. Singer into custody ever drew their pistols. The fact that the defendants utilized deception in their plan of arrest does not make it unlawful and certainly did not in any respect violate plaintiffs' constitutional rights.

Without attempting to address each specific alleged deprivation, the court finds that there is no genuine issue of material fact to support the allegations that defendants' conduct in attempting to arrest Mr. Singer on October 19, 1978, deprived the plaintiffs of any constitutional rights.

 Were the court to find any facts supporting the alleged deprivations of rights, it would find all of the defendants to this count immune from liability. There are no facts on the record to show that defendants Adkins and Christiansen planned or participated in this arrest attempt. The only facts alleged to implicate them under this count were undertaken within the scope of their role as prosecutors, for which they possess absolute immunity. Likewise, the arresting officers, insofar as they were ministerially executing the court order, might be entitled to an absolute, "quasi-judicial" immunity. *See Tymiak v. Omodt*, 676 F.2d 306, 308 (8th Cir.1982); *Hevelone v. Thomas*, 423 F.Supp. 7, 9 (D.Neb.), *aff'd*, 546 F.2d 797 (8th Cir.1976). But *cf. Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396; *Rodriguez v. Ritchey*, 556 F.2d 1185 (5th Cir.1977) (holding no cause of action stated against officers for arrest without unreasonable force under valid warrant issued pursuant to a properly con-

stituted grand jury indictment, not reaching immunity question). Insofar as the arresting officers exercised their discretion in planning and executing the arrest attempt, the facts of this case support a qualified immunity from liability.

The court need not address, in light of its holding above, the defendants additional ground in support of their motion that Mr. Singer's constitutional claims did not survive his death. Summary judgment is granted the defendants under this count.

### D. *Count Three*

Plaintiffs' third claim for relief alleges negligence or gross negligence in devising the arrest plan carried out on January 18, 1979. This claim is brought by Vickie Singer as personal representative of the heirs of John Singer against defendants Robinson, Matheson, Hansen, Lunnen, Reid, Wadman, Adkins, and Christiansen.

The initial inquiry under this claim and the other pendent claims asserted in this action is the standard to be applied to these defendants' conduct in determining liability. The Utah Governmental Immunity Act, Utah Code Ann. § 63–30–4 (Supp.1981), provides as follows:

. . . . .

The remedy against a governmental entity or its employee for an injury caused by an act or omission which occurs during the performance of such employee's duties, within the scope of employment, or under color of authority is, after the effective date of this act, exclusive of any other civil action or proceeding by reason of the same subject matter against the employee or the estate of the employee whose act or omission gave rise to the claim, unless the employee acted or failed to act through gross negligence, fraud, or malice.

An employee may be joined in an action against a governmental entity in a representative capacity if the act or omission complained of is one for which the governmental entity may be liable, but no employee shall be held personally liable for acts or omissions occurring during the performance of the employee's duties, within the scope of employment or under color of authority, unless it is established that the employee acted or failed to act due to gross negligence, fraud, or malice.

These provisions were added to the Governmental Immunity Act in 1978, in an attempt to close a loophole which existed in the Act prior to that time. *Wilkinson, The Governmental Immunity Act as Amended by House Bill No. 14,* 6 Utah State Bar Journal 27, 29–30 (Fall-Winter 1978). In 1974, the Utah Legislature passed the Indemnification of Public Officers and Employees Act, Utah Code Ann. 63–48–1 to –7. That Act provided that a public entity would bear the cost of defense and pay any judgment for its employee acting within the scope of his duty, so long as the employee did not act with gross negligence, fraud, or malice. Under decisions of the Utah Supreme Court prior to the Government Immunity Act's 1978 amendments, that Act did not apply to individuals but only to governmental entities. *See, e.g., Madsen v. State,* 583 P.2d 92, 94 (Utah 1978); *Cornwall v. Larsen,* 571 P.2d 925, 927 (Utah 1977).

Thus, prior to the 1978 amendments, a plaintiff could avoid the procedural steps and immunities established by the Act by bringing suit directly against the employee without naming the governmental entity. If a judgment was obtained against the employee, the governmental entity would be obligated to pay the judgment under the Indemnification Act.

Assuming that the intent of the 1978 amendments was to dissolve this circumvention of the Act, the amendments contain certain ambiguities. The latter paragraph quoted above seems to indicate that if an employee is sued apart from the governmental entity, the standard which must be met is that the employee "acted or failed to act due to gross negligence, fraud, or malice." If the employee is joined in an action with the governmental entity, the employee may be liable for negligence, subject to the limitations contained in the Governmental Immunity Act and the extent of the gov-

ernmental entity's indemnification. This court believes that to interpret these paragraphs to allow an employee to be sued for negligence separately from the governmental entity would make a complete nullity of this amendment. Such an interpretation, however, is not farfetched under the 1978 amendments as drafted. This court assumes for the purpose of this case that to recover for the simple negligence of a governmental employee, the employee must be joined with the governmental entity in the action.[45]

Turning then to the substantive allegations of the third claim for relief, the court must first determine the defendants potentially liable for any defects in the plan of arrest. The facts on which plaintiffs rely to include Adkins and Christiansen under this count are that they participated in having the order modified to delete the language requiring an arrest without any threat of harm. Plaintiffs also contend that Adkins and Christiansen are liable under this claim for their actions in participating in some of the early meetings which led to the actual plan utilized. There is no evidence in the record that either Christiansen or Adkins had any involvement in the final plan which was developed from the surveillance. In fact, there is no evidence that they even knew a final arrest plan had been decided upon. On the basis of these facts, the court is constrained to rule as a matter of law that Christiansen and Adkins are not liable under this claim.

The facts regarding Governor Matheson show that he was notified on about January 16 that a plan had been developed to arrest Mr. Singer. There is no evidence in the record to show that Governor Matheson knew any of the details of the plan beyond the fact that it did not involve any potential harm to the Singer family. These facts are insufficient to predicate joint activity on the part of Governor Matheson; therefore, summary judgment is granted him also under this claim.

Commissioner Lunnen did not participate in developing the plan, although the outline of the plan was described to him and he approved the plan as described. *See* Deposition of Larry Lunnen at 28–29. This can perhaps be sufficient to establish joint action on the part of Commissioner Lunnen with defendants Wadman and Robinson who were of course more directly responsible for the arrest plan.[46]

With regard to these defendants, then, the court must determine whether their actions in developing the plan of arrest can give rise to a question of fact as to whether they acted with gross negligence, or for that matter ordinary negligence. Plaintiffs claim that the defendants owed Mr. Singer a duty to use ordinary care in "devising, planning, and thereafter executing any arrest." The court has not been referred to any case which has found liability based on such a duty.[47] Specifically, plaintiffs claim the ar-

---

**45.** Plaintiffs have argued in a memorandum that the interpretation of § 63–30–4 adopted by the court here would be in violation of the "free access" clause of the Utah Constitution. Utah Const., art. I § 11. To this court's knowledge, the Utah Supreme Court has not recently expounded on the scope of this clause, despite the numerous statutes that potentially run afoul of that section should it be interpreted as broadly as plaintiffs suggest. While the court concedes that the Utah Supreme Court may consider this constitutional problem in interpreting § 63–30–4, the court is not convinced by the scant authority proposed by the plaintiffs here that the result will be a finding of unconstitutionality. In this court's view, § 63–30–4 does not necessarily abolish a cause of action for negligence against governmental employees, but merely requires that in such an action the employee be

joined with the governmental entity and that recovery be subject to the same limitations as recovery from the entity itself.

**46.** Defendants Grant Larsen, Carlson, and Jolley also participated in the development of the final plan of arrest, but these defendants are not named under this claim.

**47.** Perhaps the case with facts most similar to this action is *Maiorana v. MacDonald,* 596 F.2d 1072 (1st Cir.1979). That case was a 1983 action brought by the mother of a person shot and killed in the course of an arrest by local, state, and federal law enforcement officers. One aspect of plaintiff's allegations was that the officers knew that the plaintiff's son could have been arrested earlier in the day when he was unarmed, instead of later when they knew him

rest plan was negligent or grossly negligent for several reasons. First, they claim that defendants should have given consideration to Mr. Singer's religious beliefs, and perhaps refused to arrest him at all. Even assuming that defendants did not consider Mr. Singer's beliefs, this alone does not make the arrest plan grossly negligent or even negligent. Mr. Singer's religious beliefs did not give rise to a duty not to attempt his lawful arrest. Next, plaintiffs claim that the plan was negligent or grossly negligent because it did not include or consider "any passive force by which John Singer could be subdued without grave bodily harm." By making such an allegation, plaintiffs conveniently ignore the fact that defendants had utilized a plan involving a lesser risk of harm in October of 1978, which these plaintiffs claim violated their constitutional rights. This court does not believe a plan is negligent or grossly negligent merely because it involves a show of force; neither does the court recognize a duty to desist from arresting someone who may draw a weapon or a duty to insure that a person who draws a gun on arresting officers will be safely taken into custody. In this court's view, no amount of planning can dictate the actions of an arresting officer in a life-threatening situation. To the extent that the officers acted wrongfully or exercised poor judgment, under the specific circumstances, the proper claim is against those officers and not the individuals who planned the arrest.

■ Plaintiffs also claim the plan was negligent because it did not take into consideration the fact that Mr. Singer would never shoot first. Assuming these planners knew that to be a fact—which of course no one will ever know—the court is

stymied as to how the planners should have acted on such knowledge, beyond abandoning any attempt to place Mr. Singer in custody. Even plaintiffs' experts in police tactics do not assert that the arrest team should have been instructed that Mr. Singer would not under any circumstances fire the first shot. That the arrest team was instructed to use their discretion and best judgment hardly makes these defendants' plan negligent let alone grossly negligent.

None of plaintiffs' other allegations demonstrate that the plan was negligent or grossly negligent. Even if a factual question were raised as to whether these standards were met, a question remains as to how that plan *caused* any harm to Mr. Singer.[48] Had Mr. Singer peaceably submitted to arrest, it can hardly be said that he would then have had a cause of action for the negligence in the planning of that arrest. If plaintiffs' theory is that the plan was to cause Mr. Singer to pull his gun so that the officers could "justifiably" shoot him, a factual showing beyond mere speculation would be required to send such an issue to a jury. No such showing has been made in this case.

■ Judge Larson's comments in his deposition are perhaps appropriate with regard to this claim. In explaining why he removed the language from his order requiring that there be no risk of bodily harm, the judge dispelled the notion that a person has an absolute right to be "peacefully" arrested:

You see, the $64.00 question, so to speak, here when you get right down to the nitty-gritty was whether I would drop the arrest warrant because there was the threat of bodily harm and in my judgment as a judge this is something that, well, I hope that every defendant is ar-

to be armed. The First Circuit, in affirming a summary judgment for the defendants, rejected this argument in dicta because the law enforcement officers had a reasonable objective in timing the arrest as they did. *Id.* at 1081.

**48.** The dilemma in determining causation can be illustrated by juxtaposing two of plaintiffs' arguments. Plaintiffs claim the *plan* was negligent because it did not allow Mr. Singer an

avenue of escape; he was to be totally surrounded by the arresting officers. Yet plaintiffs claim the *execution* of the plan was negligent because several of the officers didn't reach their appointed positions, thereby allowing Mr. Singer an avenue of escape. Obviously, both of these negligent acts couldn't have caused Mr. Singer to be shot unlawfully.

rested peacefully—the fact that bodily harm is threatened is not a reason for me to vacate any warrant and I felt that John Singer just like any other person should have to face the law under present circumstances.

. . . . .

It came down to when I took that phrase out of there, the reason I took it out of there I felt that it made it almost impossible for the sheriff to go in there and make an arrest without bodily harm to someone, including the sheriff.

. . . . .

I was not going to tie his hands to prevent him from making a lawful arrest.

. . . . .

... I felt that I had the responsibility to see that the court's order was carried out and I'm sorry that there was any possibility of anyone getting hurt. That's always my concern but that is ... not a reason in my framework why I should say, well, we will just skip this one. Anybody that threatens bodily harm shouldn't be free from arrest. I can't buy that concept and I didn't in this case.

Deposition of Judge John Farr Larson at 114, 116–17, 120–21. This is not to say that police officers may use "excessive force" in making an arrest. That issue will be discussed in the next section. The tragic lesson here is that the law enforcement officers had a duty to arrest Mr. Singer, regardless of the threat of bodily harm, even if directed at themselves. A plan of arrest is not negligent merely because it cannot avoid all risk of harm to the person to be arrested, especially if he resists with a deadly weapon. If plaintiffs' theory were cognizable, the court would have to assume the arresting officers would also have a cause of action against the planners, for

placing them in a situation where Mr. Singer could endanger their lives. The court cannot accept this reasoning. The court therefore rules as a matter of law that defendants are entitled to summary judgment under count three of the amended complaint.[49]

### E. Count Four

Plaintiffs' fourth claim for relief alleges negligence and gross negligence in the arrest of Mr. Singer, including the use of excessive force in the arrest. The claim is made by Vickie Singer as personal representative of the heirs of John Singer against all of the defendants named in claim three and the ten officers making up the arrest team. Claim four is essentially a wrongful death claim brought pursuant to Utah Code Ann. § 78–11–7 (1977). The critical element in such a claim, of course, is that the death was wrongful in the sense that the tortfeasor breached a duty owed to the decedent. *See Hull v. Silver*, 577 P.2d 103 (1978). For this claim to survive defendants' summary judgment motion, there must be a factual question as to whether the defendants breached a duty to use only the amount of force reasonably necessary to effect Mr. Singer's arrest under the circumstances presented.

 In attempting to place Mr. Singer in custody, the arrest team unquestionably used deadly force. If the law enforcement officers were justified in using deadly force, the death of Mr. Singer was not wrongful under the law. Utah Code Ann. § 76–2–404 permits an officer to use deadly force as follows:

A peace officer, or any person acting by his command in his aid and assistance, is justified in using deadly force when:

. . . . .

**49.** In their arguments in support of this claim, plaintiffs rely heavily, although not exclusively, on the deposition testimony of two of their experts, Dr. Richard Kobetz and Dr. Bruce Danto. While these experts state their opinion that the plan was grossly negligent, the court is, obviously, unpersuaded by their application of the law to the facts of this case. That judgment

is reserved to the court or the jury, as the case may be, and not to the experts supplied by either party. Were the latter the case, the court would be in a quandary as to how to reconcile the Kobetz and Danto testimony with the testimony of an additional plaintiffs' expert who described the plan as "good". *See* Deposition of Maurice J. Cullinane at 73 & 103.

(2) In effecting an arrest or preventing an escape from custody following an arrest and the officer reasonably believes both that:

(a) Such force is necessary to prevent the arrest from being defeated by resistance or escape; and

(b) The person to be arrested has committed or attempted a forcible felony or is attempting to escape by use of a deadly weapon or otherwise indicates that he will endanger human life or inflict great bodily harm unless arrested without delay.

(3) The officer is in the performance of his legal duty or the execution of the legal process and reasonably believes the use of the force is necessary to the protection or safety of himself or others
. . . .

The Rules of the Narcotics and Liquor Law Enforcement Division are consonant with this statute. *See* Deposition of Robert Wadman, vol. 2 at Exhibits 15 & 16.

The court, then, must examine the defendants' conduct to determine if a question of fact exists as to whether they were justified under section 76–2–404 in using deadly force under the particular circumstances. First, in making this examination, the court finds there is no fact question but that Mr. Singer was aware that these were law enforcement officers attempting to arrest him. The Singers knew that Sheriff Robinson had been ordered to place Mr. Singer in custody. His arrest had been attempted only a few months prior to this time and Mr. Singer later became aware that officers posing as newsmen made that attempt. Further, several of the Singer family testified in their depositions that they, including Mr. Singer, thought or suspected the snowmobilers to be police officers setting up an arrest plan. *E.g.*, Deposition of Vickie Singer, vol. 4 at 651. It is true, as plaintiffs argue, that the officers on the two snowmobiles pursuing Mr. Singer up the lane did not have police written across the front of their jackets. That fact does not raise an issue as to whether Mr. Singer knew them to be police officers in light of all of the other evidence. Even the officers' jackets, which were dark blue with gold patches on the sleeves, should have suggested they were law enforcement personnel. The record contains no suggestion that Mr. Singer feared arrest or assault from another source. There is also abundant testimony of the police officers' efforts to identify themselves and his reaction to their movements. Considering all of this evidence, there can be no issue of fact as to whether Mr. Singer knew them to be police officers. Given this fact and the officers' obvious authority to place Mr. Singer in custody, Mr. Singer had a duty to submit peaceably to arrest.

There is also no question of fact presented by the record as to whether Mr. Singer had his gun out and was waving it at the officers prior to the time he was shot. All ten arresting officers so testified, Mrs. Esther Watson so testified, and Mrs. Singer so testified. It is obvious, however, that the use of deadly force would not have been justified unless Officer Jolley reasonably believed such force to be necessary to protect his life. The court must therefore examine the evidence concerning Mr. Singer's actions at the exact moment when Jolley fired his shotgun.

Officer Jolley testified in his deposition that at the time he fired, Mr. Singer was running with his head sticking back over his shoulder, pointing a pistol from shoulder level directly at Officer Jolley, with his left eye closed as if to aim the pistol. Mr. Jolley's account is corroborated by the testimony of the other officers who were observing Mr. Singer, consistent with their respective vantage points at the time.

Mrs. Singer's testimony does not in any way contradict the account given by the arresting officers. From the time she saw Mr. Singer waving the pistol at the police officers to the time she heard a shot, she only took a couple of steps towards the bedroom. Mrs. Singer testified that at the time she saw him he was facing south, which is consistent with the officers' testimony that Mr. Singer was running sidewards to the east, looking to the west over

his right shoulder. The only potential discrepancy in the testimony of all the witnesses is the testimony of Charlotte Singer, who was observing her father through binoculars. Charlotte testified in her deposition that she saw her father run two or three or four steps, that her father was looking upward and that he was facing her. The court does not find it necessarily inconsistent that Charlotte could see her father's face at the same time as Mr. Jolley, given their respective vantage points. Officer Gunderson's testimony is consistent with this possibility, as he testified that, being to Jolley's left, he could not really see Mr. Singer's face at the time he was shot. Were the court to permit an inference from Charlotte's testimony that Mr. Singer was not looking at Officer Jolley at the time Jolley shot him, the court would not consider this inference sufficient to contravene the credible facts on the record established by the testimony of the officers and Mrs. Singer.

There is no question that Officer Jolley shot Mr. Singer, and no question of fact exists that this shot produced a fatal wound.[50] Plaintiffs' pathology experts raise a question which must be addressed as to whether Mr. Singer was shot more than once. Dr. J. Wallace Graham, the Utah State Medical Examiner who performed the autopsy on Mr. Singer's body, testified in his deposition that, while the wounds were consistent with the events as described to him by Summit County Attorney Adkins, the wounds could also be consistent with a set of facts in which the body was shot more than once or shot from different places or distances. *See* Deposition of J. Wallace Graham at 52–54. Graham also testified that six of the eight wounds could have been caused by ammunition other than shotgun pellets.[51] *Id.* at 59–60. Three pathology experts for the plaintiffs testified in depositions that Mr. Singer was shot at least twice, due to the plane and angle of one of the wounds in the body. Dr. Werner Spitz testified in his deposition that the evidence supported two shots being fired, one from a shotgun fired from about thirty feet away, and the other a single shot that he believed to have come from a handgun. Deposition of Werner V. Spitz at 7. Dr. Heinz Karnitschnig testified that based on the autopsy protocol prepared by Dr. Graham, it was impossible for the wound suffered by Mr. Singer to have come from a single shotgun blast, because of the discrepancy in the trajectories of the wounds. Deposition of Heinz Karnitschnig at 11. Dr. Karnitschnig did not offer an opinion as to whether the wounds were caused by shotgun pellets or by a bullet from a handgun. *Id.* at 66. He also could not say whether Mr. Singer was shot more than twice. Professor Ralph F. Turner testified in his deposition that, based partially on information given to him by Dr. Spitz, it was his opinion that two shots were fired into Mr. Singer, one from a shotgun and one from a handgun. Deposition of Ralph F. Turner at 12. Professor Turner could not offer an opinion as to which shot was fired first, the amount of time between the shots, or which shot caused Mr. Singer's death. *Id.* at 114.[52]

This testimony is instructive both for the information it contains and for the information it does not contain. None of plaintiffs' experts who claim that two or more shots

---

**50.** The Jolley shot produced a fatal wound unless more than two shots were fired into Mr. Singer. As will be discussed further, *infra,* the pathological evidence in the case, viewed alone, does not rule out the possibility that Mr. Singer was shot as many as six times. None of the pathology experts claimed that Mr. Singer must have been shot more than twice; nor does any other evidence support such a notion. Because at least one of the wounds caused by a shot other than the alleged second shot was fatal, there can be no question of fact that the Jolley shot caused fatal injuries to Mr. Singer.

**51.** The two which he did not exclude were of course the two where the buckshot were recovered from the body.

**52.** Of course, defendants have produced experts who opine that the physical evidence supports only a one-shot theory. *See* Deposition of Lucien Haag; Deposition of Rudiger Breitenecker; Deposition of Charles S. Petty.

were fired could express an opinion as to which shot was fired first or the amount of time between the shots. *E.g.,* Deposition of Ralph F. Turner at 114. There is also no pathological evidence as to whether Mr. Singer was standing or lying on the ground when the alleged second shot was fired. *See* Deposition of Heinz Karnitschnig at 93. The alleged second shot had to have been fired from a distance of at least three or three and one-half feet, but could have been from a much greater distance. *See* Deposition of Werner V. Spitz at 111.

In essence, the pathology experts' testimony gives rise to a question of fact as to whether a second shot was fired, but adds little in the way of determining the circumstances under which the alleged second shot was fired. The court must therefore examine the deposition testimony of the various witnesses to the shooting to determine the effect of an alleged second shot as it relates to this claim for relief. The testimony of plaintiffs' experts is corroborated by the testimony of Grant Black and three Singer children, who heard a second shot fired. The children's testimony as to the time between the shots is inconsistent and therefore inconclusive. At the same time, Timothy Singer, who was in the same proximity as the other children, heard but one shot. Mrs. Singer heard only one shot. Perhaps the most neutral observer to the events, and one very close to the scene, Mrs. Esther Watson, heard only one shot. None of the shooters heard more than one shot. Taken as a whole, the testimony of all the witnesses barely supports the second shot theory.

Assuming for the moment a second shot was fired, the court must examine the undisputed. testimony as to when and by whom that shot might have been fired. If the shot was fired simultaneously with Mr. Jolley's shot, the second shot would have to have been fired by either Officer Fullmer, who was on the back of Officer Gunderson's snowmobile, or by Officer Hayward, who was to the side of the Watson home. There is no evidence in the record that Officer Gunderson had his pistol out prior to or simultaneously with Mr. Jolley's shot. There is no evidence in the record to support less than the wildest speculation as to whether Officer Fullmer or Officer Hayward fired a shot at Mr. Singer. Any issue as to this possibility cannot be submitted to a jury.

Perhaps less speculative would be an issue as to whether Officer Gunderson shot Mr. Singer at some time after Officer Jolley shot him. The only evidence to support this issue is the fact that Mr. Gunderson had his gun out, that he pointed it at Mr. Singer's body on the ground, and that he told Officer Jolley later that he fired also. At the same time, it is incredible that, their attention having been alerted by the initial shot, Mrs. Singer, Timothy, and Esther Watson did not hear the second shot. Were the testimony of the officers the only support for the proposition that a single shot was fired, the court might view the evidence differently. Considering all of the evidence, the court is constrained to rule that the issue of whether a second shot was fired does not give rise to a question of fact as to whether the officers used excessive force in attempting to arrest Mr. Singer.

The court admits that it makes this decision with some misgivings, but not without the utmost consideration of the record in this case. The only alternative, in this court's view, would be to allow the jury at trial to guess as to what actually occurred. In addition, were the court to rule that a question of fact existed as to excessive force in the arrest attempt, the court would be constrained to rule, based on the facts in the record, that such an issue existed only with regard to defendant Gunderson. This is so because the pathological evidence is irrelevant insofar as determining the intent of the arrest team or the existence of any agreement between them to cause a particular result. Assuming Gunderson fired a second shot, that fact certainly would give rise to an issue as to whether Officer Gunderson acted with malice or with gross

negligence.[53] It is a much further leap, however, to infer such a motive on the part of the other members of the arrest team. *See, e.g., Richardson v. City of Indianapolis,* 658 F.2d 494, 500 (7th Cir.1981); *Hamrick v. Lewis,* 539 F.Supp. 1166, 1170 (N.D. Ill.1982). In this court's view, the evidence in no way supports such an inference.

Even if such an inference could be drawn with regard to the other members of the arrest team, such an inference could hardly be drawn with regard to the Summit County Attorneys, Sheriff Robinson, Mr. Wadman, Mr. Lunnen, and Governor Matheson. It would require the most incredible inference from these facts to find that, for example, Governor Matheson acted jointly with the arrest team to use excessive force in arresting Mr. Singer, to the extent of shooting him after he had already been shot and was lying on the ground. In short, were the court to find an issue of fact existing as to excessive force, that issue would only be with regard to defendant Gunderson.

■ Plaintiffs also allege that defendants were negligent or grossly negligent under this claim because they "failed to render standard medical assistance and failed to take reasonable steps to protect against the death of John Singer." The exact timing of Mr. Singer's death is unknown. The statement of facts details the steps taken by the arrest team to transport Mr. Singer to a medical facility. This conduct cannot be said to have been grossly negligent, but even were the court to assume it to be negligent, the evidence is undisputed that Mr. Singer's wounds caused by Mr. Jolley's shot were undeniably fatal. Thus, any such negligence did not contribute to Mr. Singer's death. As one of plaintiffs' experts, Dr. Karnitschnig, testified:

> ... If he had been shot outside an operating room with a team of thoracic surgeons waiting there with their gloves on, and getting in there really fast, there is

an outside chance that perhaps they could have patched him up and gotten him going again. But I would doubt that.

Deposition of Heinz Karnitschnig at 70. *See also* Deposition of Werner V. Spitz at 106; Deposition of J. Wallace Graham at 92–93.

For the foregoing reasons, the court rules as a matter of law that the defendants are entitled to a summary judgment under this claim.

### F. *Count Five*

■ The fifth claim for relief alleges a cause of action under § 1983 for the same conduct in planning and carrying out the arrest as alleged in claims three and four. This claim alleges that the defendants conspired to deprive the plaintiffs of their rights to due process, to life and liberty, and to be free from cruel and unusual punishment. The claim is brought by Vickie Singer, as personal representative of the heirs of Mr. Singer, against all the defendants named in claims three and four.

In light of the court's analysis under claims three and four, very little need be said with regard to this claim. There is no evidence in the record to support an inference that these defendants agreed to commit an unlawful act or to commit a lawful act using unlawful and excessive force. The court therefore rules as a matter of law that plaintiffs' claim of conspiracy under this count must fail.

■ The court also finds that there has been no deprivation of a constitutional right by the defendants' conduct alleged under this claim. The court has already held that the defendants' conduct does not raise a question of fact as to whether they acted with gross negligence, or even negligence. Thus, while the court is aware of the dispute concerning the appropriate standard under § 1983, it need not reach this issue here. It suffices to say that defendants' conduct did not meet the stan-

---

**53.** The court chooses not to engage in any debate as to whether Gunderson's alleged shot was irrelevant because Mr. Singer would have already been fatally wounded. The alleged shot certainly is relevant to both gross negligence and malice.

dard required to establish a constitutional deprivation under this claim.

The proper standard is perhaps even less certain in light of the United States Supreme Court ruling in *Harlow v. Fitzgerald*, which brings us to the question of immunity. Assuming the court found that the plaintiffs' constitutional rights were deprived by defendants' conduct, the court would conclude as a matter of law that the defendants, with the possible exception of defendant Gunderson, were immune from suit under this claim. There is no objective evidence in the record to raise an issue of fact as to whether these defendants knew or should have known that their conduct would deprive the plaintiffs of their constitutional rights. For the above reasons, the court grants summary judgment to the defendants under the fifth claim for relief.

G. *Counts Six and Seven*

■ Claims six and seven allege pendent claims under Utah law against all defendants except Riggs for outrage, intentional infliction of emotional harm, and negligent infliction of emotional harm. Because outrage and intentional infliction of emotional harm are basically the same tort, *see Stewart v. Thomas*, 538 F.Supp. 891, 894 (D.D.C.1982), the court will strike the claim for outrage and will consider count six to allege intentional infliction of emotional harm and count seven to allege negligent infliction of emotional harm.

The Restatement (Second) of Torts § 46 states:

(1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.
(2) Where such conduct is directed at a third person, the actor is subject to liability if he intentionally or recklessly causes severe emotional distress

(a) to a member of such person's immediate family who is present at the time, whether or not such distress results in bodily harm, or
(b) to any other person who is present at the time, if such distress results in bodily harm.

Section 46 "creates liability only where the actor intends to invade the interest in freedom from severe emotional distress." *Id.* at 47, Comment a.

It has not been enough that the defendant has acted with intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort.

*Id.* § 46, Comment d.

The first question for this court's determination is therefore whether there is evidence in the record to support an allegation that the defendants, by extreme and outrageous conduct, intentionally or recklessly inflicted severe emotional distress on these plaintiffs.[54] "Recklessness" can be found where a person acts "in deliberate disregard of a high degree of probability that the emotional distress will follow." *Id.* This requirement of § 46 can be met by a showing of extreme and outrageous conduct that "is certain, or substantially certain," to inflict severe emotional harm. *See id.* § 46 Comment i.

■ To the extent that this claim is based on the defendants' conduct in killing Mr. Singer, there is no evidence in the record to support a claim based on intent. The plan of the arrest attempt was to arrest Mr. Singer away from the presence of his family, and the arrest attempt was initiated when it was determined that Mr. Singer was so isolated. In short, there is no evidence that defendants shot Mr. Singer with the intention of causing severe

---

**54.** Plaintiffs do not contend that they are entitled to recover for the intentional infliction of emotional distress on Mr. Singer. While such an allegation is perhaps implicit in claims six and seven, plaintiffs have not argued in their memoranda such a claim. The court notes, in any event, that, assuming Mr. Singer had such a claim before his death, it probably did not survive his death as a separate cause of action. *See* Utah Code Ann. § 78–11–12 (1977).

emotional distress to the members of his family, who were not immediately present at the shooting.

The court cannot conclude as a matter of law that severe emotional distress would not be highly probable to result from the shooting of Mr. Singer. On the contrary, the shooting to death of a father and husband is highly likely to result in severe emotional distress to the members of the family, who, although not present at the immediate scene of the shooting, might be expected to witness the shooting from a distance or to appear almost immediately after the shooting.

■ An additional consideration is raised by the elements of section 46, however. Comment g to § 46 states:

> The conduct, although it would otherwise be extreme and outrageous, may be privileged under the circumstances. The actor is never liable, for example, where he has done no more than to insist upon his legal rights in a permissible way, even though he is well aware that such insistence is certain to cause emotional distress. Apart from this, there may perhaps be situations in which the actor is privileged to resort to extreme and outrageous words, or even acts, in self-defense against the other, or under circumstances of extreme provocation which minimize or remove the element of outrage.

In short, there cannot be liability under § 46 where the actor is legally justified in undertaking the conduct. Thus, if the defendants were justified in prosecuting the Singers, justified in attempting to place him in custody, justified in using deadly force in self-defense, and justified in placing Mrs. Singer and the Singer children in custody, there can be no liability under § 46 of the Restatement, regardless of whether each particular action was extreme and outrageous and in deliberate disregard of a high degree of probability that emotional distress would follow.[55] In ac-

cordance with the court's previous analyses, the court cannot say that the defendants' conduct was not privileged under the particular circumstances presented here. Defendants are therefore granted a summary judgment as to the claim of intentional infliction of emotional harm.

With regard to the claim that defendants' conduct negligently inflicted emotional harm on the plaintiffs, the court notes that the Utah Supreme Court has made it abundantly clear that "a cause of action for emotional distress may not be based upon mere negligence." *Reiser v. Lohner*, 641 P.2d 93, 100 (Utah 1982). *See also Covert v. Kennecott Copper Corporation*, 23 Utah 2d 252, 461 P.2d 466 (1969); *Samms v. Eccles*, 11 Utah 2d 289, 358 P.2d 344 (1961). None of these cases, however, specifically addressed liability for emotional harm caused by negligent conduct where the emotional harm resulted in physical illness or bodily harm. In this court's view, these cases do not dispose of a claim based on those facts.

■ This court determines that were the Utah Supreme Court to recognize a cause of action based on negligent infliction of emotional harm, it would require as a minimal predicate to such liability either that physical harm resulted from the emotional distress and/or, where the illness or bodily harm was caused by emotional distress arising solely from harm or peril to a third person, that the person suffering the emotional harm was also within the "zone of danger." This court need not speculate on the exact limits which the Utah Supreme Court might impose on such a cause of action were it to be recognized, for the facts of this case do not support a claim of negligent infliction of emotional harm. As the court has already discussed, the defendants' conduct was justified. In addition, none of the plaintiffs here were endangered at the time Mr. Singer was shot. Likewise, plaintiffs have failed to specify any evidence that they suffered physical

---

**55.** In so stating, the court does not reach any conclusions as to whether the defendants' conduct apart from the shooting incident itself

would meet the other elements of an intentional infliction of emotional harm claim.

injury as a result of emotional distress. The court in its own perusal of the record cannot find any evidence of physical harm sufficient to satisfy this claim, except as to Charlotte. *See* Vickie Singer Journal at 926 & 970–71. *But cf. id.* at 868; Deposition of Charlotte Singer at 13 (illness prior to shooting).

Some of the case law applying Utah law in this area tangentially supports the court's conclusion. In *Madison v. Deseret Livestock Company,* 574 F.2d 1027 (10th Cir.1978), the Tenth Circuit affirmed a district court ruling that granted summary judgment on claims by a wife for "physical and emotional trauma resulting from the witnessing of [her] husband's suffering after the accident." *Id.* at 1032. This case emphasized the immediacy required for a negligence cause of action based on conduct directed at a third party. The Utah Supreme Court in *Covert v. Kennecott Copper Corporation,* 23 Utah 2d 252, 461 P.2d 466 (1969), affirmed a summary judgment with regard to claims for emotional harm unaccompanied by physical injury based on negligence. In that case, the plaintiffs argued that the recovery for emotional distress should be allowed more liberally because mutilation and desecration of the body of plaintiff's deceased husband was involved. The Utah Supreme Court disagreed, noting that the defendant's employees acted in an emergency situation with the hope of saving the plaintiff's husband's life. Considering all of the above, the court holds that were the Utah Supreme Court to be faced with the facts of this case it would not find them sufficient to make out a claim for negligent infliction of emotional distress.

The court also notes that this cause of action, insofar as it is based on negligence alone, may be barred by the Utah Governmental Immunity Act, Utah Code Ann. § 63–30–4 (Supp.1981), insofar as this action is solely brought against the individual employees of the various governmental entities. See discussion *supra* at Subpart D.

## H. *Count Eight*

■ Plaintiffs' eighth claim for relief alleges that all of the defendants to this action deprived the plaintiffs of their right under the Constitution to be free from malicious prosecution, their right to freedom from false prosecution, their right to freedom from harassment and intimidation, their right of privacy, and their right to be free from "outrage" or intentional infliction of emotional harm. Most of these claims have been addressed elsewhere in this court's decision and merit no further discussion here. With regard to the last allegation, the court notes that there is no constitutional right to be free from intentional infliction from emotional harm. *See, e.g., Brainerd v. Potratz,* 421 F.Supp. 836 (D.Ill.1976). As the Tenth Circuit recently stated:

> "Section 1983 imposes liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law. Remedy for the latter type of injury must be sought in state court under traditional tort-law principles. Just as "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner," *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976), false imprisonment does not become a violation of the Fourteenth Amendment merely because the defendant is a state official."

*Major v. Benton,* 647 F.2d 110, 113 (10th Cir.1981) (quoting *Baker v. McCollan,* 443 U.S. 137, 146, 99 S.Ct. 2689, 2695, 61 L.Ed.2d 433 (1979)). The Tenth Circuit went on in *Major v. Benton* to hold that a death "resulting from the negligent action of a state official does not in itself raise a constitutional claim." *Id.* at 113. *See also Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976) (defamation did not deprive plaintiff of liberty without due process of law).

The court will thus grant a summary judgment to all defendants under this claim.

## I. *Count Nine*

 Count nine alleges that the defendants "covered up" their wrongful acts and thereby deprived the plaintiffs of their constitutional right to free access to the courts, and their right "to public information necessary to freely prosecute plaintiff's claims against the defendants without interference, as guaranteed by the Fifth and Fourteenth Amendments." At the outset it should be noted that while this claim is brought on behalf of all plaintiffs in all their respective capacities, Mr. Singer had no claim under these allegations prior to his death and therefore the claims brought by his estate do not state a cause of action. Following Mr. Singer's death, he was not a "person" for purposes of 42 U.S.C. § 1983. *See Silkwood v. Kerr-McGee Corporation,* 637 F.2d 743, 749 (10th Cir.1980); *Guyton v. Phillips,* 606 F.2d 248, 250–51 (9th Cir. 1979). The court thus addresses the allegations under count nine with regard to the rights of the individual plaintiffs.

 Plaintiffs allege under this claim that the defendants conspired to "secrete" the identity of the arrest team, to intentionally misrepresent facts to the news media with the object of misleading and confusing the public, to cover up the medical facts of the shooting, to avoid conducting public inquiries and investigations, to cover up the fact that more than one shot was fired by more than one shooter by deliberately giving false information to the public and the plaintiffs, to fail to preserve evidence and make a proper investigation of the scene, to fail to preserve the projectiles removed from Mr. Singer's body to preclude testing of such projectiles, and to fail to preserve the weapons carried by the arrest team for inspection. The conspiracy alleged under this cause of action is a separate and distinct wrong based on different facts from the conspiracies alleged in the other causes of action. *See Landrigan v. City of Warwick,* 628 F.2d 736, 741 (1st Cir.1980); *Hampton v. Hanrahan, supra,* 600 F.2d at 621. The objective of the conspiracy here is entirely different from the objective of the conspiracies under the other claims.

Thus, even were a conspiracy found to exist under this claim, it would not necessarily indicate any liability for the alleged prior constitutional deprivations, unless the facts demonstrate the earlier agreement encompassed the objective of covering up the wrongful acts. *See Silkwood v. Kerr-McGee Corporation,* 637 F.2d at 749. As the court has discussed previously, there is no evidence to support the allegations that an agreement existed to commit the acts alleged by the plaintiffs, and there is likewise no evidence that the defendants conspired prior to the shooting to cover up unlawful acts.

 Plaintiffs would have the court infer from the events which occurred subsequent to Mr. Singer's death that all of the defendants agreed to cover up evidence of their unlawful conduct. Were the evidence sufficient to raise a question of fact as to whether the arrest team used excessive force, it might be inferred that the officers present entered into an agreement to secrete this fact. Barring such an assumption, the court cannot infer from the evidence in the record that any of the defendants agreed to cover up their unlawful conduct. There is no evidence that the separate actions undertaken deliberately with the objective of harming the plaintiffs. The court cannot infer from these separate incidents that an agreement existed to cover up any wrongful actions.

Neither can the court find any evidence sufficient to raise a question of fact that the defendants' conduct violated plaintiffs' constitutional rights. The essence of both of the claimed deprivations here is due process of law. The United States Supreme Court cases construing a right of access to the courts in the context of the due process clause have interpreted such a right very narrowly. *See United States v. Kras,* 409 U.S. 434, 93 S.Ct. 631, 34 L.Ed.2d 626 (1973); *Boddie v. Connecticut,* 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971). For the most part, this right extends only so far as the availability of the judicial process to resolve disputes. *See Doe v. Schneider,* 443 F.Supp. 780, 787

(D.Kan.1978). The right of access is not so broad as to include a "right to know" the facts supporting a possible cause of action. *Id.* As stated in *Doe v. Schneider:*

> Every plaintiff has the duty of proving that there was a duty owing on the part of the defendant, that defendant breached that duty and as a result thereof plaintiff has been injured. Plaintiffs cannot relieve themselves from these burdens by merely alleging they are being denied their constitutional right of access to the courts.

*Id.* at 788.

■ This is not to say that a coverup could never amount to a violation of due process. *See, e.g., Hampton v. Hanrahan, supra.* In this court's view, however, the conduct would have to be both deliberate and so egregious as to make a plaintiff's access to the courts virtually meaningless. The facts alleged here demonstrate neither the deliberation nor the severity required for the court to find a question of fact as to whether the plaintiffs' due process right. has been deprived. Therefore the court grants the defendants summary judgment under this claim.

## IV. CONCLUSION

In accordance with the above analyses, summary judgment is granted all defendants under all of the claims for relief. Accordingly, the court need not address the other motions pending at this time with the exception of the motion to consolidate this action with the similar action against Dr. Talbot. That motion is denied and considering the action taken in this case. The pretrial and trial dates are vacated.

Defendants shall prepare an appropriate judgment.